# EXHIBIT 1



Search ⌕



# R. TODD NEILSON
**Director**

Los Angeles,
2049 Centur
Suite 2525
Los Angeles,

---

BRG Directory

DUHDV RI
H[SHUWVH

Bankruptcy and
Insolvency

Corporate
Recovery and
Reorganization

Damages
Analysis

Fiduciary Services

Finance and
Valuation

Financial Services

Forensic
Accounting and
Investigations

VHP LQDUV #)

R. Todd Neilson is currently a Director at Berkeley Research Group LLC. Previously, Mr. Neilson was a Director with LECG LLC and was a founding partner of Neilson Elggren LLP (formerly Neilson, Elggren, Durkin & Co.). He is one of the nation's foremost experts in bankruptcy and forensic accounting with over thirty years combined experience in public accounting and as a Special Agent with the FBI.

In 1986, he was a founding partner of Neilson, Elggren, Durkin and Co., which was acquired by an international financial consulting firm in March 1998, where Mr. Neilson was a partner from March 1998 to September 2000. Prior to 1986, he was a manager in the Litigation/Consulting Services department of the international CPA firm of KMG/Main Hurdman for four years and also served as a special agent in the Federal Bureau of Investigation, specializing in accounting investigation of white-collar and organized crime. Due to his background, Mr. Neilson offers a unique set of skills in the areas of financial consulting and as an expert in the field of forensic accounting and fraud litigation.

Mr. Neilson is a seasoned professional having acted as a Trustee, CRO, financial consultant and expert witness in numerous high-profile accounting related litigation engagements involving complex bankruptcy reorganization matters including accounting and fraud issues, tracing of funds, financial data reconstruction, damages and lost profits, Ponzi and RICO matters, valuation, and business viability issues. Mr. Neilson has acted as bankruptcy Trustee and CRO for notable clients such as Mike Tyson, Suge Knight, Solyndra and

**page 6**

SUBSCRIBE | CONTACT 1.877.696.0390 | info@BRG-expert.com

**ATLANTA   BALTIMORE   BOGOTÁ, COLOMBIA   BOSTON AREA   CALGARY   CHICAGO**
**COLLEGE STATION   DALLAS   DETROIT   EMERYVILLE   HOUSTON   LOS ANGELES AREA**
**NEW YORK   PENSACOLA   PHILADELPHIA   PHOENIX   PITTSBURGH   SALT LAKE CITY**
**SAN DIEGO   TAMPA   WASHINGTON, DC   LONDON, UK   PERTH, WESTERN AUSTRALIA**

May 10, 2012

y Research Group LLC     Privacy     Site Map     Contact     Disclaimer     Site by
Firmcook

QHZ V\|
FRPPHQWDU\
Solyndra
Bankruptcy
Reorganization
Wins ACG Energy
Deal of the Year
June 20, 2013

Berkeley
Research Group
Announced as
Finalist for ACG
New York
Champion's
Awards
Press release
June 14, 2013

Ex-FBI Agent,
Solyndra CRO
Named 'Girls
Gone Wild'
Trustee
Law360
April 17, 2013

**More +**

Mr. Neilson is a nationally recognized expert in bankruptcy and accounting having served on the national Board of Directors of the Association of Insolvency and Restructuring Advisors, Chairman of the Securities Advisory Board in the State of Utah, faculty for the Certified Fraud Examiners, and a member of the Society of the Former Special Agents of the Federal Bureau of Investigation. He has spoken on bankruptcy, litigation support, valuation and fraud related topics to numerous professional groups such as American Institute of Certified Public Accountants (AICPA), National Conference of Bankruptcy Judges, California and Utah Society of CPA's and numerous colleges and universities throughout the United States. Mr. Neilson presently serves as an Associate Professor in the Graduate School of Accounting at the University of Utah, where he teaches a course on Forensic Accounting. He also provides regular instruction on fraud related litigation issues at the FBI Academy to CPA/FBI Agents. He is a co-author of the *AICPA Bankruptcy Practice Guide*, issued as a practice aid to all CPA's in the United States and co-author of *The CPA's Handbook of Fraud and Commercial Crime Prevention*, also issued by the AICPA. He was also inducted as a fellow in the prestigious American College of Bankruptcy, one of only a handful of CPA's in the United States given that honor.

Mr. Neilson has been involved in some of the highest profile litigation and bankruptcy matters in the nation. Highlighted below are some of the cases, which demonstrate his unique background and experience.

HGXFLWLRQ

○ University of Utah
B.S., 1975

HPSOR\PHQW#KLVWRU\

○ University of Utah Graduate School of Accounting
Associate professor

○ LECG, LLC
Director

**page 7**

# EXHIBIT 2

page 8



## R. Todd Neilson, Director

2049 Century Park East, Suite 2525
Los Angeles, California 90067
Direct:  310.499-4934
Fax:      310.557-8982
Email:  tneilson@brg-expert.com

### Summary

R. Todd Neilson is currently a Director at Berkeley Research Group LLC.  Previously, Mr. Neilson was a Director with LECG LLC and was a founding partner of Neilson Elggren LLP (formerly Neilson, Elggren, Durkin & Co.). He is one of the nation's foremost experts in bankruptcy and forensic accounting with over thirty years combined experience in public accounting and as a Special Agent with the FBI.

In 1986, he was a founding partner of Neilson, Elggren, Durkin and Co., which was acquired by an international financial consulting firm in March 1998, where Mr. Neilson was a partner from March 1998 to September 2000.  Prior to 1986, he was a manager in the Litigation/Consulting Services department of the international CPA firm of KMG/Main Hurdman for four years and also served as a special agent in the Federal Bureau of Investigation, specializing in accounting investigation of white-collar and organized crime. Due to his background, Mr. Neilson offers a unique set of skills in the areas of financial consulting and as an expert in the field of forensic accounting and fraud litigation.

Mr. Neilson is a seasoned professional having acted as a Trustee, CRO, financial consultant and expert witness in numerous high-profile accounting related litigation engagements involving complex bankruptcy reorganization matters including accounting and fraud issues, tracing of funds, financial data reconstruction, damages and lost profits, Ponzi and RICO matters, valuation, and business viability issues.  Mr. Neilson has acted as bankruptcy Trustee and CRO for notable clients such as Mike Tyson, Suge Knight, Solyndra and Death Row Records.  As Trustee, he has also operated, and negotiated the sale of an extremely large and diverse array of assets, including one of the largest Ford dealerships in the nation, an ownership interest in both the Los Angeles Kings' and Nashville Predators' hockey franchises, luxury hotels, sand and rock quarries, antique art collections, real estate, and trucking companies. Having evaluated and sold well over $1 billion dollars of assets, Mr. Neilson brings substantial credibility to the court - credibility borne of practical, not just theoretical experience.

Mr. Neilson is a nationally recognized expert in bankruptcy and accounting having served on the national Board of Directors of the Association of Insolvency and Restructuring Advisors, Chairman of the Securities Advisory Board in the State of Utah, faculty for the Certified Fraud Examiners, and a member of the Society of the Former Special Agents of the Federal Bureau of Investigation.  He has spoken on bankruptcy, litigation support, valuation and fraud related topics to numerous professional groups such as American Institute of Certified Public Accountants (AICPA), National Conference of Bankruptcy Judges, California and Utah Society of CPA's and numerous colleges and universities throughout the United States. Mr. Neilson presently serves as an Associate Professor in the Graduate School of Accounting at the University of Utah, where he teaches a course on Forensic Accounting. He also provides regular instruction on fraud related litigation issues at the FBI Academy to CPA/FBI Agents. He was a co-author of the *AICPA Bankruptcy Practice Guide*, issued as a practice aid to all CPA's in the United States and co-author of *The CPA's Handbook of Fraud and Commercial Crime Prevention*, also issued by the AICPA.  He was also inducted as a fellow in the prestigious American College of Bankruptcy, one of only a handful of CPA's in the United States



given that honor.

Mr. Neilson has been involved in some of the highest profile litigation and bankruptcy matters in the nation.  Highlighted below are some of the cases, which demonstrate his unique background and experience.

**Examples**
*American Suzuki Motor Corporation*
American Suzuki Motor Corporation ("ASMC"), a California corporation and a subsidiary of parent Suzuki Motor Corporation ("SMC"), filed a Chapter 11 Bankruptcy in November 2012, which effectively allowed for the transfer and sale of all business assets of ASMC, not affiliated with car sales, to SMC and facilitated the withdrawal of Suzuki from all new car sales in the United States. Prior to the filing, R. Todd Neilson, and another independent Board member, was added to the ASMC Board of Directors. Neilson, and the other independent Director, constituted a separate Committee ("Committee") and were tasked with the responsibility of reviewing the underlying assets of the Debtor, the intended Plan of Reorganization and implementation of the proposed Plan in order to make an independent decision as to the filing of a Chapter 11. The Committee ultimately authorized the filing of the ASMC Chapter 11, monitored the administration of the Bankruptcy, and following confirmation of the Chapter 11 Plan, remained as an Advisory Board to review the implementation of the Plan and distribution of assets pursuant to the Plan.

*Tremont v. KPMG*
R. Todd Neilson was engaged as a damage expert in the litigation between Tremont Holdings Group Inc. ("Tremont") and KPMG in relation to investments made with Bernard L. Madoff Investment Securities ("BMIS"). Tremont was the second largest investor with BMIS with billions of dollars invested over fourteen years. Following the appointment of Irving Picard as Chapter 11 Trustee, Picard brought litigation against Tremont and related entities asserting a number of avoidance actions and equitable subordination claims. As a result of that litigation, Tremont settled with Picard for over a billion dollars. Subsequent to the settlement, a complaint was filed by Tremont against KPMG as independent auditors of the Tremont funds asserting billions of dollars in damages as a result of KPMG's audit insufficiencies. Neilson was asked to provide an expert opinion as to the damages suffered by the Tremont entities due to the alleged inadequacies in the KPMG audits. Neilson issued an expert report in April 2013 contesting the damages asserted against KPMG by Tremont. As a result of the expert report, the Tremont claimants withdrew their previously asserted damage analysis.

*Solyndra LLC*
In late 2011, following a national search by the Solyndra Board of Directors, Mr. Neilson was appointed as Chief Restructuring Officer (CRO) of Solyndra, the US manufacturer of solar photovoltaic power systems specifically designed for large commercial and industrial rooftops.  On August 31, 2011, subsequent to receiving a $535 million loan guarantee from the Department of Energy (DOE), Solyndra had approximately 968 full time employees and 211 temporary employees. On September 6, 2011, Solyndra was unable to continue active business operations and filed a Chapter 11 Bankruptcy.  Mr. Neilson is supervising the efforts at selling the remaining assets of Solyndra and also provided a detailed report concerning Solyndra business operations to both the Court and other interested parties. In 2013 Mr. Neilson and BRG was awarded one of the Champion Awards for Energy Deal of the Year for their work in Solyndra by ACG New York and the M & A Advisory.

*Ezri Namvar*



Mr. Neilson is acting as Chapter 11 Trustee for the Ezri Namvar bankruptcy. Mr. Namvar, a well known member of the Iranian Jewish Community in Los Angeles, has received $3 billion in investments and loans over the past 5 years and disbursed those funds through close to 400 separate LLC's involving ownership in a wide array of assets such as hotels, golf courses, low-income housing projects, pistachio farms, conference center sites, medical buildings and ground leases. Mr. Neilson is assisting in the task to untangle this multitude of inter-related LLC's involving Mr. Namvar. Mr. Namvar was convicted of fraud following a trial and is presently incarcerated in a federal prison.

*Roman Catholic San Diego Diocese Chapter 11 Bankruptcy*
In April 2007, Mr. Neilson was the Court Appointed Expert in the Chapter 11 Bankruptcy of the Roman Catholic San Diego Diocese. The Court charged Mr. Neilson with providing an expansive report into the accounting and financial operations of the San Diego Diocese as well as related Catholic Parishes. It was the first time an independent Expert has been appointed for such a task in regards to a number of the Diocese bankruptcies throughout the United States.

*Le Nature Chapter 11 Bankruptcy*
In 2007, Mr. Neilson was appointed Chapter 11 Bankruptcy Trustee in Le Nature, a water, iced tea, and juice drink distributor located in Latrobe, Pennsylvania and Phoenix, Arizona. Mr. Neilson supervised the liquidation of Le Nature bottling plants and other assets as well as conducted the forensic accounting analysis of a purported $750 million accounting fraud perpetrated upon the creditors of Le Nature and related companies.

*Michael Tyson and Michael Tyson Enterprises*
Michael Tyson, former heavyweight champion of the world, and Michael Tyson Enterprises Inc. filed for bankruptcy protection in August 2003. Neilson Elggren was appointed as financial consultants and crisis managers for Mr. Tyson and Michael Tyson Enterprises Inc. Mr. Neilson is the responsible partner for that engagement.

*Adelphia Communications Corp*
In August 2002, Neilson Elggren was appointed as Accountants to the Official Committee of Unsecured Creditors in the Adelphia Communications Corp ("Adelphia") bankruptcy. The Adelphia bankruptcy was the 6th largest cable company in the nation. Their filing constituted one of the largest bankruptcies in history encompassing over 200 subsidiaries and approximately $21 billion in accumulated debt. Mr. Neilson acted as the primary partner in charge of the engagement. The prior owners of Adelphia, members of the Rigas family, were alleged to have engaged in the systematic looting of Adelphia. Neilson Elggren was engaged to the voluminous financial transactions of Adelphia and provide expert testimony as to their findings.

*DVI, Inc.*
DVI filed for Chapter 11 Bankruptcy protection on August 25, 2003. R. Todd Neilson was appointed as Examiner and conducted an extensive investigation of financial transactions involving the assets, liabilities, operations and financial condition of DVI and its subsidiaries (including all transactions and relationships between debtor and non-debtor subsidiaries and affiliates). DVI, with assets of approximately $3 billion, provided financing for diagnostic imaging and other sophisticated medical equipment. As part of its financing operations, DVI originated hundreds of millions of dollars in financing contracts and sold these contracts to institutional investors through over thirty (30)) investment-grade securitization vehicles. The accounting examination included the accounting practices of the debtor and any and all allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or financial and / or corporate irregularities. Mr. Neilson coordinated a cooperative effort involving numerous law enforcement and government agencies, including the Office of the U.S.



Trustee, the United States Attorneys' Office in Delaware and Pennsylvania, the Securities and Exchange Commission ("SEC"), the Federal Bureau of Investigation ("FBI"), and the United States Postal Service ("Postal Service"), all of which were tasked with conducting further investigations based upon the findings in the Examiner's report.

*IT Group*
In April 2002, R. Todd Neilson was appointed examiner in IT Group, a Chapter 11 bankruptcy in the District of Delaware. IT Group was a leading provider of services in the areas of consulting, engineering and construction, remediation, and facilities management. In 2000, IT Group had over 7,500 employees in 80 domestic offices and 10 international offices and its annual revenues on a consolidated basis were approximately $1.4 billion. Neilson provided a detailed report detailing the assets, liabilities, valuation and financial condition of IT Group as well as its capabilities of confirming a stand-alone plan of reorganization versus a sale of existing assets to an interested purchaser.

*Allegheny Health, Education and Research Foundation*
Chapter 11- Financial Advisors to Mellon Bank Group in Pittsburgh, Pennsylvania – AHERF was a large conglomerate of medical hospitals and research centers located in the eastern part of the US. Neilson Elggren was engaged as financial advisors to Mellon Bank Group Credit Facility to provide expert testimony concerning the whether substantive consolidation was justified for AHERF, and whether the Plan of Reorganization ("Plan") as proposed by the AHERF Trustee unfairly prejudiced one or more creditors. Neilson Elggren prepared a detailed report in response to the Plan, which resulted in a settlement favorable to the Mellon Bank Group.

*Reed Slatkin*
Reed Slatkin, one of the co-founders of Earthlink, filed Chapter 11 bankruptcy in 2001 following pending legal actions by many of the individuals who had invested millions of dollars with Slatkin under the promise of substantial returns. Neilson Elggren investigated Slatkin's enterprises and business practices over a period of fifteen years and provided a report detailing one of the largest Ponzi schemes in California history involving over $600 million of business transactions during that period. Mr. Neilson was appointed as Trustee in the Slatkin bankruptcy and was given the responsibility of liquidating substantial assets throughout the United States, including hotels, unimproved real estate, shopping malls, interests in movie production companies, and other substantial equity investments. Slatkin pled guilty and was incarcerated for a lengthy period in a federal prison.

*Charles Keating/Lincoln Savings*
Mr. Neilson was engaged as an expert witness in the litigation involving Charles Keating and American Continental Corporation, the parent company of Lincoln Savings, and the bondholders who invested approximately $250 million in the debentures of American Continental. He directed the review of approximately $727 million, which passed through American Continental from 1984 through 1989 and testified as to the findings in the federal District Court in Tucson, Arizona. The day after Mr. Neilson's testimony, two major defendants settled for over $90 million. Total settlements in this matter exceeded $300 million.

*Bruce McNall Chapter 11 Bankruptcy*
Mr. Neilson was appointed Chapter 11 Trustee in the personal bankruptcy of Bruce McNall in Los Angeles. Mr. McNall's holdings include ownership of the Los Angeles Kings hockey franchise, ownership interest in the Toronto Argonauts Canadian football franchise, as well as considerable holdings in thoroughbred horses, rare coins and antiques, and sports memorabilia. Mr. McNall was incarcerated for bank fraud. Mr. Neilson supervised the accounting investigation into Mr. McNall's past activities, which included tracing of over $2.5 billion in cash and asset transfers



*Technical Equities Chapter 11*
Mr. Neilson directed the accounting analysis detailing the financial demise of Technical Equities, a San Francisco based investment company and reportedly the largest investor fraud case in U.S. history. Harry Stern, former chief executive officer of Technical Equities, was sentenced to Federal prison for his role in the investor fraud. Mr. Neilson and his professionals traced almost $600 million in cash and prepared a damage analysis. As a result of his testimony, a settlement was achieved for the benefit of the creditors of Technical Equities.

*Adnan Khashoggi/Triad America*
He accepted the responsibility as Trustee of Triad America Corporation in the United States Bankruptcy Court. Triad America is the parent corporation of sixty separate companies with $200 million in total claims. Mr. Neilson directed the accounting and litigation effort, which resulted in the freezing of all assets in the United States, owned by Adnan and Essam Khashoggi and the subsequent payment of $32 million by Adnan Khashoggi to the estate.

*Property Mortgage Company*
Property Mortgage Company was a second mortgage company that had operated successfully in the Southern California area for over 40 years. The company filed for bankruptcy protection, asserting debts in excess of $100 million dollars to approximately 1,000 investors. Mr. Neilson was appointed as Trustee. In that capacity, he supervised the analysis of hundreds of millions of dollars flowing through the company. Based upon that review, we concluded that for a number of years prior to its demise the company had been operating a Ponzi scheme, paying old investors with the funds secured from fresh investors. As a result of our accounting investigation the President and Chief Executive Officer as well as two other participants were convicted of fraud.

*Dovie Beams de Villagran*
Mr. Neilson was appointed by the Federal Bankruptcy Court in California as Examiner in the bankruptcy of Dovie Beams de Villagran, former mistress of Ferdinand Macros. As a result of the report filed with the Court and Mr. Neilson's testimony, Mrs. de Villagran was convicted on thirty-nine counts of bank fraud and embezzlement for filing false and misleading financial statements with federally insured banks.

## Employment History

- LECG, LLC – Mr. Neilson was a director of the NE Group at LECG that provided a combination of bankruptcy services, forensic and investigative accounting services, litigation consulting, corporate recovery and reorganization, valuation and tax services.
- Neilson Elggren LLP – Mr. Neilson was one of the founding partners of a practice that provided a combination of bankruptcy services, forensic and investigative accounting services, litigation consulting, corporate recovery and reorganization, valuation and tax services. Offices for Neilson Elggren LLP were located in Los Angeles, California, Salt Lake City, Utah and Wilmington, Delaware.
- Arthur Andersen – Arthur Andersen was formerly one of the "Big 5" international CPA and business-consulting firms with over 80,000 employees worldwide. Mr. Neilson served as a partner and national director of Trustee/Receiver practices throughout the United States for Arthur Andersen. He also served as a member of the Executive Committee for the Global Corporate Finance division of Arthur Andersen.
- Neilson, Elggren, Durkin & Co. - As one of the founding partners of this regional and consulting firm, Mr. Neilson was instrumental in the growth of this firm from a small office in Salt Lake City to



a regional practice specializing in bankruptcy and litigation support services. The firm had grown to 85 employees and six offices prior to its merger with Arthur Andersen.
- KMG/Main Hurdman, Salt Lake City, Utah - Actively engaged as an expert witness in matters involving accounting and finance relating to contract claims, breach of contract, fraud, civil and criminal RICO, embezzlement, securities fraud, criminal matters, bankruptcy, and public hearings before regulatory bodies.
- Chief Deputy Auditor - Salt Lake County - Responsible for the accounting department, budget department, internal audit department and land assessment division for the Salt Lake County Auditor's Office. Within this capacity directed the office staff of 45 individuals and reviewed audits of governmental departments prior to issuance.
- Federal Bureau of Investigation - Special Agent Accountant - Responsible for accounting investigations including racketeer influenced and corrupt organizations involved in bank fraud, fraud against the government, bankruptcy fraud, mail fraud, securities fraud and others.

**Education**
- Bachelor of Science, University of Utah 1975
- Associate Professor – Graduate School of Accounting – University of Utah

**Publications**
- Co-Author of *AICPA Bankruptcy Practice Guide*. Authoritative practice guide to be issued to all practicing Certified Public Accountants in the United States, 1994
- Co-Author *The CPA's Handbook of Fraud and Commercial Crime Prevention* issued by the AICPA, 2002
- "*Substantive Consolidation Accounting Issues*" article for *Bankruptcy Litigation Counselor*, 1994
- "*Methods for Uncovering & Conducting Investigative Audits*," Utah State Auditors Operation Manual, 1982

**Professional Memberships**
- Association Of Insolvency Accountants - National Board of Directors
- Former Chairman - Securities Advisory Board - State of Utah - Accounting Profession Representative
- Former Chairman - Utah Association of CPA's - Professional Conduct and Ethics Sub-Committee
- Member - National Association of Bankruptcy Trustees
- American Institute of Certified Public Accountants
- Utah Association of Certified Public Accountants
- Society of Former Special Agents of the Federal Bureau of Investigation - Past President of the Utah Chapter
- Former Board Member - Salt Lake City/County Board of Health Advisory Board
- Chairman of the Board – Private Bank of California

**Speeches**
- Instructor for the Certified Public Accountants Criminal Investigation Seminar at the FBI Academy in Quantico, Virginia.
- Association of Insolvency Accountants – Tax Implications of Selling Assets in Bankruptcy –



San Diego, California 1999

- National Conference of Bankruptcy Judges – Valuations of Businesses in Bankruptcy – Dallas, Texas 1998
- American Bankruptcy Institute – Western Region – Procedures and Practices for Valuing Businesses in Bankruptcy – 1998
- Law and Justice Center – Utah Fellows of the American Academy of Matrimonial Lawyers - Methods of Valuing Businesses in Divorce – Salt Lake City, Utah – 1997
- Certified Fraud Examiners – Presentation on Fraud and Accounting Issues – Salt Lake City, Utah – 1997
- Associated Women – CPA's – Litigation Support and Accounting Issues – Salt Lake City, Utah 1997
- California Bankruptcy Institute – Accounting for Difficult Fraudulent Conveyances – Fresno, California 1997
- Association of Insolvency Accountants Valuation Conference, - Relief from Stay Valuation Issues, Salt Lake City, Utah, 1994
- Expert Witness Seminar - Preparing Accountants as Expert Witnesses, Salt Lake City, Utah, 1994
- Association of Insolvency Accountants National Conference, Washington, D.C.  Plan of Reorganization Accounting Issues, 1993
- Association of Insolvency Accountants National Conference, Santa Monica, California - Role of Examiner in Bankruptcy, 1992
- Beta Alpha Psi - University of Utah, Brigham Young University, and Weber State University
- National Association of Accountants (Utah Chapter), Salt Lake City, Utah, 1982 and 1984
- Insolvency seminars at the University of Southern California (USC), University of Utah, Brigham Young University, and Weber State College
- Arizona CPA Litigation Services Conference, The Bankruptcy Arena, The Role of the Accountant, 1991

# EXHIBIT 3



Search    🔍



**DAVID H. JUDD**
Director

Los Angeles,
2049 Centur
Suite 2525
Los Angeles,

| BRG Directory |
| --- |

**DⳄⱧⱧⱯⱽⱧⱤⰑ̵Ⱡ Ⱨ[ⱾⰘⱮⰎⰅⰘ**

Bankruptcy and
Insolvency

Corporate
Recovery and
Reorganization

Fiduciary Services

Forensic
Accounting and
Investigations

David Judd has almost 30 years of experience as a Certified Public Accountant (CPA) specializing in bankruptcy and litigation services and investigative accounting. Mr. Judd is a former director/partner of LECG, LLC, Neilson Elggren LLP, Neilson Elggren Durkin and Co., and Arthur Andersen LLP. Early in his career, Mr. Judd was a senior consultant in the Litigation/Consulting department in the international CPA firm KMG/Main Hurdman. His efforts have focused on bankruptcy matters for both Chapter 7 and Chapter 11 filings, including services as trustee, accountants for the trustee, court-appointed examiner, accountants for the examiner, and accountants for the creditors.

Mr. Judd has performed investigative accounting services relating to fraud, embezzlement, and mismanagement, including the reconstruction of records, tracing of funds, and evaluations of internal controls. He has also served as accountant to the trustee, receiver, and examiner for operating oil and gas exploration companies, operating oil refineries, and gas stations and convenience stores.

Mr. Judd has provided expert witness testimony in various investigative accounting matters relating to fraud and embezzlement, bankruptcy avoidance actions, business damages, solvency matters, and Ponzi schemes. He has testified in both federal and state courts.

He has been called upon to develop feasibility studies and projections for various real estate projects; and prepare business valuations for employee

**page 17**

Case 2:11-cv-05320-GAF-CW   Document 343-1   Filed 09/30/13   Page 14 of 150   Page ID #:18722

**SUBSCRIBE** | **CONTACT 1.877.696.0390** | info@BRG-expert.com

ATLANTA    BALTIMORE    BOGOTÁ, COLOMBIA    BOSTON AREA    CALGARY    CHICAGO

COLLEGE STATION    DALLAS    DETROIT    EMERYVILLE    HOUSTON    LOS ANGELES AREA

NEW YORK    PENSACOLA    PHILADELPHIA    PHOENIX    PITTSBURGH    SALT LAKE CITY

SAN DIEGO    TAMPA    WASHINGTON, DC    LONDON, UK    PERTH, WESTERN AUSTRALIA

Home    © 2013 Berkeley Research Group, LLC    Privacy    Site Map    Contact    Disclaimer    Site by Firmseek

**page 18**

# EXHIBIT 4

Dean A. Ziehl (CA Bar No. 84529)
Alan J. Kornfeld (CA Bar No. 130063)
Gillian N. Brown (CA Bar No. 205132)
Elissa A. Wagner (CA Bar No. 213589)
PACHULSKI STANG ZIEHL & JONES LLP
10100 Santa Monica Blvd., 13th Floor
Los Angeles, California 90067
Telephone: 310/277-6910
Facsimile: 310/201-0760
E-mail:  dziehl@pszjlaw.com
        gbrown@pszjlaw.com
        ewagner@pszjlaw.com

Special Counsel to Bradley D. Sharp, Chapter 11
Trustee of Namco Capital Group, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## LOS ANGELES DIVISION

| | |
|---|---|
| In re:<br><br>NAMCO CAPITAL GROUP, INC.,<br><br>                    Debtor. | Case No. 2:11-cv-05320-GAF (CWx)<br><br>Bankr. Case No. 2:08-bk-32333-BR<br><br>Bankr. Adv. Proc. No. 2:10-ap-02945-BR<br><br>Chapter 11 |
| BRADLEY D. SHARP, solely in his capacity as Chapter 11 Trustee of NAMCO CAPITAL GROUP, INC.,<br><br>                    Plaintiff,<br><br>vs.<br><br>MOUSA NAMVAR, et al.,<br><br>                    Defendants. | **PLAINTIFF'S EXPERT WITNESS DESIGNATIONS** |

1   Plaintiff Bradley D. Sharp, the chapter 11 trustee (the "Trustee") of Namco Capital Group,

2   Inc. ("Namco"), hereby designates the persons identified below, whose expert opinion testimony the

3   Trustee expects to offer into evidence, at trial and otherwise, in the above-captioned adversary

4   proceeding.  In accordance with the *Scheduling and Case Management Order* [D.I. 81] entered in

5   this adversary proceeding, the Trustee reserves all rights to counter-designate rebuttal expert

6   witnesses within 30 days of any timely expert disclosures by the Defendants.

7

8   A.      David H. Judd

9           The Trustee designates:

10                          David H. Judd, CPA
11                                 Director
                            Berkeley Research Group, LLC
12                          2049 Century Park East
                                   Suite 2525
13                          Los Angeles, CA  90067
                            Tel: 310.499.4750
14

15          The Trustee expects Mr. Judd to testify, and to provide expert evidence and opinions at trial

16  and otherwise, as to the following general subject areas:

17          1.      Namco's insolvency.

18          2.      A liquidation analysis of Namco, including an analysis of the estimated recovery to

19                  unsecured creditors of Namco if Namco's chapter 11 bankruptcy case were a case

20                  under chapter 7 of title 11 of the United States Code.

21          3.      The contents of Mr. Judd's expert report (including exhibits), served concurrently

22                  herewith.

23          Mr. Judd charges an hourly rate of $590.00 for deposition and trial testimony in this

24  adversary proceeding.

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

-2-

B.    <u>Gregory G. Gotthardt</u>

The Trustee designates:

> Gregory G. Gotthardt
> Managing Director
> Alvarez & Marsal Real Estate Advisory Services, LLC
> 2029 Century Park East
> Suite 2060
> Los Angeles, CA  90067
> Tel: 310.975.2689

The Trustee expects Mr. Gotthardt to testify, and to provide expert evidence and opinions at trial and otherwise, as to the following general subject areas:

1.   Credit standards for lending, including real estate lending.

2.   The extension of credit for loans, including real estate loans.

3.   The loan underwriting and approval process.

4.   Loan documentation.

5.   Lender remedies for non-payment.

6.   Borrower expectations for loans, including real estate loans.

7.   The contents of Mr. Gotthardt's expert report, served concurrently herewith.

Mr. Gotthardt charges an hourly rate of $700.00 for deposition and trial testimony in this adversary proceeding.

Dated:   May 17, 2013                    PACHULSKI STANG ZIEHL & JONES LLP

By:   /s/ Elissa A. Wagner
      Dean A. Ziehl
      Alan J. Kornfeld
      Gillian N. Brown
      Elissa A. Wagner

      Special Counsel to Bradley D. Sharp,
      Chapter 11 Trustee of Namco Capital
      Group, Inc.

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

## PROOF OF SERVICE

STATE OF CALIFORNIA          )
                             )
COUNTY OF LOS ANGELES        )

I, Mary de Leon, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067.

On May 17, 2013, I caused to be served the **PLAINTIFF'S EXPERT WITNESS DESIGNATIONS** in this action by placing a true and correct copy of said document(s) and sent as follows:

*See Attached Service List*

☑ (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑ (BY EMAIL) I caused to be served the above-described document by email to the parties indicated on the attached service list at the indicated email address.

☐ (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐ (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐ (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☐ (BY OVERNIGHT DELIVERY) By sending by Federal Express to the addressee(s) as indicated on the attached list.

I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

Executed on May 17, 2013, at Los Angeles, California.

_____
Mary de Leon

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:267649.1 59701/001

**page 23**

<u>SERVICE LIST</u>

<u>Counsel for Hooshang Namvar, Homayoun Namvar, Ramin Namvar, Helen Shadi, Hilda Bayanfar, Lida Shraga, Nataly Namvar, Trifish, LLC, Tribun, LLC, Trisister, LLC, Believers, LLC, Net, LLC, Light Source, LLC, Lacy 20, LLC, Woodman Partners, LLC, Tritowne, LLC and Trigrove, LLC</u>
Henley L. Saltzburg, Esq.
Paul T. Dye, Esq.
Genise R. Reiter, Esq.
SALTZBURG, RAY & BERGMAN, LLP
12121 Wilshire Boulevard, Suite 600
Los Angeles, California 90025-1166
Email: hls@srblaw.com
     ptd@srblaw.com
     grr@srblaw.com

-and-

Neal S. Salisian, Esq.
Newton C. Tak, Esq.
SALISIAN LEE LLP
444 South Flower Street, Suite 2320
Los Angeles, California 90071-2924
Email: neal.salisian@salisianlee.com
     newton.tak@salisianlee.com

<u>Counsel for Mousa Namvar, Magdiel, LLC, Namco 8, LLC, Wishlab 90, LLC, Bunherst, LLC and DGADE of Delaware, LLC</u>
Bernard M. Resser, Esq.
Lori L. Werderitch, Esq.
GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
Email: bresser@greenbergglusker.com
     lwerderitch@greenbergglusker.com

<u>Counsel for Bradley D. Sharp, as Chapter 11 Trustee for Namco Capital Group Inc.</u>
David M. Poitras, Esq.
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Email: dpoitras@jmbm.com

<u>Counsel for Haron Shabatian</u>
Robert B. Mobasseri, Esq.
LAW OFFICES OF ROBERT B. MOBASSERI
445 South Figueroa Street, 27th Floor
Los Angeles, California 90071
Email: robertm@mobasseripc.com

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:250159.2 59701-001

1 | Counsel for Daniel Namvar, Benjamin Namvar, Malka Namvar
and Shira Namvar
2 | Alan F. Broidy, Esq.
LAW OFFICES OF ALAN F. BROIDY
3 | 1925 Century Park East, Suite 1700
Los Angeles, California 90067
4 | Email: alan@broidylaw.com

5 | -and-

6 | John D. Younesi, Esq.
Jan A. Yoss, Esq.
7 | YOUNESI & YOSS LLP
11355 W. Olympic Blvd., Suite 200
8 | Los Angeles, California 90064
Email: jdyounesi@younesi.com
9 |        jyoss@younesi.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

001  1656
Client/Matter No.

5/22/13
Received (Date)

☐ Scanned_____Initial
☐ Emailed_____Initial

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

DOCS_LA:250159.2 59701-001

-2-

# EXHIBIT 5

David H. Judd, CPA
Berkeley Research Group, LLC
For LECG, LLC
2049 Century Park East, Suite 2525
Los Angeles, CA  90067
Telephone No. (310) 499-4750
Facsimile No. (310) 557-8982

Accountants to the Chapter 11 Trustee

UNITED STATES BANKRUPTCY COURT

CENTRAL DISTRICT OF CALIFORNIA

(LOS ANGELES DIVISION)

| | |
|---|---|
| In re: | ) |
| | ) |
| EZRI NAMVAR, | ) Case No.: 2:08-bk-32349 BR |
|        Debtor. | ) Chapter 11 |
| | ) |
| NAMCO CAPITAL GROUP, INC. | ) Case No.: 2:08-bk-32333 BP |
|        Debtor. | ) Chapter 11 |
| | ) |
| | ) **FOURTH AND FINAL APPLICATION** |
| | ) **FOR LECG, LLC, AS ACCOUNTANTS** |
| | ) **AND CONSULTANTS TO R. TODD** |
| | ) **NEILSON, CHAPTER 11 TRUSTEE AND** |
| | ) **BRADLEY SHARP, CHAPTER 11** |
| | ) **TRUSTEE OF NAMCO CAPITAL GROUP** |
| | ) **INC; DECLARATION OF DAVID H.** |
| | ) **JUDD; DECLARATION OF R. TODD** |
| | ) **NEILSON, TRUSTEE; DECLARATION** |
| | ) **OF BRADLEY SHARP, TRUSTEE, IN** |
| | ) **SUPPORT THEREOF** |
| | ) |
| | ) |
| | ) Date: October 5, 2011 |
| | ) Time: 10:00 A.M. |
| | ) Ctrm: "1668" |
| | )        255 E. Temple Street |
| | )        Los Angeles, CA |

TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE:

LECG, LLC ("LECG" or "Applicant"), as accountants and
consultants to R. Todd Neilson, chapter 11 trustee for the
Bankruptcy Estate of Ezri Namvar and as accountants and
consultants to Bradley D. Sharp, chapter 11 trustee for the

1

**page 27**

1 Bankruptcy Estate of Namco Capital Group, Inc. ("Trustee")

2 hereby applies for final compensation and reimbursement of

3 expenses for the fourth and final LECG fee period for the estate

4 of Ezri Namvar and Namco Capital Group, Inc. (the "Debtor",

5 "Namvar", "Namco" or "Estate"), and respectfully represent:

6

7                                    I.

8                            **INTRODUCTION**

9       LECG respectfully applies under 11 U.S.C. §§ 330, 331,

10 503(b), and 507(a)(2) and Local Bankruptcy Rule 2016-1, as well

11 as the Order on Application by Chapter 11 Trustee for Authority

12 to Employ LECG LLC, as Accountants and Consultants entered April

13 15, 2009 (the "Order"), for final approval of compensation for

14 accounting services it has rendered and reimbursement of

15 expenses incurred from October 1, 2010 through February 28,

16 2011.

17      1.     LECG was employed as the accountants and consultants

18 pursuant to the Order effective March 9, 2009.

19      2.     During the LECG period covered by this fourth and

20 final application, October 1, 2010, through February 28, 2011,

21 ("Fourth and Final Period"), LECG incurred total fees in the

22 amount of $777,588.50 representing 2,561 hours of services to

23 the estate.   LECG has written of 33 hours representing fees of

24 $10,388.00.   In addition, LECG has voluntarily reduced Category

25 9.13 by $5,390.00, comprised of 23.60 hours. In total LECG has

26 reduced its fourth interim fee application by $15,581.00,

27 creating a total remaining amount for fees of $762,007.50 for

28 which it seeks full approval and payment of 100% of that amount.

LECG also advanced expenses for the Fourth and Final Period

related to its services in the amount of $27,160.43.   LECG has

1  written off $5,232.10 of expenses not deemed billable to the
2  bankruptcy estates, creating a total remaining amount of
3  expenses of $21,928.33 for which it seeks full approval and
4  reimbursement.

5      3.  LECG previously sought fees and expenses through its
6  first interim application for the period March 9, 2009, through
7  August 31, 2009 ("First Interim Period"). LECG incurred total
8  fees in the amount of $873,813.00 representing 3,141.7 hours of
9  services to the estate for which it sought full approval and
10 payment of 100% of that amount. LECG also advanced expenses for
11 the First Interim Period related to its services in the amount
12 of $6,250.66 for which it also sought full approval and
13 reimbursement. Pursuant to the Order on Applications of
14 Professionals for Approval and Payment of Interim Compensation
15 and Reimbursement of Expenses ("Order") LECG was awarded
16 $873,813.00 in fees and $6,250.66 in expenses for the First
17 Interim Period. Pursuant to the Order the fees and expenses were
18 approved in full and the Order states: "This is the total amount
19 owed LECG as accountants in both the Namco and Namvar bankruptcy
20 cases. Said fees and costs will be allocated between the
21 estates by the Trustees or further Court order." The total
22 amount has been paid to LECG.

23     4.  LECG previously sought fees and expenses through its
24 second interim application for the period September 1, 2009,
25 through January 31, 2010 ("Second Interim Period"). LECG
26 incurred total fees in the amount of $992,094.75 representing
27 3,130.9 hours of services to the estate for which it sought full
28 approval and payment of 100% of that amount. LECG also advanced
   expenses for the Second Interim Period related to its services
   in the amount of $3,712.59 for which it also sought full

3

**page 29**

1  approval and reimbursement.  Pursuant to the Order on Second

2  Interim Applications of Professionals for Approval and Payment

3  of Interim Compensation and Reimbursement of Expenses ("Second

4  Application Order") LECG was awarded $982,094.75 in fees and

5  $3,712.59 in expenses for the Second Interim Period. Pursuant to

6  the Second Application Order the fees and expenses were approved

7  in full and the Order states: "This is the total amount owed

8  LECG as accountants in both the Namco and Namvar bankruptcy

9  cases.  Said fees and costs will be allocated between the

10  estates by the Trustees or further Court order."  The total

11  amount has been paid to LECG.

12      5.    LECG previously sought fees and expenses through its

13  third interim application for the period February 1, 2010,

14  through September 30, 2010 ("Third Interim Period").  LECG

15  incurred total fees in the amount of $1,824,303.00 representing

16  5,818.7 hours of services to the estate for which it sought full

17  approval and payment of 100% of that amount. LECG took a

18  voluntary reduction on its fees in the amount of $13,000.00.

19  LECG also advanced expenses for the Third Interim Period related

20  to its services in the amount of $42,508.13 for which it also

21  sought full approval and reimbursement.  Pursuant to the Order

22  on Third Interim Applications of Professionals for Approval and

23  Payment of Interim Compensation and Reimbursement of Expenses

24  ("Third Application Order") LECG was awarded $1,811,303.00 in

25  fees and $42,508.12 in expenses for the Third Interim Period.

26  Pursuant to the Third Application Order the fees and expenses

27  were approved in full and the Order states: "This is the total

28  amount owed LECG as accountants in both the Namco and Namvar

bankruptcy cases".  Said fees and costs will be allocated

between the estates by the Trustees or further Court order.

4

1  Fees in the amount of $129,237.33 have been paid and expenses in

2  the amount of $42,508.13 have been paid.  Applicant is still

3  owed a total of $1,682,065.67.

4      6.    The Debtor, Ezri Namvar, was an individual private

5  money investor in southern California alleged to be engaged in

6  the raising of funds for various entities in which he held a

7  direct or indirect ownership interest.

8

9  **A.   Exhibits to this Application**

10      1.    The nature and extent of LECG services during the

11  Fourth and Final Period are described in subsequent paragraphs

12  and in the following exhibits to this Application:

13      **Exhibit "A"** is a copy of the Namvar Order On Application by

14  Chapter 11 Trustee for Authority to Employ LECG LLC, as

15  Accountants and Consultants effective as of March 9, 2009 and a

16  copy of the Namco Order on Application by Chapter 11 Trustee for

17  Authority to Employ LECG, LLC, as Accountants and Consultants

18  effective as of May 9, 2009 ("LECG Employment Orders") approving

19  LECG's employment.

20      **Exhibit "B"** provides the detailed time entries for the

21  services provided by category by LECG as accountants and

22  consultants to the Trustee as well as the detail of all costs

23  expended.

24      **Exhibit "C"** is the summary of the monthly fees, by category

25  of service, as well as a summary of the expenses incurred.  This

26  summary excludes 56.60 hours totaling $15,581.00 representing

27  time that was provided in increments too small to bill, written-

28  off by the Applicant or services which generally may not be

    billed to bankruptcy estates. This summary also excludes

1   Dimes to be used in the plan of reorganization and disclosure

2   statement.  The analysis determined duplicate, amended and

3   potential claims within these Estates and estimated the total

4   potential claims for all estates, including intra-state claims.

5   The analysis was used as the back-bone for determining the

6   potential return to investors and viability of the plan of

7   reorganization.

8        Work on the plan of reorganization and disclosure statement

9   is ongoing and the Applicant will continue to provide analyses

10   and information as requested by counsel and the Trustees.

11        LECG has expended 74.5 hours resulting in fees in the

12   amount of $27,342.00 relating to the plan of reorganization and

13   disclosure statement.

14        63.  Travel (90): Applicant was required to travel from

15   Salt Lake City to Los Angeles to work with Namco accountants to

16   identify income tax returns required to be prepared by the

17   trustee and to determine effective ways of obtaining the

18   necessary financial information required to complete the

19   required tax work.  This travel time was not billed to the

20   estates.

21        As requested by Trustee's, applicant was required to travel

22   to/from the court to attend the third fee application hearing .

23   Travel time was billed at 50% of the normal rate.

24        LECG has expended 1.7 hours resulting in fees in the amount

25   of $476.00 for travel time.

26

27                              III.

28                          CONCLUSION

     1.   Applicant believes compensation awarded herein will

account for the quality of services rendered, the complexity of

1  the issues at hand, the desirability of employment, the results

2  obtained and the contingency thereof, as well as the actual

3  hours expended.  Applicant believes full and final payment of

4  its fees is justified when weighed against the benefit of its

5  work, as described above.

6      2.   No agreement exists between Applicant nor any other

7  person for the sharing of compensation that is received in

8  connection with this case, except for the understanding

9  concerning compensation among its shareholder/owners.

10     WHEREFORE, Applicant respectfully requests full and final

11  approval and reimbursement of 1) the Fourth and Final Period

12  compensation of fees in the amount of $777,588.50 representing

13  2,561 hours of services provided to the estate of which nothing

14  has been paid.  LECG has written of 33 hours representing fees

15  of $10,388.00.  In addition, LECG has voluntarily reduced

16  Category 9.13 by $5,390.00, comprised of 23.60 hours. In total

17  LECG has reduced its fourth interim fee application by

18  $15,581.00, creating a total remaining amount for fees of

19  $762,007.50 for which it seeks full approval and payment of 100%

20  of that amount; 2) final approval and reimbursement of 100% of

21  LECG expenses in the amount of $21,928.33 of which nothing has

22  been paid for expense for the Fourth and Final Period; 3) final

23  approval of all previously allowed and paid fees and expenses;

24  and 4) for such other further relief as the Court deems just and

25  proper.

26

27  Dated: September __7__, 2011      Respectfully submitted,

28

David H. Judd, CPA
LECG, LLC

**page 34**

1

2                          <u>DECLARATION OF DAVID H. JUDD</u>

3      I, David H. Judd, declare as follows:

4          1.   I am a Certified Public Accountant, was a director in

5      the firm of LECG, LLC ("LECG") and am now a director with the

6      Berkeley Research Group, LLC ("BRG") firm.  I have read the

7      foregoing Fourth and Final Application for LECG, LLC, as

8      Accountants and Consultants to R. Todd Neilson, Chapter 11

9      Trustee (the "Application") and know the contents thereof.  I

10     certify the facts stated therein are true of my own knowledge,

11     except for those stated upon information and belief, which I

12     believe to be true.

13         2.   The Application of LECG seeks full compensation for the

14     period October 1, 2010, through February 28, 2011, ("Fourth and

15     Final Period") totaling $777,588.50 for fees representing 2,561

16     hours of services provided to the estate. LECG has written of 33

17     hours representing fees of $10,388.00.  In addition, LECG has

18     voluntarily reduced Category 9.13 by $5,390.00, comprised of

19     23.60 hours. In total LECG has reduced its fourth interim fee

20     application by $15,581.00, creating a total remaining amount for

21     fees of $762,007.50 for which it seeks full approval and payment

22     of 100% of that amount.  The time billed in the Application is

23     based on records kept in the ordinary course of LECG's business,

24     and it is the customary practice of the professionals and

25     paraprofessionals to record their time on a substantially

26     contemporaneous basis.

27         3.   The Application seeks reimbursement of costs totaling

28     $21,928.33. LECG has also excluded $5,232.10 of expenses not

       deemed billable to the bankruptcy estates.  It is customary for

       LECG to charge its clients for photocopies at $.20 per copy.

                                      58

                                                            **page 35**

1  LECG also customarily charges its clients for toll and long-
2  distance phone charges, faxes, overnight mail, courier services,
3  and other such expenses at their cost.

4      4.   The Trustee has been informed of the nature of LECG's
5  services and the approximate amount of their fees prior to the
6  filing of the Application.

7      5.   I believe Applicant's Application substantially
8  complies with the U.S. Trustee Guidelines ("the Guidelines")
9  concerning professionals' fee applications.

10         I declare under penalty of perjury under the laws of
11 the United States of America that the facts stated herein are
12 true and correct to the best of my knowledge.  Executed this
13 7th day of September 2011, at Los Angeles, California.

14
15
16                    David H. Judd, CPA
                      Berkeley Research Group, LLC
17                    For LECG, LLC
18
19
20
21
22
23
24
25
26
27
28

59

**page 36**

## DECLARATION OF R. TODD NEILSON

I, R. Todd Neilson, declare as follows:

1.   I am a Certified Public Accountant, was a director of the LECG, LLC firm and am now a director with the Berkeley Research Group, LLC ("BRG") firm.  I am the duly appointed Chapter 11 Trustee in Ezri Namvar.  I have personal knowledge of the following facts and, if called, I could and would testify competently thereto.

2.   I have reviewed the Fourth and Final Application for LECG, LLC, as Accountants and Consultants to R. Todd Neilson, Chapter 11 Trustee (the "Application").

3.   I have discussed the Application with Applicant and have no unresolved objections to approve the amounts sought in this Application. I believe the payment to LECG of $762,007.50 which is 100% of the total requested fees and the payment to LECG of $21,928.33, which is 100% of the expenses will be appropriate in light of the amount of the assets during the administration of the case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this ___ day of September 2011, at Los Angeles, California.

R. Todd Neilson

## DECLARATION OF BRADLEY D. SHARP

I, Bradley D. Sharp, declare as follows:

1.   I am Senior Vice President of Development Specialists, Inc. firm.   I am the duly appointed Chapter 11 Trustee in Namco Capital Group.   I have personal knowledge of the following facts and, if called, I could and would testify competently thereto.

2.   I have reviewed the Fourth and Final Application for LECG, LLC, as Accountants and Consultants to Bradley D. Sharp, Chapter 11 Trustee (the "Application").

3.   I have discussed the Application with Applicant and have no unresolved objections to approve the amounts sought in this Application. I believe the payment to LECG of $762,007.50 which is 100% of the total requested fees and the payment to LECG of $21,928.33, which is 100% of the expenses will be appropriate in light of the amount of the assets during the administration of the case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 12 day of September 2011, at Los Angeles, California.

_____
Bradley D. Sharp

61

# EXHIBIT 6

1  David H. Judd, CPA
   Berkeley Research Group, LLC
2  2049 Century Park East, Suite 2525
   Los Angeles, CA   90067
3  Telephone No. (310) 499-4750
   Facsimile No. (310) 557-8982
4
5  Accountants to the Chapter 11 Trustee

6              UNITED STATES BANKRUPTCY COURT

7              CENTRAL DISTRICT OF CALIFORNIA

8                  (LOS ANGELES DIVISION)

9  In re:                        )
                                 )
10 NAMCO CAPITAL GROUP, INC.     ) Case No.: 2:08-bk-32333 BP
        Debtor.                  ) Chapter 11
11                               )
                                 )
12                               )
                                 )
13                               )
                                 ) **THIRD INTERIM APPLICATION FOR**
14                               ) **BERKELEY RESEARCH GROUP, LLC,**
                                 ) **AS SUCCESSOR ACCOUNTANTS AND**
15 ——————————————————————————————) **FINANCIAL CONSULTANTS TO R.**
                                 ) **TODD NEILSON, CHAPTER 11**
16                               ) **TRUSTEE AND BRADLEY SHARP,**
                                 ) **CHAPTER 11 TRUSTEE OF NAMCO**
17                               ) **CAPITAL GROUP INC; DECLARATION**
                                 ) **OF DAVID H. JUDD; DECLARATION**
18                               ) **OF R. TODD NEILSON, TRUSTEE, IN**
                                 ) **SUPPORT THEREOF; DECLARATION OF**
19                               ) **BRADLEY SHARP, TRUSTEE, IN**
                                 ) **SUPPORT THEREOF**
20                               )
                                 )
21                               )
                                 )
22                               )
                                 ) Date: October 22, 2013
23                               ) Time: 2:00 P.M.
                                 ) Ctrm: "1668"
24                               )     255 E. Temple Street
                                       Los Angeles, CA
25

26 TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE:

27           Berkeley Research Group, LLC ("BRG" or "Applicant"),

28 as successor accountants and financial consultants to R. Todd

   Neilson, chapter 11 trustee for the Bankruptcy Estate of Ezri

   Namvar and as successor accountants and financial consultants to

                              1

1  Bradley D. Sharp, chapter 11 trustee for the Bankruptcy Estate

2  of Namco Capital Group, Inc. ("Trustee") hereby applies for

3  compensation and reimbursement of expenses for the third interim

4  fee period for the estate of Ezri Namvar and Namco Capital

5  Group, Inc. (the "Debtor", "Namvar", "Namco" or "Estate"), and

6  respectfully represent:

7                                    I.

8                              **INTRODUCTION**

9        BRG respectfully applies under 11 U.S.C. §§ 330, 331,

10  503(b), and 507(a)(2) and Local Bankruptcy Rule 2016-1, as well

11  as the Ezri Namvar Order Approving Application of Chapter 11

12  Trustee to Employ Berkeley Research Group, LLC, of Which the

13  Trustee is an Director/Member, as Successor Accountants and

14  Financial Consultants, Effective as of March 1, 2011 (the

15  "Namvar Order"); and, the NAMCO Capital Group, Inc. Order

16  Approving Application of Chapter 11 Trustee to Employ Berkeley

17  Research Group, LLC, as Successor Accountants and Financial

18  Consultants, Effective as of March 1, 2011 (the "Namco Order")

19  for interim approval of compensation for accounting services it

20  has rendered and reimbursement of expenses incurred from

21  September 1, 2011 through August 31, 2012.

22      1.   LECG, LLC ("LECG") was originally employed as the

23  accountants and consultants in this case pursuant to an Order

24  effective March 9, 2009.

25      2.   BRG was employed as the successor accountants and

26  financial consultants pursuant to the Orders effective March 1,

27  2011.

28      3.   During the BRG period covered by this third interim

application, September 1, 2012, through August 31, 2013, ("Third

Interim Period"), BRG incurred total fees in the amount of

2

**page 41**

1   $1,805,201.15 representing 4,561.9 hours of services to the
2   estate.   BRG seeks full approval and payment of 100% of that
3   amount.   BRG also advanced expenses for the Third Interim Period
4   related to its services in the amount of $8,009.42.   BRG has
5   excluded approximately $800.00 of expenses not deemed billable
6   to the bankruptcy estates, leaving a total of $1,813,210.57 for
7   which it seeks full approval and reimbursement.

8        4.   BRG previously filed its first interim fee application
9   covering the period March 1, 2011, through August 31, 2011,
10  ("First Interim Period"). BRG incurred total fees in the amount
11  of $1,226,291.50 representing 3,675.8 hours of services to the
12  estate. BRG also advanced expenses for the first BRG interim
13  period related to its services in the amount of $21,928.33 for
14  which it also sought full approval and reimbursement.   Pursuant
15  to the Order on Applications of Professionals for Approval and
16  Payment of Interim Compensation and Reimbursement of Expenses
17  ("Order") BRG was awarded $1,226,291.50 in fees and $21,928.33
18  in expenses for the BRG First Interim Period. Pursuant to the
19  Order the fees and expenses were approved in full and the Order
20  states:

21  "the allowed fees and costs of the trustees and professionals
22  employed in the Namco and Namvar chapter 11 cases shall be paid
23  *pro rata* from available cash proceeds in both estates. To the
24  extent that it is later determined that one estate has paid a
25  disproportionate share of such fees and costs, that estate will
26  have an allowed administrative claim against the other estate
27  for repayment of such disproportionate payment. Notwithstanding
28  any future payment adjustment between the estates, no
    disgorgement of fees and costs will be required of any
    professional based upon the *pro rata* treatment authorized

3

**page 42**

1  herein." Applicant was actually paid $1,009,605.71 in fees and

2  $21,928.33 in expenses, leaving a remaining balance of

3  $216,685.79 in unpaid fees from the first BRG fee application.

4      5.    BRG previously filed its second interim fee

5  application covering the period September 1, 2011, through

6  August 31, 2012, ("Second Interim Period"). BRG incurred total

7  fees in the amount of $1,708,012.25 representing 4,813.6 hours

8  of services to the estate. BRG also advanced expenses for the

9  Second Interim Period related to its services in the amount of

10  $7,249.83 for which it also sought full approval and

11  reimbursement.  Pursuant to the Order on Applications of

12  Professionals for Approval and Payment of Interim Compensation

13  and Reimbursement of Expenses ("Order") BRG was awarded

14  $1,708,012.25 in fees and $7,249.83 in expenses for the second

15  BRG interim period. Pursuant to the Order the fees and expenses

16  were approved in full and the Order states:

17  "the allowed fees and costs of the trustees and professionals

18  employed in the Namco and Namvar chapter 11 cases shall be paid

19  *pro rata* from available cash proceeds in both estates. To the

20  extent that it is later determined that one estate has paid a

21  disproportionate share of such fees and costs, that estate will

22  have an allowed administrative claim against the other estate

23  for repayment of such disproportionate payment. Notwithstanding

24  any future payment adjustment between the estates, no

25  disgorgement of fees and costs will be required of any

26  professional based upon the *pro rata* treatment authorized

27  herein." Applicant has not been paid any of the fees and

28  expenses incurred during the second BRG interim fee application.

    6.    The Debtor, Ezri Namvar, was an individual private

money investor in southern California alleged to be engaged in

1      49.   Travel (90): Applicant was required to travel from
2   Salt Lake City to Los Angeles to work with Namco accountants to
3   identify income tax returns required to be prepared by the
4   trustee and to determine effective ways of obtaining the
5   necessary financial information required to complete the
6   required tax work.  This travel time was not billed to the
7   estates.

8      Applicant has also been required to travel in order to
9   attend meetings with the Internal Revenue Service.  The Namvar
10  estate is currently being audited, due to the $10 million tax
11  refund claimed on the 2008 tax return.

12     As requested by Trustees, applicant was required to travel
13  to/from the meetings with counsel and Trustees.  Applicant also
14  traveled to attend fee applications, mediations and 2004
15  examinations.  Travel time was billed at 50% of the normal rate.

16     BRG has expended 35.4 hours resulting in fees in the amount
17  of $8,509.75 for travel time.

18                              **III.**

19                           **CONCLUSION**

20     1.   Applicant believes compensation awarded herein will
21  account for the quality of services rendered, the complexity of
22  the issues at hand, the desirability of employment, the results
23  obtained and the contingency thereof, as well as the actual
24  hours expended.  Applicant believes full and final payment of
25  its fees is justified when weighed against the benefit of its
26  work, as described above.

27     2.   No agreement exists between Applicant nor any other
28  person for the sharing of compensation that is received in
    connection with this case, except for the understanding
    concerning compensation among its shareholder/owners.

1     WHEREFORE, Applicant respectfully requests full approval

2  and reimbursement of 1) the Third Interim Period compensation of

3  fees in the amount of $1,805,201.15 representing 4,561.9 hours

4  of services provided to the estate of which nothing has been

5  paid.   BRG seeks full approval and payment of 100% of that

6  amount.   2) approval and reimbursement of 100% of BRG expenses

7  in the amount of $8,009.42 for a total amount owed $1,813,210.57

8  of which nothing has been paid for expenses for the Third

9  Interim Period.   BRG has already reduced expenses not deemed

10  billable to the bankruptcy estates by approximately $800.00; and

11  3) for such other further relief as the Court deems just and

12  proper.

13

14  Dated: September 2\_4\_, 2013      Respectfully submitted,

15

16

17

18                          David H. Judd, CPA

19                          Berkeley Research Group, LLC

20

21

22

23

24

25

26

27

28

DECLARATION OF DAVID H. JUDD

I, David H. Judd, declare as follows:

1. I am a Certified Public Accountant and am a director in the firm of Berkeley Research Group, LLC ("BRG"). I have read the foregoing Third Interim Application for Berkeley Research Group, LLC, as Successor Accountants and Financial Consultants to R. Todd Neilson, Chapter 11 Trustee, and Bradley Sharp, Chapter 11 Trustee of Namco Capital Group, Inc. (the "Application") and know the contents thereof. I certify the facts stated therein are true of my own knowledge, except for those stated upon information and belief, which I believe to be true.

2. The Application of BRG seeks full compensation for the period September 1, 2012, through August 31, 2013, ("Third Interim Period") totaling $1,805,201.15 for fees representing 4,561.9 hours of services provided to the estate. BRG seeks full approval and payment of 100% of that amount. The time billed in the Application is based on records kept in the ordinary course of BRG's business, and it is the customary practice of the professionals and paraprofessionals to record their time on a substantially contemporaneous basis.

3. The Application seeks reimbursement of costs totaling $8,009.42 for a total amount owed of $1,813,210.57. It is customary for BRG to charge its clients for photocopies at $.20 per copy. BRG also customarily charges its clients for toll and long-distance phone charges, faxes, overnight mail, courier services, and other such expenses at their cost.

4. The Trustee has been informed of the nature of BRG's services and the approximate amount of their fees prior to the filing of the Application.

**page 46**

5.    I believe Applicant's Application substantially
complies with the U.S. Trustee Guidelines ("the Guidelines")
concerning professionals' fee applications.

I declare under penalty of perjury under the laws of
the United States of America that the facts stated herein are
true and correct to the best of my knowledge.  Executed this
24th day of September 2013, at Los Angeles, California.

David H. Judd, CPA

1

DECLARATION OF R. TODD NEILSON

2     I, R. Todd Neilson, declare as follows:

3     1.   I am a Certified Public Accountant and am a director

4 of the Berkeley Research Group, LLC firm. I am the duly

5 appointed Chapter 11 Trustee in Ezri Namvar. I have personal

6 knowledge of the following facts and, if called, I could and

7 would testify competently thereto.

8     2.   I have reviewed the Third Interim Application for

9 Berkeley Research Group, LLC, as Successor Accountants and

10 Financial Consultants to R. Todd Neilson, Chapter 11 Trustee,

11 and Bradley Sharp, Chapter 11 Trustee of Namco Capital Group,

12 Inc. (the "Application").

13     3.   I have discussed the Application with Applicant and

14 have no unresolved objections to approve the amounts sought in

15 this Application. I believe the payment to BRG of $1,805,201.15

16 which is 100% of the total requested fees and the payment to BRG

17 of $8,009.42, which is 100% of the expenses for a total amount

18 owed of $1,813,210.57 will be appropriate in light of the amount

19 of the assets during the administration of the case.

20     I declare under penalty of perjury under the laws of the

21 United States that the foregoing is true and correct. Executed

22 this _24th_ day of September 2013, at Los Angeles, California.

23

24

25     R. Todd Neilson

26

27

28

**page 48**

### DECLARATION OF BRADLEY D. SHARP

I, Bradley D. Sharp, declare as follows:

1.    I am Senior Vice President of Development Specialists, Inc. I am the duly appointed Chapter 11 Trustee in Namco Capital Group. I have personal knowledge of the following facts and, if called, I could and would testify competently thereto.

2.    I have reviewed the Third Interim Application for Berkeley Research Group, LLC, as Successor Accountants and Financial Consultants to R. Todd Neilson, Chapter 11 Trustee, and Bradley Sharp, Chapter 11 Trustee of Namco Capital Group, Inc. (the "Application").

3.    I have discussed the Application with Applicant and have no unresolved objections to approve the amounts sought in this Application. I believe the payment to BRG of $1,805,201.15 which is 100% of the total requested fees and the payment to BRG of $8,009.42, which is 100% of the expenses for a total amount owed of $1,813,210.57 will be appropriate in light of the amount of the assets during the administration of the case.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct. Executed this 25th day of September 2013, at Los Angeles, California.

_____
Bradley D. Sharp

63

# EXHIBIT 7



*The experts you trust. The insight you need.*

Corporate Finance / Turnaround Consulting / Forensic & Litigation Accounting / Publications / DSI Companion Websites

# Bradley D. Sharp

**DSI Los Angeles**
*Wells Fargo Center*
*333 South Grand Avenue Suite 4070*
*Los Angeles, California 90071-1544*

213/617-2717    bsharp@dsi.biz    Download Vcard

Bradley Sharp is a Senior Vice President and has been a professional with DSI's Los Angeles office since 1993. He has substantial experience in providing crisis management and consulting services to companies in various industries including consumer finance, high tech and agriculture. He has operated and sold publicly and privately-held troubled companies in and out of bankruptcy. Mr. Sharp is also an expert witness with respect to banking, finance and securitizations.

Mr. Sharp is currently the chapter 11 trustee for Namco Capital Group, Inc., ("Namco") a West Los Angeles based real estate investment company formerly operated by Ezri Namvar. Namco has investments in more than one hundred real estate projects and at one time was reported to be worth more than $2 billion. At this time, the estate faces claims of more than $500 million from primarily individual creditors and the values of the assets are uncertain. The DSI staff is assisting Mr. Sharp in locating and maximizing the value of the Namco assets.

Mr. Sharp is also the chapter 11 trustee for Estate Financial Mortgage Fund, LLC ("EFMF"), currently pending in Santa Barbara. EFMF received investments from almost 1,700 individual investors and in turn invested more than $170 million through Estate Financial, Inc. ("EFI"), the former manager of EFMF. Through its engagement by Mr. Sharp and by the chapter 11 trustee of EFI, DSI has been tasked with collecting or foreclosing on more than 544 loans with a principal balance of more than $315 million. As a part of this process, Mr. Sharp and the DSI team are developing and implementing action plans to maximize the value of more than 90 residential real estate development projects in California.

Mr. Sharp has provided testimony as a U.S. banking expert in the High Court of Justice, Queens Bench Division, London England, in a dispute involving two European commercial banks.

Mr. Sharp was the consulting expert for the liquidating trustee of HomeFed Corp., the holding company of a San Diego California based savings and loan. Mr. Sharp developed the evidence related to the loan loss analysis and the underwriting policies of the savings and loan. The cases were settled favorably shortly before trial.

Prior to joining DSI, Mr. Sharp was a Vice President and Senior Commercial Loan Collection Officer with Bank of America, NT&SA. He had been with the bank, through its acquisition of Security Pacific National Bank, since 1985.

Mr. Sharp has a Bachelors of Science in accounting, with an emphasis in business computer information systems, from Mesa College in Grand Junction, Colorado.

Back to DSI Professionals list

**page 51**

# EXHIBIT 8

1    **ERIC J. HELD**
     DEVELOPMENT SPECIALISTS, INC.
     333 S. GRAND AVE, SUITE 4070
2    LOS ANGELES, CA. 90071
     TELEPHONE (213) 617-2717
3    FACSIMILE (213) 617-2718

4

5

6             **UNITED STATES BANKRUPTCY COURT**

7              **CENTRAL DISTRICT OF CALIFORNIA**

8                **LOS ANGELES DIVISION**

9    IN RE:                        )   CASE NO. 2:08-BK-32333-BR

10   NAMCO CAPITAL GROUP, INC.,    )   CHAPTER 11
    A CALIFORNIA CORPORATION,       )

11                          )   **THIRD INTERIM APPLICATION FOR**
         DEBTOR.           )   **COMPENSATION AND**

12                          )   **REIMBURSEMENT OF FEES AND**
                         )   **EXPENSES OF DEVELOPMENT**

13                          )   **SPECIALISTS, INC., FINANCIAL**
                         )   **ADVISOR TO THE CHAPTER 11**

14                          )   **TRUSTEE OF NAMCO CAPITAL**
                         )   **GROUP, INC.**

15                          )   **AUGUST 1, 2011 - AUGUST 31, 2012**
                         )

16                          )   **JUDGE: THE HONORABLE BARRY RUSSELL**
                         )

17                          )   **DATE: OCTOBER 16, 2012**
                         )   **TIME: 2:00 PM**

18                          )   **PLACE: 255 E. TEMPLE ST.**
                         )   **COURTROOM 1668**

19                          )   **LOS ANGELES, CALIFORNIA**

20

21

22       Development Specialists, Inc. ("DSI"), as financial advisors and consultants to

23   Bradley D. Sharp, Chapter 11 Trustee (the "Namco Trustee"), hereby submits the

24   Application for Compensation and Reimbursement of Expenses (the "Application").

25   This Application includes the time records for employees of DSI who served in a

26   financial advisory role to the Namco Trustee. The time billed by DSI employees for

27   financial advisory services is not subject to the Namco Trustee's fee cap and is billed to

28   the estate separately. These employees are detailed in the table below along with their

standard hourly rate, and their function as financial advisors to the Namco Trustee:

| Name | 2011 Rate | 2012 Rate | Function |
|---|---|---|---|
| G. L. Berman | $525.00 | $540.00 | Support efforts to terminate retirement plans |
| E. J. Held | $375.00 | $390.00 | Analysis of claims by and against the Namco Estate; litigation support; drafting of plan of reorganization and disclosure statement; analysis of creditor accounts, deeds of trust, assignments, etc.; creditor claims analysis, reconciliation and verification; and assisting with such other services requested by the Namco Trustee |
| W. D. Tsoutsouris | $235.00 | $250.00 | Financial analysis, accounting, budgeting, preparation of monthly operating reports and other matters involving interests of affiliated LLC debtors |
| M. E. Farnsworth | $230.00 | $245.00 | Analysis of accounts receivable |
| D. K. Lee | $200.00 | $215.00 | Financial analysis and related forensic accounting related to litigation support and disclosure statement drafting |

The Application seeks approval of fees pursuant to §§ 326, 330 and 331 of the United States Bankruptcy Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), and Rule 2016 of the Federal Rules of Bankruptcy Procedure, for an order allowing DSI's fees in the amount of *$622,661.50* and reimbursement of expenses in the amount of *$220.64* for a total of *$622,882.14* for the period August 1, 2011 through August 31, 2012 (the "Third Application Period"). Extended details on the time entries for DSI and the expenses incurred are set forth in the attached Exhibits A and C.

Some employees of Development Specialists, Inc. also work with Bradley D. Sharp, the Namco Trustee. Hours and expenses detailed in this Application are in no instance duplicative, but are tracked and billed separately. Time and expenses incurred by the Namco Trustee are requested and detailed in a separate application. Several of the professionals listed above also assist the Namco Trustee. The functions of those professionals are detailed in the fee application of the Namco Trustee and include administrative type services which are wholly separate and distinct from the financial

1    advisory services rendered by such professionals in the above-described categories.

2        To avoid a duplication of efforts, please refer to the case status discussion in

3    Jeffer, Mangels, Butler & Mitchell's fee application.

4    **I.**    **BACKGROUND**

5        On December 22, 2008 (the "Petition Date"), an involuntary chapter 11 petition

6    was filed against the Debtor, an order for relief was entered on January 29, 2009, and the

7    Court entered an order on May 8, 2009 approving the appointment of a Chapter 11

8    Trustee.

9        As the complexity and scope of the case became known, the Namco Trustee

10    believed it necessary to add staff to assist in the voluminous requisite analyses and

11    supporting research. On May 6, 2010, the Court entered an order approving the

12    employment of DSI as financial advisor to the Namco Trustee, effective March 18, 2010.

13    **II.**    **PROJECT BILLING AND NARRATIVE STATEMENT OF SERVICES**

14        **A.**    **Compensation of Fees**

15        In the First and Second Application Period, much of the groundwork necessary for

16    the Namco Trustee to pursue litigation on several fronts, file involuntary bankruptcy

17    petitions for numerous affiliated entities, achieve resolutions with several former business

18    partners of the Debtor and Ezri Namvar, and manage various real estate, litigation, and

19    operational matters was undertaken. This required labor intensive work to assemble and

20    analyze the large amount of supporting data that necessitated the employment of a

21    financial advisor to the Namco Trustee. The amount of progress that has been made by

22    the Namco Trustee during the Third Application Period has been possible largely due to

23    the support of DSI. During the Third Application Period, for example, the Namco

24    Trustee pursued more than 190 adversary proceedings seeking recoveries for preferences,

25    fraudulent conveyances and collection of receivables. DSI provided the support for the

26    Namco Trustee to respond to discovery requests, engage in settlement discussions and

27    generally pursue these causes of action.

28        In addition, during this Third Application Period, DSI continued to provide

3

settlement agreements; and

- meetings, telephone calls and correspondence with other professionals regarding all of the above.

**Total hours: 484.20**     **Total fees: $174,144.50**

## IV.   SUMMARY OF COSTS AND EXPENSES

### A.   Photocopies

DSI uses a computerized accounting system known to keep track of internal photocopy charges, and bills its clients at the rate of $0.15 per page, which is under the Central District of California guidelines of $.20 per page. During the period covered by the Application, DSI incurred *$75.00* in expenses in this category.

### B.   Long Distance Phone

DSI seeks reimbursement only for its actual costs incurred for long distance telephone calls. During the period covered by this Application, DSI incurred *$145.64* in expenses in this category.

## V.   COMPENSATION PREVIOUSLY RECEIVED

DSI has not received a retainer nor any compensation for their service performed for the Namco Trustee during the Third Application Period in the above-captioned case. The court approved DSI's fees and expenses related to its First and Second Application Period and as of this date, DSI has received $1,460,435.71 of the total allowed amount of $1,558,710.45.

## VI.   CONCLUSION

Giving due consideration to the nature of the services rendered, the size of this case, the legal and operational complexities encountered, the experience of DSI's staff, DSI's normal and customary hourly rates for similar services, the results achieved on behalf of the estate, and the time devoted by DSI, Developments Specialists, Inc. respectfully submits that the fees and expenses for which compensation and reimbursement are sought in the Application are actual, reasonable and necessary costs of the administration of this chapter 11 case.

13

1    **WHEREFORE,** DSI respectfully requests that this Court enter an order allowing

2    DSI's fees earned and expenses incurred from August 1, 2011 through and including

3    August 31, 2012 in the aggregate amount of **$622,882.14.**

4    Dated: September 24, 2012                    By _____

5                                                            Eric J. Held

6    :                                            Development Specialists, Inc.

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

14

1
          **DECLARATION OF ERIC J. HELD**

2
      1.  I am a Consultant at Development Specialists, Inc. ("DSI").  DSI was retained

3
as financial advisor to Bradley D. Sharp, Chapter 11 Trustee ("Trustee") of Namco

4
Capital Group, Inc., ("Debtor") effective March 18, 2010 and pursuant to an order of this

5
Court entered on May 6, 2010.

6
      2.  I have personal knowledge of the facts stated in this declaration.

7
      3.  I have reviewed the within Interim Application for Compensation and

8
Reimbursement of Fees and Expenses of DSI (the "Application").  The facts stated

9
therein are true of my own knowledge, except such matters as may be stated upon

10
information or belief, which I believe to be true.

11
      4.  The Trustee has been informed of the nature of DSI's services and the

12
approximate amount of their fees prior to the filing of the Application.

13
      I declare under penalty of perjury under the laws of the United States of America

14
that the forgoing is true and correct and that this declaration was executed in Los

15
Angeles, California on September 24, 2012.

16

17

18
                         ERIC J. HELD

19
                   DEVELOPMENT SPECIALISTS, INC.

20

21

22

23

24

25

26

27

28

<u>**DECLARATION OF BRADLEY D. SHARP**</u>

I, Bradley D. Sharp, declare as follows:

1. I am a Senior Consultant at Development Specialists, Inc. ("DSI"). I am the duly appointed Chapter 11 Trustee ("Trustee") of Namco Capital Group, Inc. ("Debtor"). I have personal knowledge of the following facts and, if called, I could and would testify competently thereto.

2. I have reviewed the Third Interim Application for Compensation and Reimbursement of Fees and Expenses of DSI (the "Application").

3. I have discussed the Application with the Applicant and have no unresolved objections to approve the amounts sought in this Application. I believe the payment to DSI of $662,661.50, which is 100% of the total requested fees and the payment to DSI of $220.64, which is 100% of the total expenses will be appropriate in light of the amount of the assets during the administration of the case.

I declare under penalty of perjury under the laws of the United States of America that the forgoing is true and correct and that this declaration was executed in Los Angeles, California on September 24, 2012.

                            BRADLEY D. SHARP
                        CHAPTER 11 TRUSTEE FOR THE
           BANKRUPTCY ESTATE OF NAMCO CAPITAL
                           GROUP, INC.

16

# EXHIBIT 9

page 60

# Expert Report

of

# David Judd

Prepared by

David H. Judd, CPA

Director
Berkeley Research Group, LLC
2049 Century Park East, Suite 2525
Los Angeles, CA 90067

DOCS_LA:267604.1

## I. DESCRIPTION AND SCOPE OF ENGAGEMENT

The United States Bankruptcy Court for the Central District of California approved the employment of Berkeley Research Group, LLC (the "Firm") for R. Todd Neilson, Chapter 11 Trustee ("Namvar Trustee") of the bankruptcy estate of Ezri Namvar ("Ezri") and Bradley D. Sharp, Chapter 11 Trustee ("Namco Trustee") of the bankruptcy estate of Namco Capital Group, Inc. ("NCG", and with Ezri, the "Debtors"), to provide a variety of accounting and financial related services in connection with the Debtors' bankruptcy cases. In this matter we have been requested, among other things, (1) to render an opinion regarding the date of NCG's solvency and whether the same materially changed thereafter, and (2) to perform a liquidation analysis in connection with various preferential transfers made by NCG that are among the subjects of the action herein. The assessment of solvency is being conducted in the context of avoidance actions pursuant to 11 U.S.C. § 544, 547 and 550, and California Civil Code §3439 et seq.

I have utilized professionals within the Firm to assist me in conducting my analysis and preparing this report. This report describes our work to date and summarizes my opinions and the bases for those opinions. The opinions and findings expressed herein are based upon our work to date and upon the pattern of facts that we observed in our examination. It is likely that additional analysis would reveal a more dire financial condition for NCG than reflected in our analysis.

If requested, however, additional analyses may be performed. I expressly reserve the right to supplement, update or otherwise modify this report at a later date based on additional information obtained or additional analyses performed.

This report has been prepared solely in connection with the litigation referenced herein and is intended for no other use. We have not performed an audit of NCG's financial statements in accordance with Generally Accepted Auditing Standards, nor have we performed a review or compilation of financial statements in accordance with the standards promulgated by the American Institute of Certified Public Accountants.

## II. INFORMATION CONSIDERED IN FORMING OPINIONS

In conducting our analysis and forming the opinions as set forth in this report, we have reviewed, among other things, NCG's financial books and records and operating information. A list of documents and information considered can be found in Exhibit 1.

We obtained, among other records, NCG's general ledger.  We reconciled the cash receipt and disbursement activity reflected in that general ledger with NCG's banking records and other supporting documents.  The general ledger agrees in all material respects to NCG's banking records and other supporting documentation.

## III.  STATEMENT OF OPINIONS TO BE EXPRESSED AND BASES AND REASONS THEREFORE

### A.  Statement of Opinions

In accordance with the primary bases and reasons detailed herein, I have thus far formed the following opinions in this case:

1. As of March 31, 2006, the amount of NCG's liabilities exceeded the fair value of its assets by approximately $4.1 million to $5.2 million and NCG was, therefore, insolvent by this amount.

2. NCG's financial condition and access to capital did not improve or change subsequent to March 31, 2006.  Accordingly, NCG was insolvent as of March 31, 2006 and all dates thereafter.

3. If NCG were a debtor under chapter 7 of the Bankruptcy Code, the estimated recovery to unsecured creditors would be approximately 5.3% of each creditor's principal claim amount.[1]  Accordingly, any insider unsecured creditor who received or was the beneficiary of payment(s) from NCG within one year of the "Petition Date" (December 22, 2008) that exceeded approximately 5.3% of the amount of an antecedent debt owed by NCG, and any non-insider unsecured creditor who received or was the beneficiary of payment(s) from NCG within ninety days of the Petition Date that exceeded approximately 5.3% of the amount of an antecedent debt owed by NCG, received more than such creditors would have received if this were a case under chapter 7 of the Bankruptcy Code, the transfers had not been made and such creditors received payment of the antecedent debts to the extent provided by the Bankruptcy Code.

---

[1] As described in further detail below, our liquidation analysis does not include any potential litigation recoveries net of fees and expenses, inasmuch as these are very difficult to estimate at this time.

B.    Background of Namco Capital Group, Inc.

On December 22, 2008 (the "Petition Date"), involuntary chapter 11 bankruptcy petitions were filed against NCG and its sole shareholder Ezri. On January 29, 2009, orders for relief were entered in both the NCG and the Ezri bankruptcy cases.

As of the Petition Date, NCG was owned 100% by Ezri. Ezri and his brother, Homayoun Namvar, were officers and directors of NCG.

From its inception, NCG had been one of the principal repositories for funds solicited by Ezri primarily from the Persian Jewish community in Los Angeles. Investor/creditors advanced funds to NCG and, in turn, received monthly interest checks. NCG's profit was derived from the difference between the interest NCG paid to creditors and the interest charged to those to whom NCG loaned money.

Beginning in 2002, using investment capital from NCG, Ezri and the Namvar Family[2] purchased significant amounts of real property. The total amounts owing by NCG to its creditors increased from approximately $100 million in 2002 to approximately $600 million in 2008. The primary consumers of these funds during 2004 and 2005 were members of the Namvar Family either individually or through various LLCs. At the Petition Date, these investments were spread among almost 400 LLCs covering a wide array of divergent assets throughout the entire United States and extending into Israel.

The practice employed by the Namvar Family when acquiring these assets commonly consisted of NCG initially advancing funds to acquire the property on behalf of an LLC which was owned completely or partially, directly or indirectly, by a Namvar Family member or members. These advances were made, for the most part, without attendant notes, security agreements, trust deeds, collateral or other similar documents. When the real estate market was appreciating, these properties often increased in value sufficiently to allow for refinancing. Through this refinancing, NCG could be repaid its original advances, often with interest. In those instances, not only was NCG repaid but often the Namvar Family members were able to receive millions of dollars in tax-free distributions. When these properties were sold, profits were often rolled over into a new property under the Internal Revenue Code § 1031 exchange provisions.

---

[2] The Namvar Family includes: Ezri, his immediate family and all currently known extended family members including, but not limited to, Ezri's four brothers and their families, Ezri's three sisters and their families, and Ezri's parents.

Beginning in or about 2003 and continuing through at least 2008, NCG saw an ever-increasing cash flow requirement for operations and interest expense. This cash requirement far outpaced NCG's generated income. Interest payments on the borrowed funds from creditor/investors also experienced a significant increase as amounts owed to creditors increased from approximately $100 million in 2002 to approximately $600 million in 2008. With the estimated debt structure of $600 million and the approximate interest rate of 7.5%, NCG would have been required to pay the projected annual sum of $45 million for investor/creditor interest payments alone.

At the same time, the real estate portfolio acquired by the Namvar Family required the ongoing infusion of millions of dollars for debt, tax and insurance payments. This was in addition to millions of dollars required for the entitlement expenses to groom the property for development. All of this occurred at a time of dwindling income from real estate investments. The cumulative monthly shortfall continued to grow until late 2008 when NCG discontinued the payment of interest. Bankruptcy followed a few months later.

## C.    Background of Ezri Namvar

According to the Ezri's records, as well as information filed in conjunction with Ezri's criminal trial, Ezri arrived in the United States on September 17, 1969. In 1974 he obtained his Bachelor's Degree and then enrolled at UCLA in the graduate engineering program. In 1976 he earned a Master's Degree in business.

According to Ezri, Eilel Namvar ("Eilel"), Ezri's father, was the largest Jewish land owner in Iran. In addition to his land holdings, Eilel was reportedly a well established hard money lender in Iran. In 1980, following the seizure of his land and other holdings, Eilel, along with many other Iranian Jews escaping the new Islamic republic, moved to the United States and settled in the Los Angeles area.

In 1989, Ezri married his wife, Ilana. Together they have four children; Daniel, Malka, Shirah and Benjamin.[3]

The Namvar Family engaged in hard money lending in Los Angeles, often utilizing contacts which Eilel had acquired in Iran. Reportedly, NCG raised funds, at least initially, based on Eilel's relationships and reputation. However, Ezri developed his own reputation by

---

[3] It appears that "Shira Namvar" is an alternate spelling for Shirah Namvar's name.

becoming deeply involved with the Persian Jewish community.

This arrangement continued until approximately 1997, when Ezri changed his business model. He began by investing in smaller income-producing properties in the expanding real estate market. After realizing gains, Ezri fully committed the resources of NCG into large real estate projects in California, Arizona and Nevada as well as in other locations throughout the United States. These projects included a variety of property; hotels, rural residential development property, agricultural property with no entitlements, an equestrian center, pistachio farms, shopping centers, land to be developed into shopping centers, a trailer park, storage facilities, small apartment properties, small strip centers in marginal areas, single family residences, conference center sites, property to be developed into golf courses, ground leases, medical office buildings, and government-assisted housing projects.

By the end of 2007, the Namvar Family entities and the Namvar Family members owed NCG over $600 million. These funds had been advanced to or for the benefit of individual Namvar Family members and/or hundreds of limited liability companies ("LLCs") owned entirely or in part, directly or indirectly, by members of the Namvar Family.

D.   Background of Namco Financial Exchange Corp.

Namco Financial Exchange Corp. ("NFE") was organized in late 2005. NFE was owned 100% by Ezri. Namco Financial Inc. ("NFI"), was organized prior to 1990. NFI was owned 100% by Ezri. During late 2000 or early 2001, NFI was a qualified intermediary to handle tax deferred exchanges pursuant to Section 1031 of the Internal Revenue Code ("1031 Exchanges"). From the first exchange through late 2005 NFI handled hundreds of these exchanges. During late 2005, NFI transferred its 1031 Exchange activity to NFE. From 2005 through late 2008, NFE handled hundreds of 1031 Exchanges.

NFE/NFI became a significant source of funds for NCG. In general, those wishing to participate in 1031 Exchanges administered by NFE/NFI would use NFE/NFI as a qualified intermediary. As such NFI/NFE would receive proceeds from the sale of real estate. NFI/NFE was to hold these client funds pursuant to signed Exchange Agreements. The sellers had up to 180 days to close a purchase of like property thereby allowing the seller to defer any gain on sale. Significant portions of these sales proceeds were advanced to NCG from 2001 through 2008.

On May 19, 2011, Ezri was convicted of four counts of wire fraud, in violation of 18 U.S.C. §1343 and ordered to pay over $20 million in restitution.  The jury determined that Ezri participated in a scheme to defraud four former clients of NFE out of over $20 million, which had been entrusted to NFE as proceeds from the sale of real property as a qualified intermediary. Simply put, these funds had been advanced to NCG and were not available to complete the 1031 Exchanges when required.  Instead these funds had either been used to pay other clients of NFE, or were advanced to NCG and used to support its operations.

# SECTION I: INSOLVENCY OF NCG

## I.  PRIMARY BASES AND REASONS FOR OPINIONS

A.    Definition of Insolvency

In regards to avoidance actions filed under the United States Bankruptcy Code, 11 U.S.C. § 547(b) states:

> (b) Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--
> > (1) to or for the benefit of a creditor;
> > (2) for or on account of an antecedent debt owed by the debtor before such transfer was made;
> > (3) made while the debtor was insolvent;
> > (4) made--
> > > (A) on or within 90 days before the date of the filing of the petition; or
> > > (B) between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and
> > (5) that enables such creditor to receive more than such creditor would receive if--
> > > (A) the case were a case under chapter 7 of this title;
> > > (B) the transfer had not been made; and
> > > (C) such creditor received payment of such debt to the extent provided by the provisions of this title.

The definition of insolvency applicable to avoidance actions pursuant to the United States Bankruptcy Code is located at the United States Bankruptcy Code Section 101 (32) (A).  It states:

> (32) Insolvent means:
> > (A)  with reference to an entity other than a partnership and a municipality, financial condition such that the sum of such entity's debts is greater than all of such entity's property, at a fair valuation, exclusive of -- (i) property transferred, concealed, or removed with intent to hinder, delay, or defraud such entity's creditors; and (ii) property that may be exempted from property of the estate under section 552 of this title.

California Civil Code § 3439.05 states:

> A transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

California Civil Code § 3439.02 defines solvency in the following way:

(a)   A debtor is insolvent if, at fair valuations, the sum of the debtor's debts is greater than all of the debtor's assets.

(b)   A debtor which is a partnership is insolvent if, at fair valuations, the sum of the partnership's debts is greater than the aggregate of all the partnership's assets and the sum of the value of each general partner's nonpartnership assets over the partner's nonpartnership debts.

(c)   A debtor who is generally not paying his or her debts as they become due is presumed to be insolvent.

(d)   Assets under this section do not include property that has been transferred, concealed, or removed with intent to hinder, delay, or defraud creditors or that has been transferred in a manner making the transfer voidable under this chapter.

(e)   Debts under this section do not include an obligation to the extent it is secured by a valid lien on property of the debtor not included as an asset.

## B.   Standard of Value

The term "fair valuation," as stated in Section 101 (32) of the Bankruptcy Code is generally interpreted by bankruptcy case law to mean "fair market value."  Revenue Ruling 59-60 defines fair market value as:

> ...the price at which the property would change hands between a willing buyer and a willing seller when the former is not under any compulsion to buy and the latter is not under any compulsion to sell, both parties having reasonable knowledge of relevant facts.

Accordingly, our assessment of solvency has been made from the perspective of what NCG, as a willing seller, could realize from the sale of its assets to a willing buyer.

C.    Premise of Value

The following premises of value may be considered when the assessment of solvency is being conducted in the context of avoidance actions filed pursuant to Sections 544, 547and 550 of the Bankruptcy Code:

- Going concern value — the value of an assemblage of income producing assets on a going concern basis.

- Orderly disposition value as an assemblage of assets — the value of an assemblage of assets in place, but not currently in use as income producing assets.

- Orderly disposition value on a piecemeal basis — the value of assets on a piecemeal basis with normal exposure to the secondary market.

- Forced liquidation value — the value of assets on a piecemeal basis, but with less than normal exposure to the secondary market.

A going concern premise of value is often times employed when assessing solvency in the context of avoidance actions.  In general, the value of a business (either a business interest or the assets of a business) is a function of future cash flow to be derived from the business interest or asset, discounted at a rate of return that reflects the risk inherent in the cash flow stream to be derived.  While exceptions exist, the assets of a viable business will generally include tangible assets and intangible assets.  Tangible assets are typically comprised of working capital (e.g., cash, inventory, and receivables less payables and accrued liabilities) and fixed assets (e.g., furniture, fixtures, property, plant and equipment).  The intangible assets of an organization may include patents, trademarks, brand names, copyrights, a trained and established work force, and goodwill.

Accordingly, in a situation where the likelihood that an entity's assets will generate future positive cash flow is so remote, a potential buyer would not evaluate the entity's assets based on their ability to generate future cash flow.  Instead, the fair market value of the assets would be determined based on the orderly disposition of the assets — either as a mass assemblage of assets or on a piecemeal basis.  In this situation, few if any intangible asset value exists.  In my opinion, this is the condition in which NCG found itself no later than March 31, 2006.  Furthermore, the condition persisted for all dates subsequent to March 31, 2006.  The assets of NCG were comprised primarily of accounts receivable where few if any signed notes existed.  There was no collateral and no payment terms for either principal or interest set forth in notes or other similar

**page 69**

documents.  As of March 31, 2006 and for all dates subsequent, NCG's assets did not generate

sufficient cash flow to cover interest and operating expenses.

As can be seen in the table below, NCG did not generate a positive cash flow from

operations from 2005 through 2008.  In 2007 and 2008, the negative cash flows would have been

greater than indicated below, except that NCG reclassified payments originally recorded as

principal reductions to interest income in the amount of $6.96 million in 2007 and 3.47 million in

2008.

| Namco Capital Group, Inc.<br>Cashflow from Operations for the Years 2004 through 2008<br>(Adjusted Cash Basis) | | | | | |
|---|---|---|---|---|---|
| | 2004 | 2005 | 2006 | 2007 | 2008 |
| **Sources & Uses from Operations:** | | | | | |
| **Sources:** | | | | | |
| Interest Inc | $ 5,547,343 | $  1,914,329 | $  1,074,340 | $  4,719,495 | $  1,620,040 |
| Interest Inc - Namvar Entities | 6,774,774 | 8,802,074 | 13,609,424 | 24,434,142 | 9,074,393 |
| Other Income | 1,884,307 | 2,032,856 | 956,861 | 4,922,725 | 7,128,256 |
| Total Sources | 14,206,424 | 12,749,259 | 15,640,625 | 34,076,362 | 17,822,689 |
| **Uses:** | | | | | |
| Interest Exp - Non-Namvar | (6,613,901) | (10,942,257) | (15,780,872) | (21,839,628) | (18,109,817) |
| Interest Exp - Namvar Related | (1,097,558) | (1,525,994) | (2,352,414) | (3,508,181) | (1,451,226) |
| Interest Exp - Banks | (204,169) | (2,438,287) | (5,350,286) | (4,071,684) | (1,862,962) |
| Interest Exp - SPCC | (221,416) | (1,523,415) | (3,224,627) | (4,091,198) | (2,528,552) |
| Interest Exp - NFX | - | - | (7,416,309) | (4,800,000) | - |
| Interest Exp - Other Exchanges | (300,510) | (72,363) | (16,752) | (193,099) | - |
| Interest Exp - Safco | (10,418) | (191,169) | (394,582) | (1,112,793) | (632,112) |
| Operating Expenses | (2,951,352) | (4,265,249) | (3,751,685) | (4,651,417) | (3,240,728) |
| Total Uses | (11,399,324) | (20,958,734) | (38,287,527) | (44,268,000) | (27,825,397) |
| Net Sources/(Uses) from Operations | $  2,807,100 | $  (8,209,475) | $ (22,646,902) | $ (10,191,638) | $ (10,002,708) |

In line with the opinions stated above, it is my opinion that, no later than March 31, 2006

and all dates thereafter, NCG was cash flow negative and on its deathbed and, accordingly,

should be valued using an orderly disposition premise of value.

An orderly disposition value on a piecemeal basis does not contemplate any mutually

contributory value among the various groups of assets.  Nevertheless, we are unaware of any

DOCS_LA:267604.1

10

**page 70**

evidence to suggest that accounts receivable and other investment assets owned by NCG would be subject to any value enhancement from other assets, or extend value enhancement to other assets if they were sold on an orderly disposition basis as an assemblage of assets.

## D.     Valuation Approaches

### Income Approach

The income approach measures the value of assets or business interests based on the present value of future economic benefits that attach to the asset or the interest. These benefits can include earnings, cost savings, tax deductions, and proceeds from disposition. Value indications are developed by discounting expected cash flow to its present value at a rate of return that incorporates the risk-free rate for the use of funds as well as an appropriate risk premium given the nature of the investment. The discount rate selected is generally based on rates of return available from alternative investments of similar type and quality as of the valuation date. Discounts may be applied to the value estimate developed using the income approach for a variety of reasons.

### Market Approach

The market approach measures the value of assets or a business interest through an analysis of transactions involving assets or business interests, if available, that are sufficiently similar in nature to the assets or business interests being valued. Multiples of revenue, book value or an earnings measure (e.g., net income, EBIT, EBITDA) can be developed and applied in order to assess the value of the asset or business interest being valued. Furthermore, transactions involving the actual asset or business interest being valued may also be considered in assessing the value of the asset or business interest in question. Again, discounts may be applied to the value estimate developed using the market approach for a variety of reasons.

### Asset - Based Approach

The asset-based approach measures the value of a business interest based on the market value of its assets and the amount of its liabilities. Accordingly, historical cost numbers for assets have been converted to fair value based on the estimated amount that could be received between a willing buyer and a willing seller. In many instances, the assets of a business may not be reflected on balance sheets prepared pursuant to Generally Accepted Accounting Principles ("GAAP") or some other basis of accounting. For example, assets such as trademarks are not

reflected on a business's balance sheet because the expenditures associated with the creation of these assets are expensed rather than capitalized. Such assets, just as assets that are recorded on a business's balance sheet, should be reflected at their market values.

The amount of a business's liabilities is also considered in the application of the asset-based approach. In some situations, not all liabilities are reflected on a business's balance sheet. Some liabilities may have been inadvertently, or intentionally, omitted. Furthermore, in some circumstances GAAP does not require that contingent liabilities be recorded on a business's balance sheet. Notwithstanding, some potential liability may exist and, if so, should be reflected on the business's balance sheet. Accordingly, adjustments may be required to reflect the amount of all liabilities associated with a business. The net difference between the restated assets and liabilities is reflective of the market equity (or deficit) of the business.

### E.     Selected Approaches

Income Approach

The Income Approach is based on the premise of discounting future cash flows from the operations of the entity. In the case of NCG, operations had resulted in negative cash flows for the years 2005 through 2008, and positive future cash flows could not be estimated or justified. As a result, under the Income Approach, there is no going concern value.

Market Approach

The Market Approach is based on the premise that the value of assets or the business interest can be determined through an analysis of transactions involving assets or business interests that are sufficiently similar in nature to the assets or business interests being valued. In the case NCG, the primary assets to be sold are accounts and notes receivable with no signed notes, collateral, or stated terms set forth in notes or other similar documents. As such it would be very difficult, if not impossible, to find similar transactions or bona fide purchasers. For these reasons, the Market Approach was not selected.

Asset-Based Approach

The Asset-Based Approach is based on the market value of the assets and liabilities. In the case of NCG, the assets and liabilities can be identified and approximate market values can be assigned based on NCG's books and records. As discussed in more detail below, the Asset-

Based Approach has been selected as the appropriate method of valuing NCG as of March 31, 2006.

### F.    Asset-Based Approach Using the Balance Sheet Test

The Balance Sheet Test is generally the method preferred by the courts when assessing the solvency of a business and/or individual in a bankruptcy context, and is more representative of the Asset-Based Approach. The Balance Sheet Test is a test that has developed over time in a bankruptcy context to determine the solvency of a business. The Balance Sheet Test involves the following attributes:

1.    It is based on a fair valuation and not on Generally Accepted Accounting Principles which are used to prepare a typical balance sheet.
2.    The focus is on the fair market value of the debtor's assets within a reasonable time of the transfers. Asset valuation need not be exact.
3.    Assets should be valued at the sale price a willing and prudent seller would accept from a willing and prudent buyer if the assets were offered in a fair market for a reasonable period of time.
4.    A fair valuation of assets contemplates a conversion of assets into cash during a reasonable period of time.
5.    The fair value of property is determined estimating what the debtor's assets would realize if sold in a prudent manner in current market conditions.
6.    Unlike assets, debts are typically measured at their face value and not at market value.
7.    To value a contingent liability or a contingent asset, it is necessary to discount it by the probability that the contingency will occur and the liability will become real. It makes no difference whether there is a contingent asset or a contingent liability, the asset or liability must be reduced to its present, or expected, value before it can be determined whether the firm's assets exceed its liabilities.

### G.    Selected Approach for NCG

As stated previously, the Balance Sheet Test is generally the method preferred by the courts when assessing the solvency of a business in a bankruptcy context.

NCG's assets were comprised primarily of undocumented accounts and notes receivable, due in large part from the Namvar Family and LLCs controlled by the Namvar Family. The income derived from these receivables was sporadic and inconsistent. In many cases no interest was ever paid to NCG from these receivables. On a cash basis, historical profits were non-existent beginning in early 2006. Prior to that, cash based profits were limited both as to amount and measurement period.

**page 73**

Based on the above discussion, it is our opinion that the most appropriate method for assessing the solvency of NCG is the Balance Sheet Test. In our application of the Balance Sheet Test, we have assessed the fair value of NCG's assets based on the value that could be realized from the sale of these assets to a willing buyer within a reasonable time period. Within the development of the fair value of NCG's assets, we primarily utilized the asset-based approach.

## II. BALANCE SHEET TEST: NAMCO CAPITAL GROUP, INC.

### A.   Introduction

As discussed above, the value of a business (either a business interest or the assets of a business) is a function of future cash flow to be derived from the business interest or asset, discounted at a rate of return that reflects the risk inherent in the cash flow stream to be derived. In general, the assets of a viable business will generally include tangible assets and intangible assets. In a situation where the likelihood that an entity's assets will generate future cash flow is so remote, a potential buyer would not evaluate the entity's assets based on their ability to generate future cash flow. Instead, the fair market value of the assets would be determined based on the orderly disposition of the assets -- either as a mass assemblage of assets or on a piecemeal basis. In this situation, few if any intangible asset value exists. In my opinion, this is the condition in which NCG found itself no later than March 31, 2006. The assets of NCG were comprised primarily of accounts receivable where, based on my review of NCG's books and records, few if any signed notes or other security agreements existed. As such, there was no collateral and no payment terms for either principal or interest set by notes or other similar documents. As of March 31, 2006 and for all dates subsequent, NCG's assets did not generate sufficient cash flow to cover interest and operating expenses.

In line with the opinions stated above, it is my opinion that, no later than March 31, 2006 and all dates thereafter, NCG was on its deathbed and, accordingly, should be valued using an orderly disposition premise of value. When valued using an orderly disposition premise of value as of March 31, 2006, NCG was insolvent by approximately $4.1 million to $5.2 million.

**page 74**

B.    Assessment of Solvency -- Balance Sheet Insolvency

We prepared balance sheets for NCG based on its general ledger and financial books and records. In particular we prepared two limited balance sheets for NCG as of March 31, 2006.[4] In the first we have excluded accrued interest receivable and accrued interest payable. In the second we have included both accrued interest receivable and accrued interest payable.

Balance Sheet Analysis #1 (Excludes Accrued Interest Receivable and Accrued Interest Payable)

A majority of NCG's outstanding investments and receivables did not pay monthly interest. For the most part, the hundreds of millions of dollars advanced to/or for the benefit of the Namvar Family only paid sporadic interest at best. Since almost 90% of NCG's investment portfolio consisted of advances to/or for the benefit of the Namvar Family, future payment of accrued interest was highly suspect. Also, at the Petition Date the entities and investments controlled by the Namvar Family as well as the Namvar Family owed in excess of $50 million of accrued interest. A majority of NCG's outstanding investments and receivables did not pay monthly interest. Due to the lack of signed notes, other similar documentation and collateral, we have excluded accrued interest receivable for purposes of the Balance Sheet Analysis #1.[5]

For the same reasons and in order to be consistent we have also excluded any accrual of interest payable. It was NCG's practice to pay monthly interest to third party creditors. However, for Namvar Family related accounts payable including NFI/NFE, NCG only paid sporadic interest. It was uncommon for NCG to accrue unpaid interest payable. These payables also lacked signed notes, other similar documentation and collateral. Accordingly, we have excluded accrued interest payable for purposes of Balance Sheet Analysis #1.

Consistency is the important principle. If accrued interest receivable is to be included then accrued interest payable should also be included. By the same token, if accrued interest receivable is to be excluded then accrued interest payable should be excluded.

As indicated in the Balance Sheet Analysis #1 schedule below, adjustments were made to Capital and Retained Earnings.[6]

All other assets and liabilities are reflected at their stated amounts.

---

[4] In the application of the balance sheet test, capital and retained earnings have no inherent value and are not considered in the calculation of solvency.
[5] No opinion is expressed herein with regard to whether interest may be recoverable as damages in connection with litigation involving any specific receivable.
[6] See footnote 4.

**Namco Capital Group, Inc.**

Balance Sheet Analysis #1 - Assessment of Insolvency

| | March 31, 2006 | Adjustments | Adjusted March 31, 2006 |
|---|---|---|---|
| Cash & Cash Equivalents | $      648,172 | $           - | $      648,172 |
| Accounts Receivable | 35,528,644 | - | 35,528,644 |
| Accounts Receivable - Namvar Family | 480,156,118 | - | 480,156,118 |
| Allowance for Doubtful Accounts | - | | - |
| Accrued Interest Receivable | 25,704,414 | (25,704,414) | - |
| NCG Investments - Net | 6,313,432 | - | 6,313,432 |
| | $ 548,350,780 | $  (25,704,414) | $ 522,646,366 |
| | | | |
| Accounts Payable | $ (200,699,242) | $           - | $ (200,699,242) |
| Accounts Payable - Namvar Family | (109,398,648) | - | (109,398,648) |
| Accrued Interest Payable - Namvar Family | - | - | - |
| Accounts Payable - Other | (353,060) | - | (353,060) |
| Payable - NFE | (119,028,437) | - | (119,028,437) |
| Payable - NFI | (4,273,517) | | (4,273,517) |
| Accrued Interest Payable - NFE | - | - | - |
| Accrued Interest Payable - NFI | - | - | - |
| Payable - Other Exchanges | (4,635,070) | - | (4,635,070) |
| Payable - SPCC | (29,447,250) | - | (29,447,250) |
| Banks | (60,025,038) | - | (60,025,038) |
| Capital | (100,000) | 100,000 | - |
| Retained Earnings | 777,100 | (777,100) | - |
| | $ (527,183,162) | $      (677,100) | $ (527,860,262) |
| | | | |
| Net Value | $    21,167,618 | $  (26,381,514) | $    (5,213,896) |

Based on the analysis and evaluation of NCG's assets and liabilities, it was concluded that as of March 31, 2006, the sum of NCG's liabilities exceeded the fair value of its assets by approximately $5.2 million. Accordingly, NCG was insolvent no later than March 31, 2006.

A schedule of the book value of assets and liabilities, along with the adjustments to arrive at the fair value of the assets and the amount of the liabilities at March 31, 2006, is presented in the Table above as Balance Sheet Analysis #1.

**page 76**

<u>Balance Sheet Analysis #2 (Includes Accrued Interest Receivable and Accrued Interest Payable)</u>

A majority of NCG's outstanding investments and receivables did not pay monthly interest. For the most part, the hundreds of millions of dollars advanced to/or for the benefit of the Namvar Family only paid sporadic interest at best. Since almost 90% of NCG's investment portfolio consisted of advances to/or for the benefit of the Namvar Family, future payment of accrued interest was highly suspect. Also, at the Petition Date the entities and investments controlled by the Namvar Family as well as the Namvar Family members individually owed in excess of $50 million of accrued interest. A majority of NCG's outstanding investments and receivables did not pay monthly interest. Due to the lack of signed notes, other similar documentation and collateral we did not include accrued interest receivable for purposes of Balance Sheet Analysis #1.[7] However, in order to present an alternative to Balance Sheet Analysis #1 we have included accrued interest receivable for purposes of Balance Sheet Analysis #2.

For the same reasons and in order to be consistent we have also included an accrual of interest payable. It was NCG's practice to pay monthly interest to third party creditors. However, for Namvar Family related accounts payable including NFI/NFE, NCG only paid sporadic interest. It was uncommon for NCG to accrue unpaid interest payable. These payables also lacked signed notes, other similar documentation and collateral. In order to present an alternative to Balance Sheet Analysis #1, we have included accrued interest payable for purposes of Balance Sheet Analysis #2.

Consistency is the important principle. If accrued interest receivable is to be included then accrued interest payable should also be included. By the same token, if accrued interest receivable is to be excluded then accrued interest payable should be excluded.

As indicated above, the Balance Sheet Analysis #2 schedule below excludes Capital and Retained Earnings.[8]

All other assets and liabilities are reflected at their stated amounts.

---

[7] No opinion is expressed herein with regard to whether interest may be recoverable as damages in connection with litigation involving any specific receivable.
[8] See footnote 4.

**page 77**

**Namco Capital Group, Inc.**
Balance Sheet Analysis #2 - Assessment of Insolvency

| | March 31, 2006 | Adjustments | Adjusted March 31, 2006 |
|---|---|---|---|
| Cash & Cash Equivalents | $ 648,172 | $ - | $ 648,172 |
| Accounts Receivable | 35,528,644 | - | 35,528,644 |
| Accounts Receivable - Namvar Family | 480,156,118 | - | 480,156,118 |
| Allowance for Doubtful Accounts | - | - | - |
| Accrued Interest Receivable | 25,704,414 | - | 25,704,414 |
| NCG Investments - Net | 6,313,432 | - | 6,313,432 |
| | $ 548,350,780 | $ - | $ 548,350,780 |
| | | | |
| Accounts Payable | $ (200,699,242) | $ - | $ (200,699,242) |
| Accounts Payable - Namvar Family | (109,398,648) | - | (109,398,648) |
| Accrued Interest Payable - Namvar Family | - | (4,697,309) | (4,697,309) |
| Accounts Payable - Other | (353,060) | - | (353,060) |
| Payable - NFE | (119,028,437) | - | (119,028,437) |
| Payable - NFI | (4,273,517) | - | (4,273,517) |
| Accrued Interest Payable - NFE | - | (2,193,962) | (2,193,962) |
| Accrued Interest Payable - NFI | - | (17,656,918) | (17,656,918) |
| Payable - Other Exchanges | (4,635,070) | - | (4,635,070) |
| Payable - SPCC | (29,447,250) | - | (29,447,250) |
| Banks | (60,025,038) | - | (60,025,038) |
| Capital | (100,000) | 100,000 | - |
| Retained Earnings | 777,100 | (777,100) | - |
| | $ (527,183,162) | $ (25,225,289) | $ (552,408,451) |
| | | | |
| Net Value | $ 21,167,618 | $ (25,225,289) | $ (4,057,671) |

Based on the analysis and evaluation of NCG's assets and liabilities, it was concluded as of March 31, 2006, the sum of NCG's liabilities exceeded the fair value of its assets by approximately $4.1 million. Accordingly, NCG was insolvent no later than March 31, 2006.

A schedule of the book value of assets and liabilities, along with the adjustments to arrive at the fair value of the assets and the amount of the liabilities at March 31, 2006, is presented in the Table above as Balance Sheet Analysis #2.

DOCS_LA:267604.1

1.    **Cash**

Cash has not been adjusted and has been included at the value recorded in the books and records of NCG.

2.    **Receivables – Namvar Family**

By March 31, 2006, Namvar Family receivables represented hundreds of accounts and 87.6% of the total assets of NCG.  These receivables and advances existed almost exclusively without signed notes or executed agreements, accordingly there was no collateral, security or interest rates stated in signed notes or executed agreements.[9]  In addition, these receivables and advances had no schedules for the regular payment of interest or the return of principal.  Finally, the dependency of the Namvar Family on the capital of NCG along with NCG's dependency on the Namvar Family entities and individuals paying their receivables, plus interest, raises additional questions as to the real values.

Many of the outstanding receivables existing on March 31, 2006, remained outstanding as of the Petition Date, almost three years later.  Many of these receivable balances actually increased from March 31, 2006 to the Petition Date.  In addition, many of these same receivables paid little or no interest to NCG from March 31, 2006 through the Petition Date.  Even though during the time period subsequent to March 31, 2006, NCG received a total of $38.76 million from Namvar related receivables, a majority of these payments ($32.47 million) were made by less than ten (10) individuals/entities. The hundreds of other Namvar related receivables made few if any interest payments.  Finally, it has been determined that many of those same receivables had little or no value at the Petition Date.

While the $38.76 million in interest paid to NCG by Namvar related receivable accounts appears significant, NCG paid a total $92.64 million in interest expense and $10.91 million in operating expense during the same time period.

Given this lack of documentation, support, collateralization, the co-dependency described above and the lack of ultimate value to NCG, the sale of these receivables to any third party would be problematic.  In other circumstances, using acceptable valuation methodology, it would be appropriate to significantly reduce the value of those assets from the book values as recorded.

---

[9] This lack of documentation does not affect the validity of the Namvar Family receivables.  However, it has an impact on the value of those receivables.  No opinion is expressed herein regarding the validity or value of any specific receivable.

Even in a more ideal setting, it is common for companies to have a general allowance for non-collectability. This allowance for uncollectible accounts receivable can have a wide range depending primarily on the prospects for collection which may be impacted by the industry, company size and specific company practices. Even large institutional lenders with documented and collateralized loans maintain an allowance for non-collectability of 1% to 2%. For purposes of this report we have not made such an adjustment, even though such an adjustment could easily be made. For every 1% adjustment for an allowance for non-collectability of Namvar Family accounts receivable NCG's insolvency would increase by approximately $4.8 million. Even a modest 5% reduction in the value of the Namvar Family accounts receivable due to such an allowance for non-collectability would increase NCG's insolvency by $24 million.

Although not currently necessary to show insolvency, I expressly reserve the right to supplement this report with a detailed analysis of the appropriate amount of an allowance for doubtful accounts related to the Namvar Family receivables.

3.    Receivables – Other

Receivables from those unrelated to the Namvar Family had the same general characteristics as those associated with the Namvar Family. That is, based on our review of NCG's books and records, most of these receivables and advances had no signed notes or executed agreements, and accordingly there was no collateral, security or interest rates stated in signed notes or executed agreements.[10] These receivables and advances also had no schedules for the regular payment of interest or the return of principal.

Many of the outstanding receivables on March 31, 2006, remained outstanding as of the Petition Date. Many of these receivable balances actually increased from March 31, 2006 to the Petition Date. Many of these same receivables paid little or no interest to NCG from March 31, 2006 through the Petition Date. During the time period subsequent to March 31, 2006, NCG received a total of $7.28 million from other receivables. A significant number of other receivables made few if any interest payments. Finally, many of these same receivables had little or no value at the Petition Date.

---

[10] This lack of documentation does not affect the validity of the other receivables. However, it has an impact on the value of those receivables. No opinion is expressed herein regarding the validity or value of any specific receivable.

**page 80**

While the $7.28 million in interest paid to NCG by other receivables appears significant, NCG paid a total $92.64 million in interest expense and $10.91 million in operating expense during the same time period.

Given this lack of documentation, support and collateralization and the lack of ultimate value to NCG, the sale of these receivables to any third party would be problematic. In other circumstances, using acceptable valuation methodology, it would be appropriate to significantly reduce these assets from the book values as recorded.

Even in a more ideal setting, it is common for companies to have a general allowance for non-collectability. This allowance for uncollectible account receivable can have a wide range depending on the industry, company size and specific company practices. Even large institutional lenders with documented and collateralized loans maintain an allowance for non-collectability of 1% to 2%. For purposes of this report we have not made such an adjustment, even though such adjustment could easily be made. For every 1% adjustment for an allowance for non-collectability of other accounts receivable NCG's insolvency would increase by approximately $.4 million. Even a modest 5% reduction in the value of the other accounts receivable due to such an allowance for non-collectability would increase NCG's insolvency by $1.8 million.

Although not currently necessary to show insolvency, I expressly reserve the right to supplement this report with a detailed analysis of the appropriate amount of an allowance for doubtful accounts related to the other receivables.

    4.       Other Investments and Assets

We have made no adjustments to the book values of the other assets and investments of NCG.

    5.       Accrued Interest Receivable

A majority of NCG's outstanding investments and receivables did not pay monthly interest. Due to the lack of signed notes, other similar documentation and collateral, we have excluded accrued interest receivable for purposes of Balance Sheet Analysis #1.[11] By the same token, if accrued interest receivable is to be excluded then accrued interest payable should also be excluded.

For purposes of Balance Sheet Analysis #2 we have included accrued interest receivable.

---

[11] No opinion is expressed herein with regard to whether interest may be recoverable as damages in connection with litigation involving any specific receivable.

Inasmuch as consistency is a key concept, if accrued interest receivable is to be included then accrued interest payable should also be included.  This approach was implemented in Balance Sheet Analysis #2.

6.    Liabilities

The liabilities have been included at the book value as recorded in NCG's books and records.

Included in these payables is a principal amount of $119,028,437 due to NFE.  NFE, acting as a qualified intermediary, entered into 1031 Exchange transactions with owners selling investments properties and received exchange proceeds for safekeeping until a replacement property could be identified and purchased.  The funds held by NFE were to be held in a secure account or accounts and be available on demand to complete the 1031 Exchanges.

Instead, these funds were regularly transferred to NCG thereby creating the significant intercompany payable.  Once transferred to NCG, these proceeds were used to fund NCG's ongoing operations and activities.  Because these funds were used, neither NFE nor NCG had sufficient liquidity to meet the total "on demand" nature of these funds at any time subsequent to March 31, 2006.  In addition, NCG only made periodic interest payments on the outstanding balance and these payments were never sufficient to cover the outstanding interest payable.

NCG used these exchange funds from NFE and its predecessor NFI for years to fund its operations and business activities.  It would have been very difficult if not impossible for NCG to find a replacement source of capital had NFE demanded the return of all funds advanced, including unpaid interest at any point in time subsequent to March 31, 2006.  It is clear that NCG did not have the liquidity or working capital to return the totality of advances from NFE, if so demanded.  This lack of liquidity resulted in the inability of NFE to effectuate certain 1031 Exchange transactions, which led to the ultimate indictment and conviction of Ezri.

7.    Accrued Interest Payable

As explained above in the section for Accrued Interest Receivable, consistency is the key concept.  For purposes of this report we have excluded accrued interest payable based on amounts due to NFE/NFI and various Namvar Family entities for Balance Sheet Analysis #1.  We have included an accrual for interest payable based on amounts due to NFI/NFE and various Namvar Family entities for purposes of Balance Sheet Analysis #2.  Accrued interest has been

**page 82**

calculated on a periodic basis with simple interest of 7.5 % per annum.[12]  Where applicable we have given credit for actual interests payments made to NFI/NFE and the Namvar Family entities and individuals.

### 8.      Capital and Retained Earnings

We have excluded the balances for capital and retained earnings as they have no relevance for purposes of the balance sheet test.

### C.      Summary

Based on the analysis and evaluation of NCG's operations, assets and liabilities, we concluded that, as of March 31, 2006, the sum of NCG's liabilities exceeded the fair value of its assets by approximately $5.2 million based on Balance Sheet Analysis #1 and $4.1 million based on Balance Sheet Analysis #2.

Furthermore, based on the evidence that we have examined we are not aware of any compelling facts suggesting that NCG was anything but insolvent at any time subsequent to March 31, 2006 until its bankruptcy in late 2008. As shown in the table above "Cash flows from Operations", NCG did not generate a positive cash flow from operations from 2005 through 2008. Although regional markets may vary slightly from the national market, studies show that the real estate market in general peaked in late 2006 to early 2007 and then began its decline. As discussed previously, NCG would not have been the beneficiary of any of the market gains as it generally didn't own any real estate.  Even in a booming real estate market, NCG was only entitled to a return of principal plus interest.  The account receivables NCG owned were almost exclusively without signed notes, similar documentation, or collateral.  In addition, NCG's account receivables would have been susceptible to real estate market declines, making collection of principal and interest even less likely.

### D.      Factors Contributing to the NCG's Financial Demise

We conducted an extensive analysis of factors that, in our opinion, contributed to NCG's financial demise. This analysis was primarily based on an evaluation of NCG's financial and operating data as well as financial and operating information for NFI/NFE and other Namvar Family entities and individuals. As a result of our analysis, we have identified several primary

---

[12] Prior to bankruptcy, NCG was generally paying 7.5% interest to holders of accounts payable. Accordingly, for purposes of this report we have used an interest rate of 7.5% to calculate accrued interest payable.

factors that contributed to NCG's financial demise and insolvency. All of the primary
contributing factors were in place by at least March 31, 2006. Furthermore, we are unaware of
any significant events or changes in circumstances that occurred subsequent to March 31, 2006
that caused NCG to move from an insolvent position to a solvent position during that time
period. While NCG's financial condition declined subsequent to March 31, 2006, it is our
opinion that this decline in financial condition only resulted in a deepening of NCG's insolvency.
The primary factors that contributed to the NCG's financial demise are discussed below.

Lack of Income from Operations

As discussed above, NCG's portfolio of accounts receivable and real estate investments
contained few assets which generated monthly operating income that could be used to cover
operating expenses and interest. NCG used NFI/NFE funds as well as advances from Namvar
Family entities for years without making any meaningful interest payments. Even with that
lenient payment history, NCG was unable to generate sufficient cash to meet its ongoing interest
and expense obligations.

As shown in the prior table, "Cashflows from Operations", from 2005 through 2008, the
disparity between interest received and interest paid was tens of millions of dollars. As a result,
the cumulative losses continued to mount. As the real estate market continued to decline any
hope of interest income increasing was all but gone.

Collectability of Accounts Receivable

With each passing month, the value of NCG's accounts receivable was decreasing. In
order to plug the holes left by the operating losses generated by NCG, the real estate assets of the
Namvar Family held individually and through various LLCs (a significant number of which had
been purchased and/or maintained with NCG's funds) were being sold and/or refinanced and the
proceeds advanced to NCG, creating new liabilities. These advances were then consumed by
NCG to cover operating losses, with the remainder used to pay other liabilities or advanced to
other individuals and LLCs as receivables. A majority of the remaining accounts receivable
belonged to LLCs that were either already underwater or so close to the brink of collapse that the
payment of interest or meaningful collections of the outstanding balances appeared unlikely.
Even as early as mid 2005, the book value of the assets was less than the liabilities. Excluding
accrued interest receivable, the book value of the assets never exceeded the liabilities subsequent
to March 2006. Even if a particular real estate investment was wildly successful, NCG was only

**page 84**

entitled to interest and the return of its principal. The true upside belonged primarily to members of the Namvar Family.

Inability to Effectuate Sale or Raise Capital

Beginning in 2007 the impressive returns of the real estate market were all but gone and NCG's downward spiral could not be slowed, let alone stopped. From 2007 through the Petition Date (while both Ezri and Homayoun Namvar were officers and directors of NCG), Ezri was juggling the assets and liabilities of NCG. Ezri couldn't rely on other creditors to continue to fund NCG. Many of them were struggling with their own financial problems. The books and records of NCG indicate that Ezri aggressively attempted to eliminate NCG's obligation to NFI/NFE. Before this could be accomplished, NCG was placed into bankruptcy and ultimately those unpaid advances proved to be Ezri's undoing. Those unpaid NFI/NFE advances resulted in Ezri's criminal indictment and ultimate conviction. NCG was unable to obtain funding from banks or other financial institutions which left him and NCG with few options.

During this time, assets owned by the many Namvar Family entities were liquidated, and the funds were advanced to NCG to cover ongoing expenses and reduce the obligations to NFI/NFE, the banks and other creditors. In addition, by late 2007 and continuing on into 2008, many creditors were making continued requests and demands for the return of their principal. In order to meet some of these demands, interests in many of the remaining real estate assets owned by the Namvar Family and their entities were assigned to creditors.

Speculative Real Estate Investments

With the real estate market leveling off and/or declining, many of the speculative real estate investments by the Namvar Family were caught between divergent forces. Many of these were developmental properties that would require additional sums of capital to ready for further development or sale. Such capital was not available from NCG let alone any outside lender. Moreover, the properties couldn't be sold for a sufficient price that would repay the primary lenders, let alone provide a return that would repay the amounts owed to NCG. The speculative real estate investments by the Namvar Family (funded by NCG) included tens of millions of dollars in raw land and developmental properties in Nevada, Arizona and California. For example, NCG advanced approximately $15 million to or for the benefit of the Namvar Family for the purchase of a developmental property in Las Vegas. Subsequent to this purchase NCG advanced over $10 million to or for the benefit of the Namvar Family, through the same Namvar

DOCS_LA:267604.1

25

Family entity, to continue the development and pay the carrying costs of this property. This property was ultimately lost to foreclosure. This is just one of many examples.

It is estimated that NCG advanced at least $75 million to developmental properties in Las Vegas owned directly or indirectly by the Namvar Family, which were lost to foreclosure. It is also estimated that NCG advanced over $100 million to Namvar Family LLCs for the acquisition of vacant land which was also lost to foreclosure.

E.    Other Items

No Material Improvement in Financial Condition and Operating Performance Subsequent to March 31, 2006

Finally, our review of the NCG's financial information indicates there was no significant change or improvement subsequent to March 31, 2006. Accordingly, NCG was insolvent as of March 31, 2006 and all dates thereafter.


SECTION II:  LIQUIDATION ANALYSIS

We have prepared a liquidation analysis for NCG showing what general unsecured creditors would have received if NCG's bankruptcy case were administered under chapter 7 of the Bankruptcy Code.[13]  This liquidation analysis is based on a variety of assumptions and estimates which, though considered reasonable, may not be realized. The ultimate recovery to creditors may be significantly different than the recovery estimated herein.

The following assets, expenses, liabilities and claims have been estimated and/or analyzed as part of this analysis:  unrestricted cash, restricted cash, real estate, net proceeds from outstanding litigation, post-petition inter-debtor advances, pre-petition inter-debtor claims recoveries, administrative expenses, unsecured priority tax claims, secured claims, priority claims and general unsecured claims.

We have not included any potential litigation recoveries net of fees and expenses, inasmuch as these are very difficult to estimate. Based on the most current information available at this time, the estimated recovery to unsecured creditors, if NCG were a debtor under chapter 7 of the Bankruptcy Code, would be approximately 5.3% of each creditor's principal claim

---

[13] In preparing this liquidation analysis, we consulted with professionals at Development Specialists, Inc. ("DSI"). DSI also has been retained as financial advisors and consultants to the Namco Trustee.

amount, plus a pro-rata portion of net litigation recoveries, the amount of which is unknown at this time.

We have estimated the total assets of NCG to be approximately $45.0 million as of September 30, 2013. After payment of unpaid professional fees as well as repayment of professional fees paid by a related Debtor, we have estimated that approximately $23.3 million will be available for distribution to creditors. We have estimated that unsecured priority tax claims, other secured claims and priority claims will be paid 100% or $1.2 million. That leaves an estimated $22.2 million for payment of general unsecured claims. We have estimated general unsecured claims of $415.0 million resulting in an approximate payment of 5.3% to general unsecured creditors. The liquidation analysis we performed is set forth at Exhibit 2 and in the table below.

|  | Amount |
|---|---|
| Estimated Unrestricted Cash | $       3,100,000 |
| Restricted Cash | 200,000 |
| Real Estate & Other Assets, Net | 6,400,000 |
| Litigation, Proceeds, Net | Unknown |
| Post-Petition Inter-Debtor Advances | 275,000 |
| Pre-Petition Inter-Debtor Claims Recoveries | 35,000,000 |
| Total Assets | 44,975,000 |
| Less: Professional Fees |  |
| Unpaid Professional Fees | (14,528,000) |
| Payment to other Debtor for fees paid | (7,144,700) |
| Net Assets Available for Creditors | 23,302,300 |
| Claims: |  |
| Estimated Unsecured Priority Tax Claims | (460,000) |
| Estimated Other Secured Claims | (610,000) |
| Estimated Priority Claims | (75,000) |
| Available for General Unsecured Claims | $      22,157,300 |
| Estimated General Unsecured Claims | $    415,000,000 |
| Estimated Recovery for General Unsecured Claims | 5.3% |

Accordingly, as set forth in the table above and at Exhibit 2, if (a) any insider unsecured creditor of NCG received or was the beneficiary of any transfer(s) from NCG within one year of

**page 87**

the Petition Date, (b) the transfer(s) were for or on account of an antecedent debt owed by NCG, and (c) the transfer(s) totaled more than approximately 5.3% of the amount of the antecedent debt, then the insider unsecured creditor received more than such creditor would have received if this were a case under chapter 7 of the Bankruptcy Code, the transfer(s) had not been made and such creditor received payment of the antecedent debt to the extent provided by the Bankruptcy Code.  Similarly, if (a) any non-insider unsecured creditor of NCG received or was the beneficiary of any transfer(s) from NCG within ninety days of the Petition Date, (b) the transfer(s) were for or on account of an antecedent debt owed by NCG, and (c) the transfer(s) totaled more than approximately 5.3% of the amount of the antecedent debt, then the non-insider unsecured creditor received more than such creditor would have received if this were a case under chapter 7 of the Bankruptcy Code, the transfer(s) had not been made and such creditor received payment of the antecedent debt to the extent provided by the Bankruptcy Code.

## VII. QUALIFICATIONS OF EXPERT AND COMPENSATION

We make certain certifications in relation to the preparation of this assessment of solvency.  Our assumptions and limiting conditions are contained within the report narrative and schedules.  David Judd's qualifications are detailed in the resume attached as Appendix A.  Appendix B details current hourly rates by level for the professionals within BRG.  Mr. Judd's prior testimony experience is included at Appendix C.  Mr. Judd has authored no publications within the previous ten years.

DATED this 17th day of May 2013.

David H. Judd

# Exhibit 1

Namco Capital Group, Inc
Documents Reviewed

1   Namco Capital Group, Inc. - Investor/Creditor files
2   Namco Capital Group, Inc. - Promissory notes and Ezri Namvar personal guaranties
3   Statements & Schedules:  Namco Capital Group, Inc, Beshmada, LLC, Beshmada of Delaware, LLC & Dimes, LLC.
4   Filed proofs of claim:  Namco Capital Group, Inc, Ezri Namvar, Beshmada, LLC, Beshmada of Delaware, LLC & Dimes, LLC.
5   Claim settlement agreements: Namco Capital Group, Inc, Ezri Namvar, Beshmada, LLC, Beshmada of Delaware, LLC & Dimes, LLC.
6   Administrative claims including all professional fee applications
7   Namco Capital Group, Inc. - Monthly Balance Report - 2001 through 2008
8   Motions and other filings related to Ezri Namvar's criminal trial
9   Accounting support documents - Bank statements, canceled checks, deposit detail, wire transfers
10   Accounting support documents - Real property purchase, refinance & sale documentation
11   QuickBooks file - Namco Capital Group, Inc.
12   QuickBooks file - Namco Financial, Inc.
13   QuickBooks file - Namco Financial Exchange Corp.
14   QuickBooks file - Ezri Namvar
15   QuickBooks file - Daniel Namvar
16   QuickBooks file - Malka Namvar
17   QuickBooks file - Shirah Namvar
18   QuickBooks file - Benjamin Namvar
19   Account recalculation including interest - Namco Financial Exchange Corp.
20   Account recalculation including interest - Namco Financial Inc.
21   Account recalculation including interest - Ezri Namvar
22   Account recalculation including interest - Daniel Namvar
23   Account recalculation including interest - Malka Namvar
24   Account recalculation including interest - Shirah Namvar
25   Account recalculation including interest - Benjamin Namvar
26   Account recalculation including interest - Beshmada, LLC
27   Account recalculation including interest - Dimes, LLC
28   Account recalculation including interest - Beshmada of Delaware, LLC
29   First Accounting Report of the Trustees - Namco Capital Group, Inc. & Ezri Namvar
30   Sentencing memorandum regarding Ezri Namvar
31   Report by Kent Costley & Associates
32   Operating Agreements & Amendments (Various LLC's - Over 150)
33   Draft Plan of Reorganization & Disclosure Statement;attachments thereto
34   Namco database of electronically stored information
35   Namco real estate property files

# Exhibit 2

NAMCO CAPITAL GROUP, INC.
Liquidation Analysis
As of September 30, 2013

| | Amount | |
|---|---:|---|
| Unrestricted Cash | $ 3,100,000 | Note 1 |
| Restricted Cash | 200,000 | Note 2 |
| Real Estate & Other Assets, Net | 6,400,000 | Note 3 |
| Litigation, Proceeds, Net | Unknown | Note 4 |
| Post-Petition Inter-Debtor Advances | 275,000 | Note 5 |
| Pre-Petition Inter-Debtor Claims Recoveries | 35,000,000 | Note 6 |
|    Total Assets | 44,975,000 | |
| Less: Professional Fees | | |
|    Unpaid Professional Fees | (14,528,000) | Note 7 |
|    Payment to other Debtor for fees paid | (7,144,700) | Note 8 |
| Net Assets Available for Creditors | 23,302,300 | |
| Claims: | | |
|    Estimated Unsecured Priority Tax Claims | (460,000) | Note 9 |
|    Estimated Other Secured Claims | (610,000) | Note 10 |
|    Estimated Priority Claims | (75,000) | Note 11 |
| Available for General Unsecured Claims | $ 22,157,300 | |
| Estimated General Unsecured Claims | $ 415,000,000 | Note 12 |
| Estimated Recovery for General Unsecured Claims | 5.3% | Note 13 |

Note 1: This amount represents the estimated cash for NCG as of September 30, 2013.

Note 2: This amount represents the estimated restricted cash for NCG as of September 30, 2013. This amount is estimated to become available in the future based on the outcome of litigation, negotiations or other resolutions.

Note 3: This represents estimates for the equity value of the Debtor's interests in real estate and other non-cash assets, net of liens, debt or other obligations, liquidation costs and costs. These Assets include promissory notes, direct interests in real property, interests in entities with direct and indirect interests in real property or other assets, participation interests in sale proceeds, undocumented interests in real property (which may involve or require litigation to recover), and furniture and equipment. Numerous assumptions were made to arrive at the net equity value of the real estate and other assets relating to gross values of the assets and the net recovery after various obligations, expenses and costs of liquidation, including items such as payments due under promissory notes, third-party debt and debt service, outstanding tax obligations, operating expenses, and/or costs of sale. Information supporting assumptions of value utilized may include recent offers to purchase particular assets, appraisals, income capitalization estimates based on net operating income and capitalization rates, comparable

**page 93**

sales transactions, guidance from real estate agents or partners with interests in the assets, and other sources. Assumptions for third-party debt obligations are based on information such as loan statements, guidance from partners with interests in the assets, and property financial statements. Certain adjustments to value may also be incorporated in an attempt to arrive at a reasonable estimate of value to account for uncertainty related to ultimately achieving estimated net equity values due to lack of liquidity, incomplete information, potential disputes or other considerations. However, actual net recoveries may be materially higher or lower than projected. As noted above, the amounts realized for liquidation of real estate and other assets are also net of estimated management expenses and legal fees (other than fees relating to litigation proceeds).

Note 4: Recoveries of identified litigation proceeds, net of litigation fees and costs, cannot be estimated at this time due to significant uncertainties relating to pending litigation, disputed legal issues, limited data regarding collectability and the possibility that certain litigation may be resolved through transfers of property in kind, which property itself may be difficult to accurately value.

Note 5: This represents the amounts advanced by NCG to or for the benefit of Beshmada, LLC, Beshmada of Delaware, LLC and Dimes, LLC after the Petition Date of December 22, 2008. It is assumed that each of those Debtors will ultimately repay NCG for 100% of post-petition amounts due.

Note 6: This represents the estimated recoverable value of NCG's claims against other Debtors. These amounts have either been addressed in the inter-debtor settlements or by allowed scheduled or filed claims. For purposes of the Liquidation Analysis the Claim amounts against the other Debtors are assumed to be the same. These values are a function of the claims (either scheduled, filed or negotiated) and assets available for unsecured creditors in each estate.

Note 7: This primarily represents estimated unpaid fees and expenses of Professionals and may be substantially higher if there is a contested confirmation hearing. This also includes unpaid administrative claims being paid in the ordinary course and a small estimated administrative claim of the Pension Benefit Guaranty Corporation ("PBGC") relating to NCG's Pension Plan, based on an actuarial analysis of normal cost obligations of the Pension Plan after the Order for Relief in NCG's Case. The PBGC's current filed claims are in an unliquidated amount and the actual administrative claim that may be asserted by the PBGC and the basis of such Claim is unknown at this time and may be higher than estimated by the NCG Trustee and the Pension Plan actuary, and the administrative claim of the PBGC ultimately allowed may be different than estimated.

Note 8: This represents the amounts advanced by Ezri to or for the benefit of NCG after the Petition Date of December 22, 2008. This amount will be repaid by NCG. It is assumed that Namco will ultimately repay Ezri for 100% of the funds advanced as an allowed administrative claim.

Note 9: Unsecured priority tax claims include estimates of allowed claims of the City of Los Angeles.

Note 10: Secured claims represent estimates of amounts due for payment of allowed claims of Soleman Naim, Fereshteh Kohanim and Maryam Pirian as of September 30, 2013.

**page 94**

Note 11:  Priority claims include estimates of allowed priority claims of the PBGC relating to NCG's Pension Plan based on various actuarial assumptions regarding Pension Plan liabilities and analysis regarding amounts entitled to priority under the Bankruptcy Code. The PBGC's current filed claims are in an unliquidated amount and the actual priority claims that may be asserted by the PBGC and the basis of such claim is unknown at this time and may be higher than estimated by the NCG Trustee and the Pension Plan actuary, and the priority claim of the PBGC ultimately allowed may be different than estimated.

Note 12:  General unsecured claims have been estimated to be $415 million.

Note 13:  The estimated recovery to unsecured creditors, if NCG were a debtor under chapter 7 of the Bankruptcy Code, would be approximately 5.3% of each creditor's principal claim amount, plus a pro-rata portion of net litigation recoveries, the amount of which is unknown at this time.

# Appendix A



## David H. Judd, Director

2049 Century Park East, Suite 2525
Los Angeles, CA 90067
Direct:  310.499.4941
Fax:     310.557.8982
Email:   djudd@brg-expert.com

### Summary

David H. Judd is a Director of BRG and a former director/partner of LECG, LLC, Neilson Elggren LLP, Neilson Elggren Durkin and Co. and Arthur Andersen LLP. He has over thirty years experience as a Certified Public Accountant specializing in bankruptcy and litigation services and investigative accounting. Early in his career Mr. Judd was a senior consultant in the Litigation/Consulting Department in the international CPA firm of KMG/Main Hurdman. His efforts have been focused on bankruptcy matters for both Chapter 7 and Chapter 11 filings, including services as Trustee, Accountants for the Trustee, court appointed Examiner, Accountants for the Examiner and Accountants for the Creditors.

Mr. Judd has performed investigative accounting services relating to fraud, embezzlement and mismanagement, including the reconstruction of records, tracing of funds and evaluations of internal controls.

Mr. Judd has served as accountant to the trustee, receiver and examiner for operating oil & gas exploration companies, operating oil refineries and gas stations and convenience stores.

Mr. Judd has provided expert witness testimony in various investigative accounting matters relating to fraud & embezzlement, bankruptcy avoidance actions, business damages, solvency matters and Ponzi schemes. He has testified in both Federal and State Courts.

He has been called upon to develop feasibility studies and projections for various real estate projects, to prepare business valuations for ESOPs, minority interest buy-outs, mergers, acquisitions, purchase and sale of businesses, and divorce settlements.

He has been responsible for litigation services and consulting matters relating to estimates of damage for wrongful death and personal injury, business interruption claims, business valuations, economic analysis, breach of contract, and other cases involving loss of business profits or other business damages.

### Case Examples

- Solyndra LLC - On August 31, 2011, subsequent to receiving a $535 million loan guarantee from the Department of Energy (DOE), Solyndra had approximately 968 full time employees and 211 temporary employees. On September 6, 2011, Solyndra was unable to continue active business operations and filed a Chapter 11 Bankruptcy. Assisted in providing a detailed report concerning Solyndra business operations to both the Court and other interested parties.

- Ezri Namvar/Namco Capital Group — Accountants and Financial Advisors to both the Ezri

**page 97**



Namvar and Namco Capital Group Estate. Mr. Namvar, a well known member of the Iranian Jewish Community in Los Angeles, has received $3 billion in investments and loans over the past 5 years and disbursed those funds through close to 400 separate LLC's involving ownership in a wide array of assets such as hotels, golf courses, low-income housing projects, pistachio farms, conference center sites, medical buildings and ground leases. Assisting in the task to untangle this multitude of inter-related LLC's involving Mr. Namvar. Mr. Namvar was convicted of fraud following a trial and is presently incarcerated in a federal prison.

- Galleria USA, Inc. ("GUSA") – Accountants and Financial Advisors to the Trustee. GUSA was an importer of furniture for Big Box retailers. GUSA along with its sister company in Asia, Galleria (Hong Kong) Ltd. ("GHK"), had collective obligations to their secured and unsecured creditors totaling approx. $233 million. Assisted in the liquidation of inventory and the investigation of fraud related to the loan collateral and inflated sales of GUSA and GHK. The Trustee released a detailed accounting report, which ultimately led to the indictment of the two principals of the debtor.

- Reed E. Slatkin - Accountants to the Trustee. Directed the accounting investigation of Slatkin's enterprises and business practices over a period of fifteen years and provided a report detailing one of the largest Ponzi schemes in California history involving over $600 million of business transactions during that period. Assisted in liquidating substantial assets throughout the United States, including hotels, unimproved real estate, shopping malls, interests in movie production companies, and other substantial equity investments.

- Adelphia Communications Corp. - Accountant to the Official Committee of Unsecured Creditors in the Adelphia Communications Corp ("Adelphia") bankruptcy. Assisted in analyzing the voluminous financial transactions of Adelphia and providing expert testimony as to the findings.

- DVI, Inc. - Examiner and accountants. Conducted an extensive investigation of financial transactions involving the assets, liabilities, operations and financial condition of DVI and its subsidiaries (including all transactions and relationships between debtor and non-debtor subsidiaries and affiliates). Investigated the accounting practices of the Debtor and any and all allegations of fraud, dishonesty, incompetence, misconduct, mismanagement, or financial and/or corporate irregularities and coordinated a cooperative effort involving numerous law enforcement and government agencies.

- Metropolitan Mortgage – Accountants to the Examiner. A large investment venture firm including several mortgage and insurance subsidiaries. Conducted an investigation of real estate transactions and inter-company balances.

- Magic Ford - Accountants to the Trustee. One of the largest Ford dealerships in the country. Assisted in the operation and liquidation of the assets.

- Property Mortgage Company, Inc. - $150 million, Second Mortgage Company-Trustee - Accountant to the Trustee, including investigative analyses regarding a malpractice claim against the company's outside accountants.

- Fund America - Court-appointed Examiner. Fund America was an international company that marketed various goods and services through a multi-level marketing network. Investigated the company's operations.



- Receiver for two hotels and casinos in Nevada.

- Utex Oil Company – Court-appointed Examiner. Oil and gas production company.

- Arizona Fuels Corporation – Accountants for the Trustee and Receiver. Oil refinery and ranch.

- Martin Marietta, Inc. – Consultant/Expert Witness. Defended against claim from subcontractor.

- Eaton Kenway, Inc. – Consultant/Expert Witness.  Prepared claim against prime contractor for change in scope of work.

- Mother Earth Industries – Analyzed capitalized costs and operating expenses for a steam generated electrical facility that provided power to a municipal association.

- City of Fresno - Expert Witness.  Provided report and deposition testimony regarding damages for remediation of ground water contamination.

- Lincoln Mortgage and Loan - Examiner and Accountants to the Examiner.  Investigated financial affairs of the investor in real property and the related secondary trust deeds market.

Employment History

**KMG/Main Hurdman, Salt Lake City, Utah**

Bankruptcy assistance including investigative accounting, preparation of all schedules, monthly reporting to the court, operation analysis and assistance in managing ongoing business operations during bankruptcy proceedings.

Prepared expert witness testimony for business valuations, alleged fraud violations, personal injury and wrongful death suits, and other cases involving loss of business profits or other business damages.

Provided expert witness testimony on investigative cases.

Developed feasibility studies and projections for various real estate projects.

Prepared business valuations for ESOP's, minority interest buy-outs, mergers, acquisitions, purchase and sale of businesses, and divorce settlements.

**Fox & Company, Salt Lake City, Utah**

Involved in consulting engagements similar to those mentioned above relative to bankruptcy, insurance, valuation and litigation support services.

Served as an auditor and staff accountant.  Industry expertise includes:

| Real Estate | Retail establishments | Salvage Companies |
| Construction | Mortgage Companies | |



**Education**

Bachelor of Science in Accounting, Southern Utah State College, 1979
Master of Professional Accountancy, University of Utah, 1980

**Professional Memberships**

American Institute of Certified Public Accountants since 1985
Utah Association of Certified Public Accountants since 1985

# Appendix B

Berkeley Research Group, LLC
Summary of Billing Rates
Calendar Year 2013

| Position | Minimum | Maximum |
|---|---|---|
| Director | $   500.00 | $   590.00 |
| Senior Managing Consultant | 360.00 | 395.00 |
| Managing Consultant | 335.00 | 350.00 |
| Associate | 230.00 | 255.00 |
| Administrator | 200.00 | 220.00 |
| Paraprofessional | 125.00 | 170.00 |
| Accounting Technician | 95.00 | 150.00 |

# Appendix C

DAVID H. JUDD
EXPERT QUALIFICATIONS

Testimony Experience

| YEAR | CASE NAME | DESCRIPTION | TESTIMONY |
|------|-----------|-------------|-----------|
| 2013 | Beshmada, LLC v Canyon Springs Shopping Center, LLC Case No. bk-25523-B3 | Deposition testimony re: Insolvency of Ezri Namvar and Beshmada, LLC | Bankruptcy Court – Central District of California |
| 2013 | Ezri Namvar & R, Todd Neilson, chapter 11 Trustee v David York Case No. bk-32349-BR | Deposition testimony re: Insolvency of Namco Capital Group and Ezri Namvar | Bankruptcy Court – Central District of California |
| 2012 | John Skordoulis, etc. v Fidelity Nat'l Title Ins. Co., etc., et al. Case No. INC 091596 | Testimony re: Cedar Funding Inc. Accounting Transactions | Riverside County Superior Court, California |
| 2011 | Ezri Namvar & Hamid Tabatabai Case No. CR 10-1055-PA | Testimony re: Accounting Transactions | United States District Court – Central District of California |
| 2010 | Death Row Records, Inc. Case No. 2:06-bk-11205 -VZ | Deposition testimony re: contract dispute | Bankruptcy Court – Central District of California |
| 2010 | Bundy Dimes, LLC Case No. 2:10-bk-22149 -BR | Deposition testimony re: allocation of estimated sales proceeds | Bankruptcy Court – Central District of California |
| 2005 | Reed E. Slatkin BK No. 01-11549-RR | Deposition testimony re: discharge | Bankruptcy Court – Central District of California |
| 2004 | Wells Fargo v. Great Basin | Deposition testimony re: fraudulent transfers. | Third Judicial District Court-Salt Lake County, Utah |
| 2003 | Reed E. Slatkin BK No. 01-11549-RR | Deposition testimony re: fraudulent transfers. | Bankruptcy Court - Central District of California |
| 2003 | Reed E. Slatkin BK No. 01-11549-RR | Testimony re: plan confirmation | Bankruptcy Court – Central District of California |

**page 104**

## PROOF OF SERVICE

STATE OF CALIFORNIA          )

COUNTY OF LOS ANGELES    )

    I, Mary de Leon, am employed in the city and county of Los Angeles, State of California. I am over the age of 18 and not a party to the within action; my business address is 10100 Santa Monica Blvd., 13th Floor, Los Angeles, California 90067.

    On May 17, 2013, I caused to be served the **EXPERT REPORT OF DAVID JUDD (DATED MAY 17, 2013)** in this action by placing a true and correct copy of said document(s) and sent as follows:

*See Attached Service List*

☑  (BY MAIL) I am readily familiar with the firm's practice of collection and processing correspondence for mailing. Under that practice it would be deposited with the U.S. Postal Service on that same day with postage thereon fully prepaid at Los Angeles, California, in the ordinary course of business. I am aware that on motion of the party served, service is presumed invalid if postal cancellation date or postage meter date is more than one day after date of deposit for mailing in affidavit.

☑  (BY EMAIL) I caused to be served the above-described document by email to the parties indicated on the attached service list at the indicated email address.

☐  (BY NOTICE OF ELECTRONIC FILING) I caused to be served the above-described document by means of electronic transmission of the Notice of Electronic Filing through the Court's transmission facilities, for parties and/or counsel who are registered ECF Users.

☐  (BY FAX) I caused to be transmitted the above-described document by facsimile machine to the fax number(s) as shown. The transmission was reported as complete and without error. (Service by Facsimile Transmission to those parties on the attached List with fax numbers indicated.)

☐  (BY PERSONAL SERVICE) By causing to be delivered by hand to the offices of the addressee(s).

☐  (BY OVERNIGHT DELIVERY) By sending by Federal Express to the addressee(s) as indicated on the attached list.

    I hereby certify that I am employed in the office of a member of the Bar of this Court at whose direction the service was made.

    Executed on May 17, 2013, at Los Angeles, California.

_____
Mary de Leon

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

1

<u>SERVICE LIST</u>

2

<u>Counsel for Hooshang Namvar, Homayoun Namvar, Ramin Namvar, Helen Shadi, Hilda Bayanfar, Lida Shraga, Nataly Namvar, Trifish, LLC, Tribun, LLC, Trisister, LLC, Believers, LLC, Net, LLC, Light Source, LLC, Lacy 20, LLC, Woodman Partners, LLC, Tritowne, LLC and Trigrove, LLC</u>

Henley L. Saltzburg, Esq.
Paul T. Dye, Esq.
Genise R. Reiter, Esq.
SALTZBURG, RAY & BERGMAN, LLP
12121 Wilshire Boulevard, Suite 600
Los Angeles, California 90025-1166
Email: hls@srblaw.com
        ptd@srblaw.com
        grr@srblaw.com

-and-

Neal S. Salisian, Esq.
Newton C. Tak, Esq.
SALISIAN LEE LLP
444 South Flower Street, Suite 2320
Los Angeles, California 90071-2924
Email: neal.salisian@salisianlee.com
        newton.tak@salisianlee.com

<u>Counsel for Mousa Namvar, Magdiel, LLC, Namco 8, LLC, Wishlab 90, LLC, Bunherst, LLC and DGADE of Delaware, LLC</u>

Bernard M. Resser, Esq.
Lori L. Werderitch, Esq.
GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER LLP
1900 Avenue of the Stars, 21st Floor
Los Angeles, California 90067
Email: bresser@greenbergglusker.com
        lwerderitch@greenbergglusker.com

<u>Counsel for Bradley D. Sharp, as Chapter 11 Trustee for Namco Capital Group Inc.</u>

David M. Poitras, Esq.
JEFFER MANGELS BUTLER & MITCHELL LLP
1900 Avenue of the Stars, 7th Floor
Los Angeles, California 90067
Email: dpoitras@jmbm.com

<u>Counsel for Haron Shabatian</u>

Robert B. Mobasseri, Esq.
LAW OFFICES OF ROBERT B. MOBASSERI
445 South Figueroa Street, 27th Floor
Los Angeles, California 90071
Email: robertm@mobasseripc.com

DOCS_LA:250159.2 59701-001

**page 106**

1  Counsel for Daniel Namvar, Benjamin Namvar, Malka Namvar
   and Shira Namvar
2  Alan F. Broidy, Esq.
   LAW OFFICES OF ALAN F. BROIDY
3  1925 Century Park East, Suite 1700
   Los Angeles, California 90067
4  Email: alan@broidylaw.com

5  -and-

6  John D. Younesi, Esq.
   Jan A. Yoss, Esq.
7  YOUNESI & YOSS LLP
   11355 W. Olympic Blvd., Suite 200
8  Los Angeles, California 90064
   Email: jdyounesi@younesi.com
9          jyoss@younesi.com

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PACHULSKI STANG ZIEHL & JONES LLP
ATTORNEYS AT LAW
LOS ANGELES, CALIFORNIA

-2-

001 1 056
Client/Matter No.
5/22/13
Received (Date)
☐ Scanned_____Initial
☐ Emailed_____Initial

page 108

# EXHIBIT 10

Page 1

1                    UNITED STATES DISTRICT COURT

2                  CENTRAL DISTRICT OF CALIFORNIA

3                        LOS ANGELES DIVISION

4           In re:                      )

5           NAMCO CAPITAL GROUP,        )   Case No.

6                        Debtor.        )   2:11-cv-05320-

7           _____)   GAF (CWx)

8           BRADLEY D. SHARP, Solely    )

9           in his capacity as          )

10          Chapter 11 Trustee of       )

11          NAMCO CAPITAL GROUP INC.,   )

12                        Plaintiff,    )

13                vs.                   )

14          MOUSA NAMVAR, et al,        )

15                        Defendants.   )

16

17

18          VIDEOTAPED DEPOSITION OF BRADLEY D. SHARP

19                          TAKEN ON

20                   MONDAY, AUGUST 5, 2013

21

22     TSG Job # 64265

23     Reported by:

24     BRENDA R. COUNTZ, RPR-CRR

25     CSR NO. 12563

Page 2

1

2

3

4

5

6

7

8        Videotaped deposition of BRADLEY D. SHARP,

9   taken at The Law Firm of Greenburg Glusker Fields

10   Claman & Machtinger LLP, 1900 Avenue of the

11   Stars, 21st Floor, Los Angeles, California, on

12   Monday, August 5, 2013, before Brenda R. Countz,

13   CSR No. 12563.

14

15

16

17

18

19

20

21

22

23

24

25

Page 3

1    APPEARANCES OF COUNSEL:

2

3    COUNSEL FOR THE PLAINTIFF:

4    PACHULSKI STANG ZIEHL & JONES

5             BY:  DEAN ZIEHL, ESQ.

6             10100 Santa Monica Boulevard

7             Los Angeles, California 90067

8

9

10

11   COUNSEL FOR DEFENDANTS MOUSA NAMVAR, MAGDIEL,

12   LLC, NAMCO 8, LLC, WISHLAB 90, LLC, BUNHERST, LLC

13   AND DGADE OF DELAWARE, LLC:

14            GREENBERG GLUSKER FIELDS CLAMAN &

15            MACHTINGER

16            BY:  BERNARD RESSER, ESQ.

17            1900 Avenue of The Stars

18            Los Angeles, California 90067

19

20

21

22   ALSO PRESENT:

23            MICHAEL MULLEN, VIDEOGRAPHER

24

25

Page 4

1                              I N D E X

2   WITNESS                    EXAMINATION BY              PAGE

3   BRADLEY D. SHARP

4                        Mr. Resser                        6

5              -                      :            :    :  -

6

7                           E X H I B I T S

8   NO.                DESCRIPTION                         PAGE

9   Exhibit 801   Printout of Bradley Sharp               40

10                Biography

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 5

1          LOS ANGELES, CA - MONDAY, AUGUST 5, 2013

2                        9:40 A.M.

3

4          THE VIDEOGRAPHER:  We are now on the

5    video record.  The following is a videotaped

6    deposition of Bradley D. Sharp in the matter of

7    Sharp versus Namvar filed in the United States

8    District Court for the Central District of

9    California, Case No. 2:11-cv-05320-GAF.

10          This deposition is being held at

11   Greenberg Glusker Fields Claman & Machtinger LLP,

12   1900 Avenue of The Stars, Suite 2100 in Los

13   Angeles, California.

14          Today's date is Monday, August 5, 2013.

15   The time now is 9:40 a.m.  My name is Michael

16   Mullen from TSG Reporting and I'm the legal video

17   specialist.  The court reporter is Brenda Countz.

18          Will all counsel introduce themselves

19   for the video record, please.

20          MR. RESSER:  Bernard Resser, Greenberg

21   Glusker Fields Claman & Machtinger LLP for

22   defendants Mousa Namvar, Wishlab 90, Namco 8,

23   Bunherst, DGADE of Delaware and at least one

24   other LLC.  I didn't bring my trial book so I

25   don't have the list.

1          MR. ZIEHL:  And Dean Zeihl, Pachulski

2  Stang Ziehl & Jones for Bradley Sharp, Chapter 11

3  Trustee of Namco Capital Corporation, Inc.

4          MR. RESSER:  I left off Magdiel LLC.

5          THE VIDEOGRAPHER:  Will the court

6  reporter please swear in the witness.

7

8          BRADLEY D. SHARP,

9      having been first duly sworn, was

10      examined and testified as follows:

11

12          EXAMINATION

13  BY MR. RESSER:

14     Q.   Good morning, Mr. Sharp.

15     A.   Good morning.

16     Q.   We only had a few minutes to spend with

17  you the last time you were here but I think we

18  established that you were quite familiar with the

19  process.  I just want to remind you to try to

20  speak separately so we don't speak over one

21  another and also to give your attorney chance to

22  make objections to the form of questions, okay?

23     A.   Fine, thank you.

24     Q.   Is there any reason such as sickness,

25  medication or emotional reasons you are not able

Page 40

```
 1              THE WITNESS:  I'd have to look back at

 2    the plan for that debtor in possession.  There

 3    were various parties and creditors of that estate

 4    that were paid, including Namco.

 5    BY MR. RESSER:

 6        Q.   And the reason Namco was paid was

 7    because it had loaned money to an LLC controlled

 8    by Ezri, correct?

 9              MR. ZIEHL:  Objection, calls for a

10    legal conclusion.

11    BY MR. RESSER:

12        Q.   Is that your understanding?

13        A.   Namco had a loan to Playa Properties.

14        Q.   And Playa Properties was an LLC

15    controlled by Ezri?

16        A.   At one time, yes.

17              MR. RESSER:  I'm going to hand you a

18    document we'll mark as Exhibit 801 to the

19    deposition.  I have written that in pencil on the

20    original and the reporter can mark it later.

21              THE WITNESS:  (Perusing.)

22              (Sharp Exhibit 801, Printout of

23              Bradley Sharp Biography, was

24              marked for identification.)

25    BY MR. RESSER:
```

Page 41

1      Q.    Okay, you've had a chance to review

2   Exhibit 801 which we've put in front of you?

3      A.    Yes.

4      Q.    What is Exhibit 801?

5      A.    I believe it's a printout from my bio

6   that is on the DSI website.

7      Q.    I printed this out on July 24 which

8   was, I think, the date of the last session of

9   your deposition.

10          Have you made any changes in this since

11  then?

12     A.    I don't believe so.

13     Q.    In the second paragraph you mention,

14  "Mr. Sharp is currently the Chapter 11 trustee

15  for Namco Capital Group, Inc., a West Los

16  Angeles-based investment company formerly

17  operated by Ezri Namvar."

18          Do you see that?

19     A.    Yes, except for it says "Based real

20  estate investment company."

21     Q.    Why do you mention that in the second

22  paragraph of your bio?

23     A.    Because I think it's an important part

24  of my current resume.

25     Q.    Is the Namco Capital Group bankruptcy

Page 42

1    case the largest Chapter 11 case in which you've

2    been a trustee?

3         A.    How do you define largest?

4         Q.    Largest in terms of the total assets

5    under management?

6              MR. ZIEHL:   Vague and ambiguous.   What

7    do you mean assets under management?

8              MR. RESSER:   I'll withdraw.

9    BY MR. RESSER:

10        Q.    Is the Namco Capital Group bankruptcy

11   case the largest bankruptcy case you've been

12   involved with from the standpoint of the total

13   assets in the estate?

14        A.    Scheduled assets, probably.   Ultimate

15   realizable value, uncertain.

16        Q.    Is the Namco Capital Group bankruptcy

17   case the largest bankruptcy case you've been

18   involved with from the standpoint of the total

19   fees that you've incurred in the case?

20        A.    I don't believe so.   I'm sorry, are you

21   talking about my fees?

22        Q.    Yes.   Is the Namco Capital Group

23   bankruptcy case the largest case you've been

24   involved with from the standpoint of the total

25   fees paid to professionals incurred in the case?

1      A.    Paid or incurred?

2      Q.    Incurred.

3      A.    Yes.

4      Q.    Do you have an understanding of the

5 total fees incurred to professionals in the Namco

6 bankruptcy case?

7      A.    As I sit here, no.  It would be

8 reflected in the disclosure statement.

9      Q.    You can't give me an estimate?

10     A.    No, not as I sit here.

11     Q.    Has DSI been paid all of the fees that

12 have been incurred so far in connection with its

13 work in the Namco bankruptcy case?

14     A.    No.

15     Q.    How much is still owed to DSI?

16     A.    More than a million.

17     Q.    Is the timing of the payment of that

18 million dollars dependent in any way on the

19 outcome of this lawsuit?

20     A.    I don't believe so.

21     Q.    Is the payment of any of the

22 compensation to be paid to DSI in the Namco

23 bankruptcy case dependent on the outcome of this

24 lawsuit?

25     A.    I don't believe so.

Page 44

1          Q.    Is the payment of any of the

2    compensation, the timing of the payment of any

3    compensation to DSI, affected by the outcome of

4    this lawsuit?

5          A.    I would say affected by, yes.

6          Q.    And how will this lawsuit affect the

7    timing of any payments to DSI in the Namco

8    bankruptcy case for its fees?

9          A.    To the extent there is a quick result

10   that yields substantial cash to the estate, it

11   would accelerate timing to all administrative

12   expenses.

13         Q.    If there isn't a quick result that

14   yields substantial cash, how would that affect

15   the timing of payment of DSI's fees?

16         A.    The timing would be as discussed in the

17   disclosure statement.

18         Q.    And that's because DSI has agreed to

19   defer the timing of the payment of its fees under

20   the plan?

21         A.    As discussed in the disclosure

22   statement, yes.

23         Q.    Does the collection of fees by DSI

24   affect your personal compensation?

25         A.    Only generally.

Page 45

1          Q.    Are you a partner or a principal in

2     DSI?

3          A.    No.   How do you define principal?

4          Q.    Do you have an ownership interest in

5     DSI equity?

6          A.    No.

7          Q.    Is your compensation based in any way

8     on DSI's revenues?

9          A.    Generally.

10         Q.    Is your compensation based in any way

11    on DSI's profits?

12         A.    Generally.

13         Q.    Is your compensation based in any way

14    on the work that you originate for DSI?

15         A.    Generally.

16         Q.    Are you considered the originator of

17    the work that DSI has been doing in the Namco

18    bankruptcy case?

19         A.    Yes.

20         Q.    So you get credit as originator for the

21    work that DSI does within your company for the

22    Namco bankruptcy case, right?

23         A.    I'm not sure I'd use the word credit.

24    I'm responsible for.

25         Q.    And that responsibility results in some

Page 46

1    effect on your compensation, correct?

2         A.    I believe so but I don't know.

3         Q.    The next sentence in paragraph two of

4    Exhibit 801 -- back up, withdrawn.

5               Did you write Exhibit 801, the words?

6         A.    I believe so.

7         Q.    The second sentence of the second

8    paragraph of your bio that we marked as

9    Exhibit 801 says, "Namco has investments in more

10   than 100 real estate projects and at one time was

11   reported to be worth more than $2 billion."

12              Do you see that?

13        A.    Yes.

14        Q.    When was Namco reportedly worth more

15   than $2 billion?

16        A.    I don't recall.  There were obviously

17   discussions about that prepetition.

18        Q.    Discussions with whom?

19        A.    I recall seeing something in writing

20   but as I sit here I don't recall what that was.

21        Q.    Something in writing from within the

22   Namco records or --

23        A.    Yes.

24        Q.    The first part of that sentence says,

25   "Namco has investments in more than 100 real

# EXHIBIT 11

Page 1

1              UNITED STATES DISTRICT COURT FOR THE

2                 CENTRAL DISTRICT OF CALIFORNIA

3

4    In re: NAMCO CAPITAL GROUP, INC.,)
     a California corporation,        ) CASE NO:
5                          Debtor.  ) 2:11-cv-05320-GAF
     ───────────────────────────────)
6                                     ) ADV PROC NO.:
     BRADLEY D. SHARP, solely in his  ) 2:10-ap-02945-BR
7    capacity as Chapter 11 Trustee of)
     NAMCO CAPITAL GROUP, INC.,       )
8                                     )
                          PLAINTIFF, )
9              VS.                     )
                                      )
10   MOUSA NAMVAR, et al.             )
                          DEFENDANTS. )
11   ───────────────────────────────)

12

13

14        VIDEOTAPED DEPOSITION OF R. TODD NEILSON

15             LOS ANGELES, CALIFORNIA

16             WEDNESDAY, JULY 10, 2013

17

18

19

20

21

22

23   REPORTED BY:

24   CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR, RSA

25   JOB NO.: 63050

## Page 2

Wednesday, July 10, 2013
10:11 A.M.

Videotaped deposition of R. Todd Neilson,
taken on behalf of Defendants, held at
the offices of Greenberg Glusker Fields
Claman & Machtinger, 1900 Avenue of the Stars,
Los Angeles, California, before Christy A.
Cannariato, CSR #7954, RPR, CRR, RSA.

## Page 3

APPEARANCES

ON BEHALF OF THE DEPONENT:
PACHULSKI STANG ZIEHL & JONES
BY: DEAN ZIEHL, ESQ.
10100 SANTA MONICA BOULEVARD
LOS ANGELES, CALIFORNIA 90067

ON BEHALF OF THE DEFENDANTS MOUSA NAMVAR; MAGDIEL,
LLC; DGADE OF DELAWARE, LLC; NAMCO 8, LLC; BUNHERST,
LLC; and WISHLAB 90, LLC:
GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER
BY: BERNARD RESSER, ESQ.
1900 AVENUE OF THE STARS, 21ST FLOOR
LOS ANGELES, CALIFORNIA 90067

ON BEHALF OF THE DEFENDANTS HOOSHANG NAMVAR;,
HOMAYOUN NAMVAR; RAMIN NAMVAR; HELEN SHADI ; HILDA
BAYANFAR; LIDA SHRAGA; NATALY NAMVAR; LACY 20, LLC;
TRIFISH; TRIBUN; TRISISTER; BELIEVERS; NET; LIGHT
SOURCE MANAGEMENT; WOODMAN PARTNERS; TRITOWNE; and
TRIGROVE:

SALTZBURG RAY & BERGMAN
BY: PAUL DYE, ESQ.
12121 WILSHIRE BOULEVARD
LOS ANGELES, CALIFORNIA 90025

ALSO PRESENT:
CHRIS JORDAN, VIDEOGRAPHER, TSG REPORTING, INC.

## Page 4

### INDEX

| EXAMINATION BY | PAGE |
| --- | --- |
| MR. DYE | 6, 181 |
| MR. RESSER | 73 |

EXHIBITS MARKED
(None)

EXHIBITS PREVIOUSLY MARKED
Exhibits 151, 159

QUESTIONS INSTRUCTED NOT TO ANSWER
176:10

## Page 5

Los Angeles, California; Wednesday, July 10, 2013
10:11 a.m.

THE VIDEOGRAPHER: This marks the
beginning of Disc No. 1, the videotaped deposition
of R. Todd Neilson being taken in the matter of
Bradley D. Sharp versus Mousa Namvar, et al. being
held in the United States District Court for the
Central District of California.

The deposition is being held at 1900
Avenue of the Stars, Los Angeles, California, on
July 10th, 2013, at approximately 10:12 a.m.

My name is Chris Jordan with TSG
Reporting. The court reporter is Christy Cannariato
with TSG Reporting.

Will counsel please state your name for
the record.

MR. DYE: My name is Paul Dye,
Saltzburg, Ray & Bergman. I'm representing Hooshang
Namvar, Homayoun Namvar, Ramin Namvar, Helen Shadi,
Hilda Bayanfar, Lida Shraga, Nataly Namvar, Lacy 20,
LLC -- actually, a whole group of LLCs in there --
Lacy 20, Trifish, Tribun, Trisister, Believers, Net,
Light Source Management, Woodman Partners, Tritowne,
and Trigrove.

Page 6

1      MR. RESSER:  Bernard Resser, Greenberg
2  Glusker Fields Claman & Machtinger, LLP, for
3  Defendants Mousa Namvar and the following LLCs:
4  Magdiel, Namco 8, WishLab 90, Bunherst, DGADE of
5  Delaware.
6      MR. ZIEHL:  And Dean Ziehl for Pachulski
7  Stang Ziehl & Jones.  I'm here for the witness.
8      THE VIDEOGRAPHER:  Will the court please
9  swear in the witness.
10
11          R. TODD NEILSON,
12      having first been duly sworn, was
13      examined and testified as follows:
14
15          EXAMINATION
16  BY MR. DYE:
17      Q.  Good morning, Mr. Neilson.
18      A.  Good morning.
19      Q.  I take it you've been deposed before; is
20  that correct?
21      A.  Yes.
22      Q.  On how many occasions?
23      A.  Well, in excess of 100.
24      Q.  Wow, that's probably more than the
25  number of depositions I've taken.  I'm impressed.

Page 7

1  That's good.  It's a hard life, though.
2      A.  Yes.  There's other, better ways to
3  spend your time.
4      Q.  This is true, but we must get through
5  it, so let's get started on this.
6      The one thing I will say is if there are
7  any questions that you don't understand, please let
8  me know, and I will try to rephrase them.
9      A.  Okay.
10      Q.  I'm going to hand you a document that's
11  been previously marked as Exhibit 159 in this case.
12  It's a Notice of FRCP 30(b)(6) Deposition of the
13  Chapter 11 Bankruptcy Estate of Ezri Namvar.  And I
14  will ask you if you've seen this document.
15      MR. ZIEHL:  What was the Exhibit No.?
16      MR. DYE:  159.
17      MR. ZIEHL:  Okay.
18      A.  I've seen this.
19      Q.  Okay.  My understanding, and your lawyer
20  can correct me if I'm wrong, is you've been
21  designated as a person to answer some -- at least
22  some of the questions in this Notice of Deposition;
23  is that correct?
24      A.  That's my understanding.
25      Q.  Okay.  Can you tell me which categories

Page 8

1  you have information on?
2      A.  Well, having information and acting as a
3  person of knowledge is probably two different
4  things.
5      Q.  Well, let's go with the latter.
6      A.  Okay.  It is my understanding that I am
7  here primarily to discuss the first Trustee Report.
8  I'm certainly not saying that you are excluded from
9  asking any other questions.  I wouldn't say that.
10  But that's my understanding.
11      Q.  Okay.
12      A.  Having said that, I think I have a
13  significant amount of experience and knowledge
14  relative to the entire Namco operations and many of
15  the issues that are discussed herein, but it is not
16  my -- it is my understanding that that is not the
17  primary purpose of my testimony, although again, I'm
18  not limiting anyone.  Dean may, but I'm not.
19      Q.  Okay.  You are the Bankruptcy Trustee
20  for the estate of Ezri Namvar; correct?
21      A.  Correct.
22      Q.  And Bradley Sharp is the Trustee for the
23  bankruptcy estate of Namco Capital Group; correct?
24      A.  Correct.
25      Q.  Is there -- do you and Mr. Sharp work

Page 9

1  together on these two bankruptcy matters in an
2  effort to coordinate activities?
3      A.  Yes.
4      Q.  Can you give me sort of an outline of
5  how that interaction works?
6      A.  As you said, for purposes of efficiency,
7  and purposes of cost reduction, and also for
8  purposes of unity of purpose, after Brad Sharp was
9  appointed as Trustee, we came to an agreement that
10  we would work closely together; that, where
11  possible, we would use the same financial advisors;
12  where feasible, we would use similar litigation
13  counsel; that we would work closely together, keep
14  each other informed as to any actions the other was
15  taking; and try to seek some unanimity as to the
16  course of events, the sales, litigation, and other
17  matters.  And in doing so, we felt such action would
18  be in the beneficial interest of both estates.
19      Q.  Okay.  You said you came to an
20  agreement.  Is the agreement in writing?
21      A.  I don't recall.  You know, it's been
22  awhile ago, and so I don't recall.  Back in the
23  recesses in my mind there may have been some
24  writing, but I don't recall.
25      Q.  Has it been formalized within either of

3 (Pages 6 to 9)

Page 70

1     MR. DYE: He's expressed numerous
2 opinions about the use of LLCs in this case. I want
3 to find out what his familiarity with LLCs is, use
4 of LLCs in real estate ventures. He has made
5 comments in his report about that. And I want to
6 find out what he knows about that subject, whether
7 he was just making stuff up out of thin air or
8 whether he has some information and expertise in
9 this area.
10    THE WITNESS: Can you repeat the
11 question for me, please?
12    Q. BY MR. DYE: Yes. Do you have an
13 understanding about the use, whether it's a normal
14 use or an unusual use, when people get together and
15 purchase real property through the LLC form?
16    A. I want to be responsive, but what do you
17 mean by "understanding"? Do you mean a legal
18 understanding or do you mean a -- what do you mean?
19    Q. You're not a lawyer, are you?
20    A. No, I am not.
21    Q. And I don't expect you to testify from a
22 legal standpoint on anything in this case. And I
23 won't hold you to a legal level on any of your
24 answers.
25    What I'm asking you for is what you

Page 71

1 know, based on your life experience, not a legal
2 understanding.
3     So do you have any familiarity with the
4 use of LLCs in connection with real estate
5 purchases?
6     A. It is -- I have a familiarity that it is
7 often done.
8     Q. Do you have an understanding of why LLCs
9 are used to purchase real estate?
10    A. I would suspect that it has to do with
11 the personal liabilities associated with that.
12    Q. Anything else?
13    A. No.
14    Q. Has anyone ever told you that LLCs are
15 frequently used in real estate purchases because it
16 makes getting financing a lot easier?
17    A. No.
18    Q. Was it your opinion when you were
19 writing this report that Namvar, Ezri Namvar, or
20 others involved with this -- these transactions were
21 using limited liability corporations in an
22 inappropriate way?
23    A. The -- I don't recall that we ever said
24 within this report that the actual formational
25 structure of an LLC was in any way violative of any

Page 72

1 standards here.
2     Q. Do you know what a 1031 exchange is?
3     A. Yes.
4     Q. And just in a basic sense, what is a
5 1031 exchange?
6     A. A 1031 exchange is a mechanism whereby
7 an asset may be sold, and subsequently the proceeds
8 from that asset sale may be invested in a similar
9 asset within a specific period of time, and that the
10 gain associated with that initial sale would not be
11 recognized, although the basis of the new acquired
12 asset would be -- would be adjusted by the gain on
13 that sale.
14    Q. Would you agree with me that a 1031
15 exchange is typically used for tax deferment?
16    A. Yes.
17    Q. And would you agree with me that 1031
18 exchanges are frequently used in connection with
19 sales of commercial real property?
20    A. Yes.
21    MR. DYE: Why don't we take a break for
22 lunch.
23    THE VIDEOGRAPHER: Off the record. The
24 time is 12:23.
25    (Recess.)

Page 73

1     THE VIDEOGRAPHER: Back on the record.
2 The time is 1:42.
3
4     EXAMINATION
5 BY MR. RESSER:
6     Q. Mr. Neilson, my name is Bernie Resser.
7 I introduced myself at the beginning of the day. I
8 represent Mousa Namvar and several LLCs in which
9 Mousa either was manager or a member --
10    A. Okay.
11    Q. -- or one of his companies had a
12 membership interest.
13    I know with Mr. Dye you went through
14 some of your deposition experience, so I don't -- I
15 know I don't need to go over the ground rules of a
16 deposition. I just want to make sure that today you
17 feel that you're able to give your best and most
18 complete testimony today.
19    There's no reason today that you're
20 feeling ill or under the weather or unable to give
21 your best and most accurate testimony, is there?
22    A. No.
23    Q. Do you have a license, CPA license?
24    A. Yes.
25    Q. In what state?

19 (Pages 70 to 73)

Page 74

1      A.    In California and Utah.
2      Q.    Your office is it in California or Utah
3  or both?
4      A.    The place where I have an office is here
5  in California, although BRG does have a Utah office,
6  a Salt Lake City office.
7      Q.    Where do you spend most of your time in
8  Utah or California?
9      A.    California.
10     Q.    Do you still spend any substantial
11  amount of time in Utah?
12     A.    I do on the weekends at home, but I
13  don't spend -- I don't have any Utah clients.
14     Q.    When you say "at home," so you maintain
15  your residence in Utah and commute to Los Angeles to
16  work?
17     A.    Yes.
18     Q.    And you're employed by BRG; is that
19  right?
20     A.    That's correct.
21     Q.    And according to BRG's web site, it is:
22           (As read:)  A leading global
23           expert services and consulting firm
24           that provides independent expert
25           testimony, litigation, and regulatory

Page 75

1  support, authoritative studies,
2  strategic advice, document and
3  data analytics for major law firms,
4  Fortune 500 companies, government
5  agencies, regulatory bodies around
6  the world.
7           Do that I have right?
8      A.    Yes.
9      Q.    Before -- how is it -- well, BRG got
10  involved in this case when you moved over from LECG.
11  Is that the first time they got involved?
12     A.    Yes.
13     Q.    Okay.  How is it that you were retained
14  as trustee for the Namvar estate?
15     A.    How was it?  What do you mean?
16     Q.    How were you first contacted?  By whom
17  were you first contacted in connection with the Ezri
18  Namvar estate?
19     A.    I was contacted by the office of the
20  U.S. Trustee, and I was asked whether I would be
21  interested and wiling to serve as Trustee for the
22  Ezri Namvar estate.
23     Q.    And I take it you replied that you were
24  interested?
25     A.    Yes.

Page 76

1      Q.    What was the next thing that happened in
2  the process leading to your appointment as Trustee
3  of the Ezri Namvar estate?
4      A.    Well, we would do a conflicts check,
5  which we did, and then we provide the appropriate
6  statement of disinterest in this and qualifications.
7  And then the U.S. Trustee reviewed those.  And then
8  the U.S. Trustee filed the motion to appoint me as
9  Trustee in this matter.  And --
10     Q.    And the Trustee obviously -- I mean, the
11  Court obviously approved that application; correct?
12     A.    Yes.
13     Q.    And as Trustee, you are compensated by
14  the Ezri Namvar estate; is that right?
15     A.    We are -- I am compensated by both
16  estates.  We have agreed, and have done so since the
17  beginning of the case, to share the proceeds as a
18  joint computation, not respective estates.  So we
19  are compensated together in that fashion.
20     Q.    Is that a recognition by the two
21  trustees that there lacks a separateness between
22  Namco and Ezri Namvar?
23     A.    No.
24     Q.    When performing services for the estate
25  as Trustee for the estate of Ezri Namvar, as Trustee

Page 77

1  do you directly seek compensation for that from the
2  Court or does the company you work with, presently
3  BRG, previously LECG, seek that compensation on your
4  behalf?
5      A.    I seek it directly.
6      Q.    Does BRG also seek compensation
7  separately from the compensation that you seek as
8  Trustee?
9      A.    Yes.
10     Q.    And that's pursuant to its appointment
11  in both cases to provide forensic accounting
12  services; is that right?
13     A.    Yes, and tax services.
14     Q.    Can you recall sitting here today how
15  much you, as Trustee, have billed the two estates
16  for your time and efforts in these matters?
17     A.    I don't bill the other estate.  But I do
18  not know as I sit here how much I have billed the
19  Namvar estate.
20     Q.    Does your compensation at BRG -- is it
21  affected at all by the income received by BRG on the
22  billings that have been submitted by BRG for
23  reimbursement?
24     A.    There is a component that is computed
25  into my income stream based on what BRG receives

20  (Pages 74 to 77)

Page 78

1  separately from myself as well.
2      Q.   At law firms when partners bring in a
3  piece of business, that's typically referred to as
4  origination.  Is that something that's used at your
5  firm?
6      A.   Yes.
7      Q.   Are you the person who originated the
8  work that is being done by BRG for the purposes of
9  credit for origination at your firm?
10      A.   The manner in which it is done is not
11  solely mine.  The compensation structure is based on
12  two specific components.  It is based on a -- I
13  receive as my compensation a percentage of the hours
14  that I put in and receive payment for and as
15  Mr. Judd does and as all of the other directors do.
16          Pursuant to an understanding and
17  agreement amongst ourselves, the six directors that
18  would be part of what we euphemistically call the
19  Neilson group, we have agreed to take the finders
20  fees or origination fees that occur for us as a
21  whole from any director in that group.  We put them
22  into a pool, and we share them ratably.  If there's
23  a Salt Lake case that comes into the pool, if
24  there's other L.A. cases, they come into the pool.
25  And we all share one sixth in that pool.

Page 79

1      Q.   So based upon that description, am I to
2  understand from that Mr. Judd also gets finders or
3  origination credit on the work that BRG is doing on
4  the two bankruptcy cases?
5      A.   He gets his ratable share, yes.
6      Q.   I understand that some of the
7  professionals that have been employed in the
8  bankruptcy estates -- withdrawn.
9          I understand that some of the
10  professionals employed by both the Ezri Namvar
11  estate and the Namco Capital Group estate have
12  agreed, for the purposes of a pending proposed plan
13  of organization, to defer some of their
14  compensation.  Are you familiar with that?
15      A.   Yes.
16      Q.   Are you one of the professionals who has
17  agreed to defer his compensation in this matter?
18      A.   Yes.
19      Q.   Is BRG one of the professional
20  organizations that has agreed to defer its
21  compensation in this case?
22      A.   Yes.
23      Q.   Has LECG agreed to defer any
24  compensation in this matter?
25      A.   Well, there -- we don't owe anymore

Page 80

1  money to LECG.  We had an agreement with LECG where
2  we were to pay them a certain specific amount, and
3  then after that amount we received 100%.  In other
4  words, they got everything that came in the door
5  with first shot at it, and then we took everything
6  after that.  So they have not agreed to defer or --
7  but -- because they've been paid what their
8  contractual amount was.
9      Q.   I think you referred earlier in your
10  testimony when Mr. Dye and you were talking that
11  LECG experienced difficulties, and it basically is
12  no longer in business.
13      A.   It may be in business, but it's no
14  longer functioning like it was before.  I honestly
15  don't know whether it's in business or not.  I've
16  heard it is, and then I've heard it isn't.
17      Q.   Do you know if there were any creditors'
18  claims that resulted from LECG's difficulties
19  that remained or existed at the time you left the
20  company?
21      A.   I have heard they've all been resolved,
22  but I was not party to that, and no claims have been
23  made against us personally.
24      Q.   What claims are you aware of were being
25  made by creditors of LECG before they were resolved?

Page 81

1      A.   There was -- there were leasehold claims
2  in the 20 -- 2049 building of Century Park East.
3  There was an I think they had a full floor there,
4  and so they were trying to find some resolution to
5  there.
6      Q.   Is a director the LECG the same as a
7  partner?
8      A.   No, it's different.  It's different.
9      Q.   Does a director -- did a director at
10  LECG have any ownership interest in LECG equity?
11      A.   Not like a partner.  No.
12      Q.   Any kind of equity, whether like a
13  partner or not.
14      A.   No, the LECG structure was very similar
15  to the BRG structure with a few iterations.  And
16  that you basically shared in what you billed and
17  what you collected.  There was no sharing throughout
18  the whole firm as a normal partnership would be.
19      Q.   I think you said that you weren't sure
20  whether it was an LLC or a LLP.  Is that -- were you
21  referring to LECG or BRG when you said that?
22      A.   No, I was referring to our firm, the
23  Neilson Elggren Durkin.  I think we were an LLP.  We
24  could have been an LLC.  It's been a number of years
25  ago.  I don't know the corporate structure for LECG.

21  (Pages 78 to 81)

# EXHIBIT 12

1   DAVID M. POITRAS P.C. (State Bar No. 141309)
     JEFFER MANGELS BUTLER & MITCHELL LLP
2   1900 Avenue of the Stars, Seventh Floor
     Los Angeles, California 90067-4308
3   Telephone: (310) 203-8080/Facsimile: (310) 203-0567
     Email: dpoitras@jmbm.com
4
     Counsel for Bradley D. Sharp, Chapter 11 Trustee
5   for Namco Capital Group, Inc.

6   RICHARD K. DIAMOND (State Bar No. 70634)
     DANNING, GILL, DIAMOND & KOLLITZ, LLP
7   2029 Century Park East, Third Floor
     Los Angeles, California 90067-2904
8   Telephone: (310) 277-0077/Facsimile: (310) 277-5735
     Email: rdiamond@dgdk.com
9
     Attorneys for R. Todd Neilson,
10   Chapter 11 Trustee for Ezri Namvar

11                     UNITED STATES BANKRUPTCY COURT
                         CENTRAL DISTRICT OF CALIFORNIA
12                           LOS ANGELES DIVISION

13   In re:                              CASE NO.: 2:08-bk-32333-BR

14   NAMCO CAPITAL GROUP, INC.,
     a California corporation,           Chapter 11
15
16                    Debtor.            NOTICE OF HEARING ON APPLICATIONS
                                         OF CHAPTER 11 TRUSTEES AND
17                                       PROFESSIONALS FOR APPROVAL AND
                                         PAYMENT OF INTERIM COMPENSATION
18                                       AND REIMBURSEMENT OF EXPENSES

19
20                                       Hearing:
                                         Date:      October 16, 2012
21                                       Time:      2:00 p.m.
                                         Place:     Courtroom 1668
22                                                  255 East Temple Street
                                                    Los Angeles, CA 90012
23
24
25
26   TO THE HONORABLE BARRY RUSSELL, UNITED STATES BANKRUPTCY JUDGE
27   AND INTERESTED PARTIES:
28

PRINTED ON
RECYCLED PAPER

LA 9009067v1

**page 131**

1    **PLEASE TAKE NOTICE** that on October 16, 2012 at 2:00 p.m., or as soon thereafter as

2    the applicants can be heard, before the Honorable Barry Russell, United States Bankruptcy Judge, in

3    Courtroom 1668, located at 255 East Temple Street, Los Angeles, California, the Bankruptcy Court

4    will consider the applications of the chapter 11 trustees and professional persons listed below for

5    allowance and payment of interim compensation and reimbursement of expenses for services

6    rendered in connection with the chapter 11 cases of Namco Capital Group, Inc. ("Namco") and Ezri

7    Namvar ("Namvar"). Bradley D. Sharp is the duly appointed, qualified and acting chapter 11

8    trustee for the Namco bankruptcy estate (the "Namco Trustee"), and R. Todd Neilson is the duly

9    appointed, qualified and acting chapter 11 trustee for Namvar bankruptcy estate (the "Namvar

10   Trustee") (the Namco Trustee and the Namvar Trustee are referred to hereinafter collectively as the

11   "Trustees").

12

13                                          **NAMCO PROFESSIONALS**

14

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Jeffer Mangels Butler & Mitchell LLP<br>1900 Avenue of the Stars, 7th Floor<br>Los Angeles, CA 90067<br><br>Attn: David M. Poitras P.C.<br><br>*Counsel to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $1,096,848.50 | $36,291.03 | $1,133,139.53 |
| Bradley D. Sharp<br>333 South Grand Avenue<br>Suite 4070<br>Los Angeles, CA 90071<br><br>*Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 8/1/2011 - 8/31/2012 | $700,249.00 | $7,141.05 | $707,390.05 |

JMBM | Jeffer Mangels
Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

LA 9009067v1

2

Case 2:11-cv-05320-GAF-CW Document 343-1 Filed 09/30/13 Page 129 of 150 Page ID #:1883?

Case 2:08-bk-32333-BR Doc 2040 Filed 09/21/12 Entered 09/21/12 15:19:21 Desc
Main Document Page 3 of 19

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Ezra Brutzkus Gubner LLP<br>21650 Oxnard Street, Suite 500<br>Woodland Hills, CA 91367<br><br>Attn: Steven T. Gubner<br>Robyn B. Sokol<br><br>*Special Counsel to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $2,916,763.56 | $61,667.83 | $2,978,431.39 |
| BRG, LLC<br>2049 Century Park East, Suite 2525<br>Los Angeles, CA 90067<br><br>Attn: David Judd<br><br>*Accountants to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $1,708,012.25 | $7,249.83 | $1,715,262.08[1] |
| Neufeld, Marks, Gralnek & Maker<br>360 East Second Street, Suite 703<br>Los Angeles, CA 90012<br><br>Attn: Timothy L. Neufeld<br><br>*Special Counsel to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $28,642.00 | $1,954.79 | $30,596.79 |

[1] BRG's total fees and costs between the two estates is $1,715,262.08, which amount is split equally between the Namco and Namvar estates.

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

LA 9009067v1

3

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Creim, Macias, Koenig & Frey LLP<br>633 West 5th Street, Suite 5100<br>Los Angeles, CA 90071<br><br>Attn:  Stuart I. Koenig<br><br>*Counsel to the Official Committee of Unsecured Creditors of Namco Capital Group, Inc.* | 8/16/2011 - 9/15/2012 | $254,925.00 | $9,770.72 | $264,695.72 |
| Creim, Macias, Koenig & Frey LLP<br>633 West 5th Street, Suite 5100<br>Los Angeles, CA 90071<br><br>Attn:  Stuart I. Koenig<br><br>*Special Claims Counsel to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 5/1/2012 - 9/15/2012 | $14,503.50 | $665.49 | $15,168.99 |
| Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard<br>13th Floor<br>Los Angeles, CA 90067<br><br>Attn: Gillian N. Brown<br><br>*Special Counsel to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 8/1/2011 - 7/31/2012 | $2,429,461.63 | $115,027.46 | $2,544,489.09 |

LA 9009067v1

4

**page 134**

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Development Specialists, Inc. 333 South Grand Avenue, Suite 4070 Los Angeles, CA 90071-1544  Attn: Eric Held  *Financial Advisors to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 8/1/2011 - 8/31/2012 | $622,661.50 | $220.65 | $622,882.14 |
| Jones Day 555 South Flower Street Los Angeles, CA 90071  Attn: Richard L. Wynne  *Special Counsel to Bradley D. Sharp, Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $235,992.50 | $519.24 | $236,571.74[2] |
| FTI Consulting 633 West Fifth Street, 16th Floor Los Angeles, CA 90071  Attn: M. Freddie Reiss  *Financial Advisers to the Official Committee of Unsecured Creditors of Namco Capital Group, Inc.* | 9/1/2011 - 8/31/2012 | $19,811.00 | $12.50 | $19,823.50 |
| The Lobel Firm, LLP 840 Newport Center Drive, Suite 750 Newport Beach, CA 92660  Attn: Mike Neue  *Co-Counsel to the Official Committee of Unsecured Creditors of Namco Capital Group, Inc.* | 9/1/2011- 8/31/2012 | $312,467.80 | $0.00 | $312,467.80 |

---

[2] Jones Day's total fees and costs between the two estates is $236,571.74, which amount is split equally between the Namco and Namvar estates.

PRINTED ON
RECYCLED PAPER

LA 9009067v1

5

**page 135**

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Intelligent Discovery Solutions, Inc. 1242 E. Lexington Ave., Suite 1200 Pomona, CA 91766 Attn: James Vaughn, Managing Director *Computer Consultants* | 8/27/2011 - 8/31/2012 | $38,311.94 | $0.00 | $38,311.94 |

### NAMVAR PROFESSIONALS

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Danning, Gill, Diamond & Kollitz LLP 2029 Century Park East, 3rd Floor Los Angeles, CA 90067 Attn: Richard K. Diamond *Counsel to R. Todd Neilson, Chapter 11 Trustee for the Ezri Namvar Bankruptcy Estate* | 8/1/2011- 8/31/2012 | $1,780,083.50 | $37,068.68 | $1,817,152.18 |
| R. Todd Neilson 2049 Century Park East Suite 2300 Los Angeles, CA 90067 *Chapter 11 Trustee for the Ezri Namvar Bankruptcy Estate* | 8/1/2011 - 8/31/2012 | $706,857.75 | $2,688.56 | $709,546.31 |
| BRG, LLC 2049 Century Park East, Suite 2525 Los Angeles, CA 90067 Attn: David Judd *Accountants to R. Todd Neilson, Chapter 11 Trustee for the Ezri Namvar Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $1,708,012.25 | $7,249.83 | $1,715,262.08[3] |

---

[3]  *See* footnote 2.

LA 9009067v1

PRINTED ON
RECYCLED PAPER

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Pachulski Stang Ziehl & Jones LLP<br>10100 Santa Monica Boulevard<br>13th Floor<br>Los Angeles, CA 90067<br><br>Attn: Gillian N. Brown<br><br>*Special Counsel to R. Todd Neilson, Chapter 11 Trustee for the Ezri Namvar Bankruptcy Estate* | 8/1/2011 - 7/31/2012 | $1,012,714.63 | $66,395.03 | $1,079,109.66 |
| Shulman Hodges & Bastian LLP<br>8105 Irvine Center Drive<br>Suite 600<br>Irvine, CA 92618<br><br>Attn: Melissa R. Davis<br><br>*Counsel to the Official Committee of Unsecured Creditors of the Bankruptcy Estate of Ezri Namvar* | 9/1/2011 - 9/14/2012 | $206,772.00 | $3,831.96 | $210,603.96 |
| Elmer Dean Martin III<br>A Professional Corporation<br>P O Box 4670<br>22632 Golden Springs Drive<br>Suite 190<br>Diamond Bar, CA 91765<br><br>Attn:  Elmer Dean Martin III<br><br>*Special Tax Counsel for R. Todd Neilson, Chapter 11 Trustee for the Ezri Namvar Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $78,861.50 | $1,935.15 | $80,796.65 |
| Jones Day<br>555 South Flower Street<br>Los Angeles, CA 90071<br><br>Attn: Richard L. Wynne<br><br>*Special Counsel to R. Todd Neilson, Chapter 11 Trustee for the Ezri Namvar Bankruptcy Estate* | 9/1/2011 - 8/31/2012 | $235,992.50 | $519.24 | $236,511.74[4] |

---

[4]  *See* footnote 3.

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON
RECYCLED PAPER

LA 9009067v1

7

| Professional/Name | Time Period | Fees Requested | Expense Reimb. | Total |
|---|---|---|---|---|
| Intelligent Discovery Solutions, Inc. 1242 E. Lexington Ave., Suite 1200 Pomona, CA 91766<br><br>Attn: James Vaughn, Managing Director<br><br>*Computer Consultants* | 8/27/2011 - 2/23/2012 | $5,044.10 | $0.00 | $5,044.10 |

**PLEASE TAKE FURTHER NOTICE** that as of the date of this Notice, there are not sufficient funds available to pay the projected amount of allowed fees and costs in either the Namco or Namvar estates in full for the above fifth interim fee applications upon allowance. The approximate amount of the fees and costs sought by the Trustees and professionals in connection with the fifth interim fee applications in these cases is $14.4 million. Notwithstanding the fact that the estates do not presently have sufficient funds on hand to pay the fees and costs as may be allowed by the Court, the Trustees believe that it is prudent to seek interim approval of fees and costs periodically so that (1) the Court and parties in interest can review the various fee requests in a timely manner (and not after substantial time has passed between the time that the services were rendered and the applications are considered) and (2) prompt payment can be made as and when funds are available in the estates to pay allowed fees and costs.

In connection with the first, second, third and fourth interim allowances of fees and costs, the Trustees proposed that the allowed fees and costs of professionals employed in the Namco and Namvar chapter 11 cases be paid *pro rata* from available cash in both estates. This approach was approved by the Court with regard to prior fee applications. At this point in time, as was the case in connection with the first through fourth round of fee applications, either estate may arguably make a claim to some or all of any assets held by the other estate. The Trustees continue to believe that proportional payment to professionals employed in both cases is both necessary and appropriate, and the Trustees may in their discretion weight future payments based upon the total amount owed and outstanding with regard to any particular professional. To the extent that it is later determined that one estate has paid a disproportionate share of such fees and costs, that estate will have an

JMBM | Jeffer Mangels Butler & Mitchell LLP

PRINTED ON RECYCLED PAPER

LA 9009067v1

1  allowed administrative claim against the other estate for repayment of such disproportionate

2  amount. Notwithstanding any future payment adjustment between the estates, no disgorgement of

3  fees and costs will be required of any professional based upon the treatment proposed herein and

4  previously approved by the Court. Any objection to this proposal must be stated in writing and

5  served not later than fourteen (14) days prior to the scheduled hearing date on the Applications.

6      **PLEASE TAKE FURTHER NOTICE THAT:**

7      1.    The Applications will be on file with the Court and available for inspection and

8  copying at the Office of the Clerk, United States Bankruptcy Court, Los Angeles Division, 255 East

9  Temple Street, Los Angeles, California 90012. The Applications will also be posted on the

10  Trustees' website at www.namvar-namco-bankruptcy.com. A copy of the Applications may also be

11  requested by contacting in writing the professional filing the same.

12      2.    Objections to the Applications, if any, must be in writing, filed with the United

13  States Bankruptcy Court, and served on the United States Trustee, on the professional person to

14  whom the objection is directed, and on counsel for the Trustees whose name and address appears in

15  the upper left hand corner of the first page of this Notice. Any such objection not so filed and

16  served may be deemed to have been waived.

17      3.    Pursuant to Local Bankruptcy Rule 9013-1(f), any objections to any of the

18  Applications must be filed and served not later than fourteen (14) days prior to the scheduled

19  hearing date. Failure to timely file and serve a proper objection may be deemed consent to the

20  award and payment of fees and expenses as requested.

21  

22          Respectfully submitted,

23  

24  Date: September 21, 2012        JEFFER MANGELS BUTLER & MITCHELL LLP

25          By: _____ /s/ David M. Poitras _____

26             DAVID M. POITRAS P.C.
           Attorneys for Bradley D. Sharp,

27             Chapter 11 Trustee for Namco Capital Group, Inc.

28  

PRINTED ON
RECYCLED PAPER
LA 9009067v1

9

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding.  My business address is:
1900 Avenue of the Stars, 7th Floor, Los Angeles, CA 90067

A true and correct copy of the foregoing document entitled (*specify*): ***NOTICE OF HEARING ON APPLICATIONS OF CHAPTER 11 TRUSTEES AND PROFESSIONALS FOR APPROVAL AND PAYMENT OF INTERIM COMPENSATION AND REIMBURSEMENT OF EXPENSES*** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner stated below:

**1.  TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:  Pursuant to controlling General Orders and LBR, the foregoing document will be served by the court via NEF and hyperlink to the document. On *September 21, 2012*, I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following persons are on the Electronic Mail Notice List to receive NEF transmission at the email addresses stated below:

☒  Service information continued on attached page

**2.  SERVED BY UNITED STATES MAIL**:  On *September 21, 2012*, I served the following persons and/or entities at the last known addresses in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States mail, first class, postage prepaid, and addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☒  Service information continued on attached page

**3.  SERVED BY PERSONAL DELIVERY, OVERNIGHT MAIL, FACSIMILE TRANSMISSION OR EMAIL** (state method for each person or entity served):  Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *September 21, 2012*, I served the following persons and/or entities by personal delivery, overnight mail service, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows.  Listing the judge here constitutes a declaration that personal delivery on, or overnight mail to, the judge will be completed no later than 24 hours after the document is filed.
**SERVED BY OVERNIGHT MAIL**
Honorable Barry Russell
United States Bankruptcy Court
255 E. Temple St., Suite 1660
Los Angeles, CA 90012

☐  Service information continued on attached page

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.

| | | |
|---|---|---|
| September 21, 2012 | Billie Terry | *[signature]* |
| *Date* | *Printed Name* | *Signature* |

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012* **F 9013-3.1.PROOF.SERVICE**

## ADDITIONAL SERVICE INFORMATION

**1.** <u>**TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**</u>:

- Simon Aron   saron@wrslawyers.com
- Raymond H Aver   ray@averlaw.com
- Charles Avrith   cavrith@nagler.com, jneal@nagler.com
- Shauna Avrith   savrith@nagler.com, jneal@nagler.com
- Andrew Bao   aabao@wolfewyman.com
- Robert D Bass   rbass@greenbass.com
- Christine E Baur   christine.e.baur@bakernet.com, tracey.l.angelopoulos@bakernet.com;anne.w.hamann@bakern et.com;ali.m.m.mojdehi@bakernet.com;jane.b.mackie@bakern et.com
- Michael Jay Berger   michael.berger@bankruptcypower.com, jennifer.phan@bankruptcypower.com
- Stephen F Biegenzahn   efile@sfblaw.com
- Linda M Blank   linda@lmblank.com
- J Scott Bovitz   bovitz@bovitz-spitzer.com
- David W Brody   dbrody@brody-law.com, bknotice@brody-law.com
- Alan F Broidy   alan@broidylaw.com, sherrie@broidylaw.com
- Gillian N Brown   gbrown@pszjlaw.com, gbrown@pszjlaw.com
- Richard Burstein   rburstein@ebg-law.com, ecf@ebg-law.com
- J Sheldon Capeloto   jcapeloto@capelotolaw.com
- Michael F Chekian   mike@cheklaw.com, msalanick@cheklaw.com
- Sara Chenetz   chenetz@blankrome.com, chang@blankrome.com;darling@blankrome.com
- Shirley Cho   scho@pszjlaw.com
- Matthew M Clarke   mclarke@cappellonoel.com
- Russell Clementson   russell.clementson@usdoj.gov, dare.law@usdoj.gov
- Alicia Clough   alicia.clough@kayescholer.com
- Marc S Cohen   mcohen@kayescholer.com
- Yona Conzevoy   yconzevoy@dwclaw.com
- Donald H Cram   dhc@severson.com
- Ashleigh A Danker   adanker@kayescholer.com, dclow@kayescholer.com;dhernandez@kayescholer.com
- Brian L Davidoff   bdavidoff@greenbergglusker.com, jreinglass@greenbergglusker.com;kwoodson@greenbergglusker.com
- Lesley Davis   lesleydavislaw@gmail.com
- Melissa Davis   mdavis@shbllp.com
- Daniel Denny   ddenny@gibsondunn.com
- Richard K Diamond   rdiamond@dgdk.com, DanningGill@gmail.com
- Richard K Diamond   jlv@dgdk.com, rdiamond@ecf.epiqsystems.com;DanningGill@Gmail.com
- Caroline Djang   crd@jmbm.com
- Keith S Dobbins   kdobbinslaw@aol.com
- Joseph A Eisenberg   jae@jmbm.com
- Lei Lei Wang Ekvall   lekvall@wgllp.com
- Robert Esensten   resensten@wcclaw.com
- James R Felton   jfelton@greenbass.com
- Michael G Fletcher   mfletcher@frandzel.com, efiling@frandzel.com;shom@frandzel.com
- Alan W Forsley   awf@fredmanlieberman.com, awf@flklawfirm.com;addy@flklawfirm.com
- Heather Fowler   heather.fowler@lw.com, colleen.rico@lw.com
- Bryan J Freedman   sshaulis@ftllp.com
- Jon H Freis   jon@jhflaw.net
- Sandford Frey   Sfrey@cmkllp.com
- Vanessa B Fung   vfung@sobini.com
- Philip A Gasteier   pag@lnbrb.com
- Randi R Geffner   rgeffner@wcclaw.com
- Randi R Geffner   rgeffner@wccelaw.com
- Thomas M Geher   tmg@jmbm.com
- Julia P Gibbs   legalgibbs@gmail.com
- Daniel H Gill   ecf@ebg-law.com, dgill@ebg-law.com
- Bernard R Given   bgiven@loeb.com, mortiz@loeb.com
- Barry S Glaser   bglaser@swjlaw.com
- Steven Glaser   sglaser@wwllp.com
- Jeffrey I Golden   jgolden@wgllp.com, kadele@wgllp.com
- Hal D Goldflam   hgoldflam@frandzel.com, efiling@frandzel.com;dwise@frandzel.com
- Stanley E Goldich   sgoldich@pszjlaw.com
- Mark E Goodfriend   markgoodfriend@yahoo.com, lawofficesofmeg@gmail.com
- Andrew A Goodman   agoodman@goodmanfaith.com
- David Gould   dgould@gglawllp.com
- Matthew Grimshaw   mgrimshaw@blakeleyllp.com
- Irving M Gross   img@lnbrb.com, angela@lnbrb.com
- Steven T Gubner   sgubner@ebg-law.com, ecf@ebg-law.com
- Stella A Havkin   stella@havkinandshrago.com, havkinlaw@earthlink.net
- M Jonathan Hayes   jhayes@hayesbklaw.com, roksana@hayesbklaw.com;carolyn@hayesbklaw.com;elizabeth@hayesbklaw.com
- Teresa Y Hillery   teresa.hillery@fnf.com
- James KT Hunter   jhunter@pszjlaw.com
- Stephen E Hyam   shyam@clarktrev.com
- Eric P Israel   eisrael@dgdk.com, danninggill@gmail.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

1. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING (NEF)**:

- Seymone Javaherian   sj@javlaw.com
- David Joe   djoe@rutterhobbs.com, calendar@rutterhobbs.com
- Lance N Jurich   ljurich@loeb.com, kpresson@loeb.com
- Sheri Kanesaka   skanesaka@alvaradosmith.com, crosas@alvaradosmith.com
- Jerome Kaplan   kapkenkd@pacbell.net, jeklaw@pacbell.net
- Ira Benjamin Katz   IKatz@GershuniKatz.com
- Talin Keshishian   tkeshishian@ebg-law.com, ecf@ebg-law.com
- George H Kim   george@gkimlaw.com
- John W Kim   jkim@nossaman.com
- Yi S Kim   ykim@greenbass.com
- Stuart I Koenig   Skoenig@cmkllp.com
- Michael S Kogan   mkogan@koganlawfirm.com
- Alan J Kornfeld   akornfeld@pszjlaw.com, akornfeld@pszjlaw.com
- John P Kreis   jkreis@attglobal.net
- Jeffrey A Krieger   jkrieger@ggfirm.com, kwoodson@greenbergglusker.com
- Pamela Labruyere   pamela@sgsslaw.com
- Ronald L Leibow   rleibow@kayescholer.com
- Jennifer Leland   jleland@peitzmanweg.com
- Mitchell B Ludwig   mbl@kpclegal.com
- John T Madden   maddenj@bryancave.com
- Harris M Madnick   hmmadnick@rkmc.com
- William Malcolm   bill@mclaw.org
- Elmer D Martin   elmermartin@gmail.com
- Daniel J McCarthy   dmccarthy@hillfarrer.com, spadilla@hillfarrer.com;docket@hillfarrer.com
- Ashley M McDow   amcdow@mbnlawyers.com, aacosta@mbnlawyers.com
- Alexis M McGinness   amm@jmbm.com, vr@jmbm.com;fc3@jmbm.com
- David W. Meadows   david@davidwmeadowslaw.com
- Carey L Melton   cmelton@clark-law.net
- Neeta Menon   nmenon@btlaw.com
- Hal M Mersel   mark.mersel@bryancave.com
- Ronald E Michelman   ronaldmichelman@sbcglobal.net
- Elissa Miller   emiller@sulmeyerlaw.com, asokolowski@sulmeyerlaw.com
- Ali M Mojdehi   amojdehi@cooley.com, jgertz@cooley.com;bbyun@cooley.com;arego@cooley.com
- Richard M Moneymaker   rmm@moneymakerlaw.com
- Susan I Montgomery   susan@simontgomerylaw.com
- Monserrat Morales   mmorales@peitzmanweg.com

- Brian A Morris   bam@cohenjohnson.com, sjohnson@cohenjohnson.com;rpoll@cohenjohnson.com
- Vicente Matias Murrell   murrell.vicente@pbgc.gov, efile@pbgc.gov
- Edmond Nassirzadeh   ed@nasslawfirm.com, ecfbestcase@gmail.com
- Darren B Neilson   dneilson@ebg-law.com, ecf@ebg-law.com
- R. Todd Neilson   tneilson@ecf.epiqsystems.com, vdoran@brg-expert.com;sgreenan@brg-expert.com;tneilson@ecf.epiqsystems.com
- Christopher R Nelson   cnelson@erlaw.com
- Mike D Neue   mneue@thelobelfirm.com, jmattiace@thelobelfirm.com;nlockwood@thelobelfirm.com
- Lisa N Nobles   lnobles@lgbfirm.com, jcasillas@lgbfirm.com
- David Norouzi   david@norouzi.us
- William Novotny   william.novotny@mwmf.com
- Walter K Oetzell   woetzell@dgdk.com, DanningGill@gmail.com
- Sam S Oh   sam.oh@limruger.com, julie.yu@limruger.com;amy.lee@limruger.com
- Robert E Opera   ropera@winthropcouchot.com, pj@winthropcouchot.com;vcorbin@winthropcouchot.com;chipp@winthropcouchot.com
- Aram Ordubegian   ordubegian.aram@arentfox.com
- Shai S Oved   ssoesq@aol.com
- Malhar S Pagay   mpagay@pszjlaw.com, mpagay@pszjlaw.com
- Kerry A Moynihan   kerry.moynihan@bryancave.com, raul.morales@bryancave.com;trish.penn@bryancave.com
- Randall P Mroczynski   randym@cookseylaw.com
- Jenny Y Park Garner   jpark@sheppardmullin.com
- Daryl G Parker   dparker@pszjlaw.com
- Leo D Plotkin   lplotkin@lsl-la.com, dsmall@lsl-la.com
- David M Poitras   dpoitras@jmbm.com
- Kourosh M Pourmorady   pourmorady.law@gmx.com
- Samuel Price   sprice@pooleshaffery.com
- Uzzi O Raanan   uor@dgdk.com, DanningGill@Gmail.com
- Russell H Rapoport   rrapoport@prllplaw.com, lgillis@prllplaw.com
- Christopher S Reeder   csreeder@rkmc.com
- Saul Reiss   reisslaw@verizon.net
- John P Reitman   jreitman@lgbfirm.com, scolen@lgbfirm.com;jcasillas@lgbfirm.com
- Ronald N Richards   ron@ronaldrichards.com
- Martha E Romero   Romero@mromerolawfirm.com
- Jeremy E Rosenthal   jrosenthal@sidley.com
- Neal Salisian   neal.salisian@salisianlee.com, richard.lee@salisianlee.com;christina.cordero@salisianlee.com
- Damon G Saltzburg   ds@srblaw.com, cs@srblaw.com

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

**ADDITIONAL SERVICE INFORMATION**

**I. TO BE SERVED BY THE COURT VIA NEF**

- Henley L Saltzburg   hls@srblaw.com, ar@srblaw.com;lb2@srblaw.com
- Gregory M Salvato   gsalvato@pmcos.com, calendar@salvatolawoffices.com
- Gregory M Salvato   gsalvato@salvatolawoffices.com, calendar@salvatolawoffices.com
- Robert M Saunders   rsaunders@pszjlaw.com, rsaunders@pszjlaw.com
- Bruce S Schildkraut   bruce.schildkraut@usdoj.gov
- Benjamin Seigel   bseigel@buchalter.com, IFS_filing@buchalter.com
- David Selki   david@selki.com
- Steven M Sepassi   steve@sepassilaw.com
- Charles Shamash   cs@locs.com, generalbox@locs.com
- Terry D Shaylin   tshaylin@karasiklaw.com
- David B Shemano   dshemano@peitzmanweg.com
- Yuriko M Shikai   yshikai@nmgmlaw.com
- Brian P Simon   nightowl5755@yahoo.com
- Steven R Skirvin   srs@dkclaw.com
- Robyn B Sokol   ecf@ebg-law.com, rsokol@ebg-law.com
- Ryan J Stonerock   rstonerock@wrslawyers.com
- Nico N Tabibi   nico@tabibilaw.com
- Sam Tabibian   sam.tabibian@gmail.com
- Derrick Talerico   dtalerico@loeb.com, kpresson@loeb.com
- David A Tilem   davidtilem@tilemlaw.com, malissamurguia@tilemlaw.com;dianachau@tilemlaw.com;joanfidelson@tilemlaw.com

- James E Till   jtill@thelobelfirm.com, jmattiace@thelobelfirm.com;nlockwood@thelobelfirm.com
- Alan G Tippie   atippie@sulmeyerlaw.com, jbartlett@sulmeyerlaw.com;kfox@sulmeyerlaw.com
- United States Trustee (LA)   ustpregion16.la.ecf@usdoj.gov
- Matthew S Walker   matthew.walker@pillsburylaw.com, sue.hodges@pillsburylaw.com;pamela.breeden@pillsburylaw.com
- Michael A Wallin   mwallin@sheppardmullin.com
- Howard J Weg   hweg@peitzmanweg.com
- Joel B Weinberg   jweinberg@usisg.com
- Michael H Weiss   mw@weissandspees.com, lm@weissandspees.com;jb@weissandspees.com
- Sharon Z Weiss   sharon.weiss@hro.com, raul.morales@hro.com
- Monika S Wiener   mwiener@jonesday.com
- Kimberly S Winick   kwinick@clarktrev.com
- Richard Lee Wynne   rlwynne@jonesday.com, sjperry@jonesday.com
- Beth Ann R Young   bry@lnbyb.com
- Mark T Young   myoung@donahoeyoung.com
- Afshin Youssefyeh   ady@adylaw.com
- Dean A Ziehl   dziehl@pszjlaw.com, dziehl@pszjlaw.com

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012                                    **F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

2. <u>**SERVED BY UNITED STATES MAIL**</u>:

<u>Debtor</u>
Ezri Namvar
12855 Parkyns St.
Los Angeles, CA 90049

<u>Chapter 11 Trustee for the Namco Capital Group Bankruptcy Estate</u>
Bradley D. Sharp
333 South Grand Avenue, Suite 4070
Los Angeles, CA 90071

**REQUEST FOR SPECIAL NOTICE**

<u>Attorneys for MAGD Enterprises, Inc.</u>
Alexander Haroonian, Esq.
Law Offices of Alexander Haroonian
9025 Wilshire Blvd., Suite 301
Beverly Hills, CA 90211

<u>Financial Advisors to the Official Unsecured Creditors' Committee of
Namco Capital Group, Inc.</u>
M. Freddie Reiss
Amir Agam
FTI Consulting
633 West Fifth Street, 16th Floor
Los Angeles, CA 90071

<u>In re: R. Todd Neilson v The Paul and Judith Laska Family Trust</u>
<u>Attnys for Paul & Judith Laska aka the Laska Family Trust</u>
David S. White, Esq.
David S. White & Associates
12401 Wilshire Blvd., Suite 200
Los Angeles, CA 90025

Benjamin B. Efraim
5423 E Village Road, Ste 200
Long Beach, CA 90808

Ehsan Afaghi
170 S Beverly Drive, Ste 315
Beverly Hills, CA 90212

Dorita Ashoori
1520 Camden Avenue, Apt 306
Los Angeles, CA 90025

Abraham B. Assil Trust
Attn: Abraham Assil
1000 S. Westgate, #100
Los Angeles, CA 90049

Berkeley Research Group LLC
2049 Century Park East, Ste 2525
Los Angeles, CA 90067

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**page 144**

**ADDITIONAL SERVICE INFORMATION**

2. **SERVED BY UNITED STATES MAIL**:

Keith A Bregman
11320 Magnolia Boulevard
N Hollywood, CA 91601

Victoria Brooke
606 North 1st
San Jose, CA 95112

A. Barry Cappello, Esq.
Cappello & Noel LLP
831 State Street
Santa Barbara, CA 93101

Cathay Bank
c/o Frandzel Robins Bloom & Csato LC
6500 Wilshire Blvd., Ste 1700
Los Angeles, CA 90048

Matthew M Clarke, Esq.
Christman Kelley & Clarke
831 State Street
Santa Barbara, CA 93101

David Alan Cooper
417-B W Foothill Blvd., # 511
Glendora, CA 91741

Crowe Horwath LLP
15233 Ventura Blvd, 9th Floor
Sherman Oaks, CA 91403

Delson Brown Properties, LLC
c/o K&L Gates LLP
10100 Santa Monica Blvd., 7th Floor
Los Angeles, CA 90067

Elite Properties Realty
Attn Phil Peymour
148 S Beverly Dr
Beverly Hills, CA 90212

Robert Esensten, Esq.
Wasserman Comden Casselman LLP
5567 Reseda Blvd., Ste 330
PO Box 7033
Tarzana, CA 91357-7033

Eximo, Inc.
3820 Del Amo Blvd
Suite 235
Torrance, CA 90503

Farhadian Family Trust
Attn: F. Jason Farhadian, Esq.
P.O. Box 7333
Newport Beach, CA 92658

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

2. <u>**SERVED BY UNITED STATES MAIL**</u>:

Robert P. Goe
Goe & Forsythe LLP
18101 Von Karman Avenue, Suite 510
Irvine, CA 92612

Mark E. Goodfriend
16255 Ventura Blvd., Ste 205
Encino, CA 91436

David Haghani
c/o Alexander Escandari
9100 Wilshire Blvd. #725
Beverly Hills, CA 90212

David Haghani
1855 Lincoln Blvd.
Santa Monica, CA 90210

David Haghnazarzadeh
17914 Magnolia blvd., #207
Encino, CA 91316

Teresa Y. Hillery
Fidelity National Law Group
915 Wilshire Blvd., Ste 2100
Los Angeles, CA 90017

Eric P. Israel
2029 Century Pk East, 3rd Flr
Los Angeles, CA 90067-2904

Dugan P. Kelley
Cappello & Noel LLP
831 State Street
Santa Barbara, CA 93101

Samuel Krane, Esq.
Jeremy D. Smith, Esq.
Marc Smith, Esq.
Krane & Smith
16255 Ventura Blvd., Ste 600
Encino, CA 91436-2303

Lapico LLC and Picola 8 LLC
c/o Levinson Arshonsky & Kurtz, LLP
15303 Ventura Blvd., # 1650
Sherman Oaks, CA 91403

Lee & Associates - Newport Beach, Inc.
3991 MacArthur Blvd., Ste 100
Newport Beach, CA 92660

David R Krause-Leemon, Esq.
LUCE FORWARD HAMILTON & SCRIPPS
601 S Figueroa Ste 3900
Los Angeles, CA 90017

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

June 2012

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

2. <u>SERVED BY UNITED STATES MAIL</u>:

Paul H. Levine, Esq.
Law Offices of Henry N. Jannol
10850 Wilshire Blvd Ste 825
Los Angeles, CA 90024

Jeffrey L. Licht
Licht & Associates
1875 Century Park East, Suite 600
Los Angeles, CA 90067

William N. Lobel
840 Newport Center Dr, Ste 400
Newport Beach, CA 92660-6324

Ronald E. Michelman, Esq.
Michelman & Michelman LLP
20265 Ventura Blvd., Ste D
Woodland Hills, CA 91364

Robert B Mobasseri, Esq.
Law Office of Robert Mobasseri
445 S. Figueroa St., 27th Fl
Los Angeles, CA 90071

David M. Morrow
c/o Stephen H. Marcus, Esq.
Gittler & Bradford
10537 Santa Monica Blvd., 3rd Floor
Los Angeles, CA 90025

Parham Naghdechi & Evelyn Lahiji
619 Rollingbrook Street, Apt # 506
Baytown, TX 77521

Timothy Neufeld, Esq.
Neufeld Law Group
360 E 2nd St., Ste 703
Los Angeles, CA 90012

Omni Management Group, LLC
Rust Consulting/Omni Bankruptcy
5955 DeSoto Ave., Ste 100
Woodland Hills, CA 91367

Orrick, Herrington & Sutcliffe LLP
777 S. Figueroa St. Suite 3200
Los Angeles, CA 90017-5855

Richard Pachulski, Esq.
Pachulski Stang Ziehl & Jones LLP
10100 Santa Monica Blvd., Ste 1100
Los Angeles, CA 90067-4003

Parker, Milliken, Clark, O'Hara & Samuelian
c/o David K. Eldan, Esq.
555 S. Flower St., 30th Fl.
Los Angeles, CA 90071-2440

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

2. **SERVED BY UNITED STATES MAIL**:

Amanda K. Pawlyk, Esq.
Clark & Associates PC
2999 Overland Ave., Ste 127
Los Angeles, CA 90064

Physicians Reciprocal Insurers
c/o Penelope Parmes, Esq.
Rutan & Tucker LLP
611 Anton Blvd., Ste #1400
Costa Mesa, CA 92626

David Pourbaba
8271 Melrose Ave #200
Los Angeles, CA 90046

Saul Reiss, Esq.
Law Offices of Saul Reiss
2800 28th St., Ste 328
Santa Monica, CA 90405

Mohammad Reza-Karimi
3409 Overland Ave
Los Angeles, CA 90034

RPM Investments, Haroon Hanasab and M&Y Management Inc.
Attn: Robert Hanasab
606 S. Olive Street, #600
Los Angeles, CA 90014

John M. Rygh
915 Wilshire Blvd Ste 2100
Los Angeles, CA 90017

Salvato Law Offices
333 So. Grand Avenue, 25th Floor
Los Angeles, CA 90071

Shayfar Financial Services
Attn: Joseph Shayfar
14250 Ventura Blvd., 2nd Floor
Sherman Oaks, CA 91423

Shulman Hodges & Bastian LLP
26632 Towne Centre Dr, Ste 300
Foothill Ranch, CA 92610

Jeremy D. Smith, Esq.
Krane & Smith
16255 Ventura Blvd., Ste 600
Encino, CA 91436

Stinson Morrison Hecker LLP
Attn: Christopher C. Simpson
1850 N. Central Avenue
Suite 2100
Phoenix, AZ 85004-4584

---

This form is mandatory. It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

**ADDITIONAL SERVICE INFORMATION**

2. <u>SERVED BY UNITED STATES MAIL</u>:

Marc Tavakoli
8900 W. Olympic Blvd,
Beverly Hills, CA 90211

Kasra Torabi
Pacifica International Law Group LLP
15233 Ventura Bl., PH 16
Sherman Oaks, CA 91403

Daniel J Uretsky
Wolf Rifkin Shapiro Schulman & Rabkin LL
11400 W Olympic Blvd., Ninth Flr
Los Angeles, CA 90064-1582

Alireza Varastehpour
P.O. Box 491381
Los Angeles, CA 90049

Wall Street Mart, L.P., a California limited partnership
12121 Wilshire Boulevard, Suite 200
Los Angeles, CA 90025

David M. Wiseblook, Esq.
Seyfarth Shaw LLP
560 Mission St., Ste 3100
San Francisco, CA 94105

Yamin Family Trust
Attn: Mansour Yamin
640 Clinton Place
Beverly Hills, CA 90210

David Zadeh
Fredman Lieberman LLP
1875 Century Park East, Suite 2200
Los Angeles, CA 90067

---

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*June 2012*

**F 9013-3.1.PROOF.SERVICE**

# EXHIBIT 13

Page 1

1            UNITED STATES DISTRICT COURT FOR THE

2              CENTRAL DISTRICT OF CALIFORNIA

3

4   In re: NAMCO CAPITAL GROUP, INC.,)
    a California corporation,        ) CASE NO:
5                         Debtor.    ) 2:11-cv-05320-GAF
    _____ )
6                                    ) ADV PROC NO.:
    BRADLEY D. SHARP, solely in his  ) 2:10-ap-02945-BR
7   capacity as Chapter 11 Trustee of)
    NAMCO CAPITAL GROUP, INC.,       )
8                                    )
                          PLAINTIFF, )
9            VS.                     )
                                     )
10  MOUSA NAMVAR, et al.             )
                          DEFENDANTS.)
11  _____ )

12

13

14       VIDEOTAPED DEPOSITION OF BRADLEY D. SHARP

15            LOS ANGELES, CALIFORNIA

16                JULY 24, 2013

17

18

19

20

21

22

23  REPORTED BY:

24  CHRISTY A. CANNARIATO, CSR #7954, RPR, CRR, RSA

25  JOB NO.: 63052

Page 2

```
 1
 2
 3
 4
 5
 6
 7              July 24, 2013
 8              10:11 A.M.
 9
10
11                    -
12
13  Volume I of the videotaped deposition of
14  Bradley D. Sharp, taken on behalf of
15  Defendants, held at the offices of
16  Greenberg Glusker Fields Claman &
17  Machtinger, LLP, 1900 Avenue of the Stars,
18  Los Angeles, California, before
19  Christy A. Cannariato, CSR #7954, RPR, CRR,
20  RSA.
21
22
23
24
25
```

Page 3

```
 1
 2                 APPEARANCES
 3
    ON BEHALF OF THE PLAINTIFF AND DEPONENT:
 4  PACHULSKI STANG ZIEHL & JONES
    BY:  DEAN ZIEHL, ESQ.
 5  10100 SANTA MONICA BOULEVARD
    LOS ANGELES, CALIFORNIA 90067
 6
 7
 8
    ON BEHALF OF THE DEFENDANTS MOUSA NAMVAR; MAGDIEL,
 9  LLC; DGADE OF DELAWARE, LLC; NAMCO 8, LLC; BUNHERST,
    LLC; and WISHLAB 90, LLC:
10  GREENBERG GLUSKER FIELDS CLAMAN & MACHTINGER
    BY:  BERNARD RESSER, ESQ.
11  1900 AVENUE OF THE STARS
    LOS ANGELES, CALIFORNIA 90067
12
13
14  ON BEHALF OF THE DEFENDANTS HOOSHANG NAMVAR;,
    HOMAYOUN NAMVAR; RAMIN NAMVAR; HELEN SHADI; HILDA
15  BAYANFAR; LIDA SHRAGA; NATALY NAMVAR; LACY 20, LLC;
    TRIFISH; TRIBUN; TRSISTER; BELIEVERS; NET; LIGHT
16  SOURCE MANAGEMENT; WOODMAN PARTNERS; TRITOWNE; and
    TRIGROVE:
17  SALTZBURG RAY & BERGMAN
    BY:  PAUL DYE, ESQ.
18  12121 WILSHIRE BOULEVARD
    LOS ANGELES, CALIFORNIA 90025
19
20
21  ALSO PRESENT:
    CHRIS JORDAN, VIDEOGRAPHER, TSG REPORTING, INC.
22
23
24
25
```

Page 4

```
 1                  INDEX
 2
 3  EXAMINATION BY               PAGE
 4  MR. DYE                  6
 5  MR. RESSER              220
 6  -------------------------------------------
 7               EXHIBITS
 8  EXHIBIT DESCRIPTION           PAGE
 9
10  Exhibit 475
11  Declaration of Bradley D. Sharp filed 11/11/11   69
12
13  Exhibit 476
14  Stipulation between Debtor Ezri Namvar and
15  Chapter 11 Trustee filed 8/6/09          77
16
17
18
19        EXHIBITS PREVIOUSLY MARKED
20        5, 100, 151, 160, 450, 451, 452
21  -------------------------------------------
22
23     QUESTIONS INSTRUCTED NOT TO ANSWER
24            68:14, 219:19
25
```

Page 5

```
 1   Los Angeles, California; Wednesday, July 24, 2013
 2             10:11 a.m.
 3
 4       THE VIDEOGRAPHER:  This marks the
 5  beginning of Disc No. 1, the videotaped deposition
 6  of Bradley D. Sharp being taken in the matter of
 7  Bradley D. Sharp versus Mousa Namvar, et al. being
 8  held in the United States District Court for the
 9  Central District of California.
10       The deposition is being held at 1900
11  Avenue of the Stars, Los Angeles, California on
12  July 24, 2013 at approximately 10:09 a.m.
13       My name is Chris Jordan with TSG
14  Reporting.  The court reporter is Christy Cannariato
15  with TSG Reporting.
16       Will counsel please state your name for
17  the record.
18       MR. DYE:  Paul Dye, Saltzburg, Ray &
19  Bergman, representing Defendants Hooshang Namvar,
20  Homayoun Namvar, Ramin Namvar, Helen Shadi, Hilda
21  Bayanfar, Lida Shraga, Nataly Namvar, and a host of
22  LLCs.
23       MR. RESSER:  Bernard Resser, Greenberg
24  Glusker Fields Claman & Machtinger, LLP, for
25  Defendants Mousa Namvar; Magdiel LLC; Namco 8, LLC;
```

2 (Pages 2 to 5)

Page 6

1  WishLab 90, LLC; Bunherst, LLC; DGADE of Delaware,
2  LLC.
3       MR. ZIEHL:  Dean Ziehl, Pachulski Stang
4  Ziehl & Jones, appearing on behalf of Mr. Sharp the
5  witness as a Chapter 11 Trustee.
6       THE VIDEOGRAPHER:  Will the court
7  reporter please swear in the witness.
8
9            BRADLEY D. SHARP,
10      having first been duly sworn, was
11      examined and testified as follows:
12
13            EXAMINATION
14 BY MR. DYE:
15      Q.   Good morning, Mr. Sharp.
16      A.   Good morning.
17      Q.   Is there any reason why you can't give
18 your best testimony today?
19      A.   No.
20      Q.   How many times have you been deposed in
21 the past?
22      A.   More than 20.
23      Q.   So you're familiar with the rules and
24 how the court reporting works?
25      A.   Yes.

Page 7

1       Q.   One thing I would like to just throw out
2  there, if I ask a question that is not clear to you,
3  will you let me know that?
4       A.   Yes.
5       Q.   Because I will try to -- I want to ask
6  clear questions and get clear answers.
7            Can you tell me your background starting
8  with when you graduated from college and where you
9  went to college?
10      A.   I graduated from college in 1985 with a
11 Bachelor of Science in Accounting, emphasis in
12 Business Computer Information Systems from Mesa
13 State College in Grand Junction, Colorado.
14      Q.   And what was your first employment
15 following that?
16      A.   I became a commercial loan training,
17 trainee with Security Pacific National Bank in
18 Los Angeles.
19      Q.   And when did that -- what were the years
20 of employment?
21      A.   I started July 1st, 1985, and was
22 employed with Security Pacific Bank up and through
23 and including its merger with Bank of America.  I
24 left Bank of America December 1st of 1993.
25      Q.   When you left Bank of America, what was

Page 8

1  your position?
2       A.   I was a Vice President in the Special
3  Assets Group.
4       Q.   What was the Special Assets Group?
5       A.   Special Assets Group was tasked with
6  collecting or managing the bank's risk to commercial
7  loans in the Los Angeles area.
8       Q.   Following your departure from Bank of
9  America, what was your next job?
10      A.   I started with Development Specialists,
11 Inc., my current employer.
12      Q.   And when did you start there?
13      A.   December 1st of 1993.
14      Q.   When you began at Development
15 Specialists, Inc. -- can I call that DSI?
16      A.   Yes.
17      Q.   When you started with DSI, what was your
18 position?
19      A.   Consultant.
20      Q.   And did that position ever change?
21      A.   Yes.
22      Q.   When?
23      A.   Oh, I don't recall.  It's been several
24 years.
25      Q.   Approximately.

Page 9

1       A.   Probably eight years.
2       Q.   Eight years after '93 or eight years
3  prior to today?
4       A.   Probably eight years from today.
5       Q.   Okay.  All right.  And what was your
6  next position after Consultant?
7       A.   I became Senior Vice President and
8  Manager of the Los Angeles office.
9       Q.   Did that position change?
10      A.   No.
11      Q.   What does DSI do?
12      A.   DSI is a firm of -- we do insolvency
13 consulting, turnaround management, third party
14 fiduciary financial -- corporate finance consulting,
15 as well as expert witness.
16      Q.   Have you ever been hired to give
17 testimony as an expert witness?
18      A.   Yes.
19      Q.   On how many occasions?
20      A.   Four, I believe.  Maybe five.
21      Q.   Have you actually given expert testimony
22 in any of those occasions --
23      A.   Yes.
24      Q.   -- those services?  On how many?
25      A.   Probably four or five.

3 (Pages 6 to 9)

**Page 46**

1    Q.    We're talking about the Sunset Springs
2  property.
3          MR. ZIEHL:  Okay.
4    Q.    Namco made a loan on that property;
5  correct?
6    A.    No.
7    Q.    What did Namco do?
8    A.    Namco advanced money to entities
9  involved with that property.  I took by your
10 question "on that property" means they received some
11 collateral position for that.
12   Q.    Okay.  So Namco advanced monies
13 expecting them to be repaid?
14   A.    I would presume so.  Yes.
15   Q.    So the Complaint in this action has been
16 marked as Exhibit 5, I believe; is that right?
17         MR. RESSER:  Yeah.  Let me double check.
18 Yes.
19         MR. DYE:  I can always rely on
20 Mr. Resser here to --
21         MR. RESSER:  I don't know about that,
22 but I did know that.  I wrote it down.
23   Q.    BY MR. DYE:  You've seen Exhibit 5, I
24 take it; correct?
25   A.    Yes.

**Page 47**

1    Q.    What role did you play in the
2  preparation of Exhibit 5, the Complaint?
3    A.    I reviewed it in draft, and I ultimately
4  approved it.
5    Q.    So this was drafted by the lawyers;
6  correct?
7    A.    Yes.
8    Q.    Under your supervision?
9    A.    Yes.
10   Q.    How much money would you estimate --
11 well, how much in fees would you estimate was
12 incurred in connection with the preparation of this
13 Complaint?
14   A.    I don't know.  That would be reflected
15 in our fee applications.
16   Q.    Okay.  There would be fees to the
17 lawyers for the preparation of the Complaint;
18 correct?
19   A.    Yes.
20   Q.    There would be fees to the accountants
21 in connection with the preparation of the Complaint;
22 correct?
23   A.    Yes.
24   Q.    That would be a lot of work that was
25 done to understand the Namco books and records and

**Page 48**

1  what they said about the various transactions that
2  are identified here; correct?
3    A.    Yes.
4    Q.    Also in going through the books and
5  records and determine where claims might be made
6  against various Namvar family members; correct?
7    A.    Among others, yes.
8    Q.    Okay.  There would also be fees by you
9  and Mr. Neilson in connection with overseeing that
10 whole process; correct?
11   A.    Well --
12         MR. ZIEHL:  Go ahead.
13   A.    Certainly from me.
14   Q.    Did Mr. Neilson play any role in the
15 Complaint, preparation of the Complaint?
16   A.    I don't believe so.
17   Q.    So if I were to go back and look through
18 the fee applications that were made, can -- would I
19 be able to tell what specific items related to the
20 analysis necessary to come up with these claims?
21         MR. ZIEHL:  Objection.  Calls for
22 speculation.
23         MR. DYE:  I'm not sure how he would know
24 what I would know.
25         MR. ZIEHL:  Yeah.

**Page 49**

1    Q.    Would you be able to do that?
2    A.    Probably not.
3    Q.    And why is that?
4    A.    To -- the tasks to understand these
5  transactions and to understand the books and records
6  of Namco related to more than just this Complaint.
7  It related to other causes of action, to analysis of
8  the property value.  So it's difficult to take the
9  work that was performed on a specific transaction
10 and say that was just related to this complaint.
11         It may have been related to a different
12 Complaint against someone else.  It may have related
13 to understanding the value, if any, of the property.
14   Q.    Would it be fair to say that millions of
15 dollars were spent in the analysis that was
16 necessary to arrive at this complaint?
17   A.    I don't know.
18   Q.    Take a look at paragraph 51 of the
19 Complaint.  This is talking about the L.A. Marriott.
20 The first sentence says, "Although Namco provided
21 the investment capital, beneficial ownership was
22 distributed among family members through a series of
23 uncapitalized family entities."
24         Do you see that?
25   A.    Yes.

13 (Pages 46 to 49)